## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| Dick Anthony Heller<br>263 Kentucky Avenue, SE<br>Washington, DC 20003-2317 | )<br>)<br>)<br>) |
| Andrew Hanson<br>76 Seaton Place NW<br>Washington, DC 20001 | )<br>)<br>)<br>) |
| Elby Godwin<br>19 8th Street SE<br>Washington, DC 20003 | )<br>)<br>)<br>) |
| Plaintiffs, | )<br>) |
| v. | ) Civil Action No. 21-2376<br>) |
| District Of Columbia<br>Serve: Mayor Muriel Bowser<br>1350 Pennsylvania Avenue, NW<br>Washington, DC 20004 | )<br>)<br>)<br>)<br>) |
| c/o Office of Attorney General<br>1 Judiciary Square<br>441 4th Street, N.W., 6th Fl. South<br>Washington, D.C. 20001 | )<br>)<br>)<br>)<br>) |
| and | )<br>) |
| Metropolitan Police Dept. Chief Robert Conti<br>300 Indiana Avenue, N.W.<br>Washington, DC 20004 | )<br>)<br>)<br>) |
| Defendants.<br>_____ | )<br>) |

## COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

COME NOW the Plaintiffs, Dick Anthony Heller, Andrew Hanson and Elby Godwin, by

and through their undersigned counsel, and complain of the Defendants as follows:

## I.    Introduction.

1.      After gaining home rule from the United States Congress in 1976, the District of Columbia's elected officials have adhered to a cynical policy of "self-government for me, but no self-defense for thee." Indeed, the District is notorious for its antipathy to the right to keep and bear arms guaranteed to the people of the United States by the Second Amendment to the Constitution. From the outset of home rule, the District enacted wide ranging restrictions on firearms. *See* D.C. Law 1-85, Firearms Control Regulations Act of 1975 (effective September 24, 1976). However, successive court decisions have steadily struck down District laws which infringe the right to keep and bear arms. Today, the District, unrepentant and reckless, continues to pass laws violating the Second Amendment. Often the District's actions rest on utterly false application of basic concepts in firearms technology and regulation well established under Federal law. If the situation continues, District law would deny the people the means to exercise their Second Amendment rights and unintentionally outlaw existing firearms lawfully in the hands of both the people and the police.

2.      For more than 30 years, the District had banned ordinary citizens from owning a handgun, the quintessential defensive arm, until the DC Circuit struck down that ban in March of 2007. *See Parker v. District of Columbia,* 478 F.3d 370 (D.C. Cir. 2007), *affirmed, District of Columbia v. Heller*, 554 U.S. 570 (2008).

*3.*      The District made most semi-automatic firearms illegal by erroneously classifying any semi-automatic firearm with a capacity of 12 or more rounds as a machine gun (i.e., fully automatic), *see* D.C. Law 1-85, § 101(10)(B)*,* in plain conflict with the commonly understood definition of a machine gun under federal law, which is "Any weapon which shoots, is designed to shoot, or can be readily restored to shoot, automatically more than one shot without manual

reloading, *by a single function of the trigger* (emphasis added)." See 26 U.S.C. § 5845(b); *Staples v. United States,* 511 U.S. 600 (1994). District law also rendered rifles and shotguns useless for self-defense by requiring such long guns to be unloaded and either disassembled or trigger-locked. Like the handgun prohibition, *Parker* and *Heller* invalidated the District's prohibition on bearing operable rifles or shotguns for immediate self-defense. *See Heller,* 540 U.S. at 630; *Parker,* 478 F.3d at 400-01.

4.      Despite the Supreme Court's *Heller* decision, the District continued to impose severe restrictions on the right to keep and bear arms. Unsurprisingly, the D.C. Circuit invalidated several of those restrictions in a second *Heller* case. *See Heller v. District of Columbia,* 801 F.3d 264, 277-280 (D.C. Circuit 2015). According to his dissent, then Judge Kavanaugh would have upended the vast bulk of the District's post *Heller* gun registration scheme. *See Heller v. District of Columbia,* 670 F.3d 1244, 1269-96 (D.C. Cir. 2011) (Kavanaugh, J., dissenting).

5.      In another example of cynicism, District law pre-*Heller* had a provision for the issuance of licenses to carry a handgun, notwithstanding the District's prohibition on owning a handgun in the first place, but it was a matter of judicial notice, that no one actually was ever issued a carry license in the District.[1]  *See Palmer v. District of Columbia,* 59 F.Supp.3d 173, 176 (D.D.C. 2014) ("Former D.C. Code § 22–4506 empowered the District of Columbia's police chief to issue licenses to carry handguns to individuals, including to individuals not residing in the District of Columbia. However, it was Defendant District of Columbia's policy for many years not to issue such licenses.")

---

[1] This resulted in the rather anomalous situation where persons were prosecuted for the felony offense of carrying a handgun without a license, having no prospect that they could ever be issued a licensed to carry.

6.      Post *Heller*, the District doubled down on its infringement of the Second Amendment. and "[o]n December 16, 2008, the District of Columbia's City Council and Mayor repealed the Police Chief's authority to issue handgun carry licenses," altogether, removing any authority for the average citizen to carry a firearm outside the home for personal protection. *Palmer v. District. of Columbia*, 59 F.Supp.3d at 176. This court in June of 2014 overturned the District's flat ban on citizen carry of handguns for self-defense. *Id.* at 173. In response, the District enacted a scheme to issue gun carry licenses that was so restrictive, only some 125 such licenses were issued according to a published report. *See* Portnoy, Jenna, *GOP congressman wants his colleagues to be able to carry guns everywhere, including in D.C.*, The Washington Post (June 19, 2017), available at https://www.washingtonpost.com/local/dc-politics/gop-congressman-wants-members-of-congress-to-be-able-to-carry-guns-everywhere-including-dc/2017/06/19/881d3dfc-5523-11e7-a204-ad706461fa4f_story.html. The D.C. Circuit found that scheme in violation of the Second Amendment. *See Wrenn v. District of Columbia,* 864 F.3d 650 (D.C. Cir. 2017).

7.      D.C.'s antipathy to the Second Amendment has also been applied to non-lethal arms. In another example of blatantly erroneous classification of arms, D.C. classified TASERS and stun guns in the same category as bombs, i.e., destructive devices, and prohibited their possession, relenting only after D.C. residents sued to protect their Second Amendment rights to use these non-lethal arms for self-defense. *See Wright v. District of Columbia,* Case No. 1:2016 cv 01556 (D.D.C.) (District repeals the ban on electronic arms following the entry of a stipulated preliminary injunction). Subsequently, the District also repealed the requirement that possessors of pepper spray register such devices with the Metropolitan Police Department ("MPD"), a requirement the then acting police chief stated had served no purpose. *See* D.C. B21-0886, Stun Gun Regulation Amendment Act of 2016 & Public Hearing Record (October 17, 2016), available

at                                    https://lims.dccouncil.us/downloads/LIMS/36420/Hearing_Record/B21-0886-HearingRecord1.pdf.

8.      One might think that after repeated losses in the courts, the District would show a modicum of respect for the Second Amendment. Alas, it does not appear to have happened. Examples abound of continuing facially unconstitutional limitations on the Second Amendment right of District residents. The District for example, so restricts the location of firearm dealers that no stocking gun retailer exists in the City. *See Ezell v. City of Chicago*, 846 F.3d 888 (7th Cir. 2017) (invalidating zoning ordinance which unnecessarily restricted the location of firing ranges). *See also, Ezell v. Chicago,* 651 F.3d 684 (7th Cir. 2011) (invalidating Chicago's ban on firing ranges).

9.      The District has clearly not learned from its numerous defeats of in the courts, and this case arises from that predicament. The District's antipathy toward firearms, a Constitutional protected item, extends so far as to flatly prohibit the manufacture of a firearm in the District; not a particularly dangerous and unusual firearm, *see, e.g., Heller,* 554 U.S. at 571 (discussing that laws forbidding the carrying of dangerous and unusual weapons were presumptively valid), but any firearm. *See* D.C. Code § 7-2504.01(a).

10.     Imagine were the District to ban the act of publishing one's own words. Would this court not see such a law as utterly invalid under any standard of review? Can there be any justification for an outright prohibition on the manufacture of a firearm, a Constitutionally protected item? Indeed, how can there be a right to keep and bear arms, if there's no right to make an arm in the first place? This case presents that issue for this court's consideration.

11.     The District, knowing full well where the battle lines lay, recently supplemented its ban on making a gun, by prohibiting even the import and possession of parts necessary for the

manufacture of a firearm by outlawing what it pejoratively calls "Ghost Guns." Never missing an opportunity for erroneously defining firearms terminology, the District legislation in question is so poorly thought out and written that the City Council has managed to criminalize the possession of a vast array of popular, common handguns that it regularly allows residents to register, including the very handgun it issues to its police officers. Accordingly, this so-called "Ghost Gun" prohibition is hopelessly flawed and must be found invalid under the Second and Fifth Amendments.

## II.    The Parties.

12.    Plaintiff Dick Anthony Heller is well known to this court. He is a natural person and a citizen of the United States and of the District of Columbia. He is a special police officer the District has commissioned to provide security services and to carry a firearm on the job. He holds registration certificates for a number of firearms he personally owns. He holds a Concealed Pistol Carry License ("CPL") issued by the Chief of the Metropolitan Police Department ("MPD") as well as a Concealed Firearm Permit issued by the Utah Department of Public Safety. He regularly carries a concealed firearm for personal protection within the District of Columbia. In addition, Mr. Heller is an NRA certified handgun instructor. He is also a Second Amendment activist and was a plaintiff in each of the aforementioned *Heller* cases successfully challenging the District's firearm infringements.

13.    Mr. Heller has desired for some time to build his own firearm. After much research, on February 18, 2021, Mr. Heller contacted Adjunct Professor Stephen Bozich, owner of Bare Arms, LLC, located in Robbins, North Carolina. Bare Arms offers several complete kits to build handguns: specifically, the metal frame 1911 Government model pistol chambered in .45 caliber, and the polymer framed Glock 17, 19 and 26 model pistols, chambered in 9 mm parabellum. Each

of the kits comes with an unfinished receiver and appropriate jigs and tools to aid in the machining of the unfinished receiver into what federal law and the Bureau of Alcohol, Tobacco and Firearms classifies as a firearm. *See* https://www.barearms.com/. Mr. Heller subsequently purchased a kit to make a Glock style 9 mm handgun from Bare Arms, LLC, complete with an unfinished polymer receiver.

14.     Desiring to ensure compliance with the District of Columbia's requirement to register all firearms, Mr. Heller directed Bare Arms to ship the kit to one of the District's Federal Firearm Licensees ("FFL"), DC Security Associates ("DCSA") located at 1413 K Street, 10th Floor, Washington, DC 20005-4577. Mr. Heller intended the kit to be registered and transferred to him pursuant to District procedures for the registration of firearms.

15.     The aforementioned kit was shipped on or about April 8, 2021 and received by DCSA on or about April 9, 2021. On or about April 9, 2021, DCSA received direction from MPD that it was not to try to register the kit, was not to possess the kit in inventory and was to return the kit to the vendor. DCSA subsequently returned the kit to Bare Arms.

16.     On information and belief, MPD's direction was pursuant to the District's so-called "Ghost Gun" prohibition and its separate statute that prohibits the manufacture of firearms in the District. The District's so-called "Ghost Gun" prohibition and its specific statute against manufacture of a firearm thus prevents Mr. Heller from making a firearm which is otherwise lawful to register. He invokes this court's jurisdiction to remedy this violation of his Second Amendment rights.

17.     Plaintiff Andrew Hanson is a natural person and a citizen of the United States and of the District of Columbia. He holds a CPL from the District of Columbia and a Concealed Firearm Permit issued by the Utah Department of Public Safety. He regularly carries a concealed

firearm for personal protection within the District of Columbia. He holds a registration certificate for several polymer framed handguns, including a Glock 43 9 mm pistol, none of which he manufactured himself. As we discuss below, because the District has apparently unwittingly made Mr. Hanson's existing polymer frame handguns illegal, Mr. Hanson fears the District may seek to revoke the registration certificates for these firearms or even prosecute him under the District's so-called "Ghost Gun" prohibition. He seeks this court's jurisdiction to enjoin the enforcement of this legislation against him with respect to his registered polymer framed handguns.

18.     Plaintiff Elby Godwin is a natural person and a citizen of the United States and of the District of Columbia. He holds a CPL from the District of Columbia, a Wear and Carry Permit issued by the Maryland State Police and a Virginia Concealed Handgun Permit issued by the Virginia State Police. He regularly carries a concealed firearm for personal protection within the District of Columbia and other jurisdictions. He holds registration certificates for several polymer framed handguns, including an FN 509 pistol. As we discuss below, because the District has apparently unwittingly made Mr. Godwin's polymer frame handguns illegal, Mr. Godwin fears the District may seek to revoke his handgun registration certificates or even prosecute him under the District's so-called "Ghost Gun" prohibition. He seeks this court's jurisdiction to enjoin the enforcement of this legislation against him with respect to his registered polymer framed handguns.

19.     Defendant District of Columbia is a municipal entity organized under the Constitution and laws of the United States. It is the seat of government of the United States. Article I, Section 8 of the Constitution gives Congress plenary authority to make laws governing the seat of government of the United States.  Congress has chosen to delegate the majority of its power to

make laws for the governing of the District of Columbia to the mayor and city council of the District.

20.     Defendant Robert Contee is the Chief of the MPD. Chief Contee is responsible for executing and administering the District of Columbia's laws, customs, practices, and policies at issue in this lawsuit and is in fact presently enforcing the challenged laws, customs and practices in the District of Columbia. Defendant Contee is sued in both his individual and official capacities.

## III.     Jurisdiction And Venue.

21.     This court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §§ 1331, 1343, 2201, 2202 and 42 U.S.C. § 1983 and § 1988. Venue lies in this court pursuant to 28 U.S.C. § 1391.

## IV.     Statement Of Facts.

### A.     The Second Amendment.

22.     The Second Amendment to the United States Constitution provides: "A well regulated Militia being necessary to the security of a free State, the right of the people to keep and bear Arms shall not be infringed." The Second Amendment guarantees individuals the fundamental right to keep and carry arms for self-defense and defense of others in the event of a violent confrontation. *Heller*, 554 U.S. 570; *McDonald v. Chicago*, 561 U.S. 742 (2010); *Caetano v. Massachusetts,* 577 U.S. __, 136 S.Ct. 1027 (2016); *Wrenn v. District of Columbia,* 864 F.3d 650; *Palmer v. District of Columbia,* 59 F.Supp.3d 173.

23.     Arms are "'weapons of offence, or armour of defence.' 1 Dictionary of the English Language 107 (4th ed.). They are anything that a man [or woman] wears for his defense, or takes into his hands, or uses in wrath to cast at or strike another.' 1 A New and Complete Law Dictionary (1771)." *Heller*, 554 U.S. at 581.  The Second Amendment extends, prima facie, to all instruments

that constitute bearable arms, even those that were not in existence at the time of the founding. *Heller,* 554 U.S. at 582; *Caetano,* 577 U.S. at __, 136 S.Ct.1027.

24.     Under the Second Amendment, the District of Columbia retains the ability presumptively to regulate the manner of keeping and carrying arms, including handguns, and may prohibit certain arms in narrowly defined sensitive places, prohibit the carrying of arms that are not within the scope of Second Amendment's protection such as unusually dangerous arms, disqualify specific, particularly dangerous individuals from possessing or carrying arms, and regulate the commercial sale of arms. *See Heller,* 554 U.S. at 627; *Wrenn,* 864 F.3d at 662-63 & n. 5. However, "[o]nce it is determined – as we have done – that handguns are 'Arms' referred to in the Second Amendment, it is not open to the District to ban them." *Parker v. District of Columbia,* 478 F.3d at 400.

25.     It follows rationally from the guarantee of the Second Amendment that activities necessary for the exercise of the right to keep and bear arms themselves are protected by the amendment. *See Ezell v. City of Chicago*, 651 F.3d 684 (city could not ban firing ranges in the city while making range training a prerequisite of lawful firearms ownership). Thus, for example, the government cannot ban the manufacture of firearms, or the possession of materials from which firearms can be made, as the District has here done, as this would serve to limit the people from acquiring firearms, and over time result in a shortages of firearms as they wear out or break. Existing regulations acknowledge this obvious logic as we shall see in the following discussion of District law. Although the manufacture of ammunition is prohibited, a person may manufacture ammunition for that person's own registered firearm.

**B.      District law.**

26.      District law flatly bans the manufacture of firearms in the city. DC Code § 7-2504.01 provides as follows:

**§ 7–2504.01. Manufacture of firearms, destructive devices or ammunition prohibited; requirement for dealer's license.**

(a)   No person or organization shall manufacture any firearm, destructive device or parts thereof, or ammunition, within the District; provided, that persons holding registration certificates may engage in hand loading, reloading, or custom loading ammunition for his registered firearms; provided further, that such person may not hand load, reload, or custom load ammunition for others.

27.      District law further outlaws what it pejoratively calls "Ghost Guns" for the average citizen. D.C. Code § 22.4514, in pertinent part, provides as follows:

**§ 22–4514. Possession of certain dangerous weapons prohibited; exceptions.**

(a)   No person shall within the District of Columbia possess any … ghost gun …; provided, however, that … ghost gun, … may be possessed by the members of the Army, Navy, Air Force, or Marine Corps of the United States, the National Guard, or Organized Reserves when on duty, the Post Office Department or its employees when on duty, marshals, sheriffs, prison or jail wardens, or their deputies, policemen, or other duly-appointed law enforcement officers, including any designated civilian employee of the Metropolitan Police Department, or officers or employees of the United States duly authorized to carry such weapons, banking institutions, public carriers who are engaged in the business of transporting mail, money, securities, or other valuables, wholesale dealers and retail dealers licensed under § 22-4510.

28.      A "Ghost Gun" is defined in D.C. Code § 7-2501.01 as follows:

**§ 7–2501.01. Definitions.**

As used in this unit the term:

(9B) "Ghost gun":

(A) Means:

(i) A firearm that, after the removal of all parts other than a receiver, is not as detectable as the Security Exemplar, by walk-through metal detectors calibrated and operated to detect the Security Exemplar; or

(ii) Any major component of a firearm which, when subjected to inspection by the types of detection devices commonly used at secure public buildings and transit stations, does not generate an image that accurately depicts the shape of the component; and

(B) Includes an unfinished frame or receiver.

29.     D.C. Code § 7-2501.01 defines a receiver as:

(12B) "Receiver" means the part of a firearm that provides the action or housing for the hammer, bolt, or breechblock and firing mechanism.

30.     D.C. Code § 7-2501.01, in turn, defines an unfinished receiver as:

(17B)(A) "Unfinished frame or receiver":

(i) Means a frame or receiver of a firearm that is not yet a component part of a firearm, but which may without the expenditure of substantial time and effort be readily made into an operable frame or receiver through milling, drilling, or other means; and

(ii) Includes any manufactured object, any incompletely manufactured component part of a firearm, or any combination thereof that is not a functional frame or receiver but is designed, manufactured, assembled, marketed, or intended to be used for that purpose, and can be readily made into a functional frame or receiver.

(B) For the purposes of this paragraph, the term:

(i) "Manufacture" means to fabricate, make, form, produce or construct, by manual labor or by machinery; and

(ii) "Assemble" means to fit together component parts.

31.     D.C. Code 7-2501.01 defines the security exemplar as:

(15A) "Security Exemplar" means an object, to be fabricated at the direction of the Mayor, that is:

(A) Constructed of 3.7 ounces of material type 17-4 PH stainless steel in a shape resembling a handgun; and

(B) Suitable for testing and calibrating metal detectors.

32.     D.C. Code § 7-2502.02, in pertinent part, in turn prohibits the registration of what DC defines as a "Ghost Gun."[2]

33.     In sum, the District makes it a criminal offense to make a firearm in the District, and makes it a criminal offense to possess components to make a firearm frame or receiver. In addition, the District makes it a criminal offense to possess a firearm the bare frame or receiver of which is less detectible than 3.7 ounces of ferrous metal. As discussed herein, these provisions raise grave Constitutional issues under the Second Amendment and the due process clause of the Fifth Amendment.

**C.     Self-made firearms.**

34.     The ability to self-manufacture arms has always been part of the Second Amendment right, as well as American history and tradition. Although federal law now requires a license to engage in the *business* of manufacture of firearms, federal law has never prohibited a person from making his or her own firearm. The vast majority of states place few or no restrictions on self-made firearms.

35.     The colonists in the first permanent English settlements had the express right to import arms and the items necessary to make them. Binding his "Heirs and Successor," King James I in 1606 granted the "Southern Colony" (Virginia) the right to import from Great Britain "the Goods, Chattels, Amour, Munition, and Furniture, needful to be used by them, for their said Apparel, Food, Defence or otherwise." 7 Federal and State Constitutions: Colonial Charters, and Other Organic Laws of the States, Territories, and Colonies Now or Heretofore Forming the United States of America, 3787-88 (Francis Thorpe ed. 1909) (hereinafter "Federal and State

_____

[2] D.C. Code § 7-2502.02(a): "A registration certificate shall not be issued for a: … (8) Ghost gun."

Constitutions"). Similarly, the 1620 Charter of New England granted the colonists the right "to take, load, carry and transport in . . . Shipping, Armour, Weapons, Ordinances, Munitions, Powder, Shott, Victuals, and all Manner of Clothing, Implements, Furniture, Beasts, Cattle, Horses, Mares, and all other Things necessary for the said Plantation, and their Use and Defense, and for Trade with the People there." 3 Federal and State Constitutions, 1834-35. And "[f]rom the earliest periods American gunsmiths had made and repaired military firearms." Peterson, Harold L., *Arms and Armor in Colonial America* 178 (1956).

36.    "The influence of the gunsmith and the production of firearms on nearly every aspect of colonial endeavor in North America cannot be overstated, and that pervasive influence continuously escalated following the colonial era." Brown, M.L., *Firearms in Colonial America: The Impact on History and Technology* 1492-1792 at 149 (1980).

37.    As historian Charles Winthrop Sawyer explained, "in the smaller shops which formed the great majority – mere cabins on the outskirts of the wilderness – one man with or without an apprentice did every part of the work." 1 Sawyer, Charles Winthrop, *Firearms in American History* 145 (1910). Moreover, many gunsmiths worked primarily in other trades and built or repaired firearms as a hobby. *See* Whisker, James, *The Gunsmith's Trade*, 145-63 (1992).

38.    During the Revolutionary War, many colonies relied on and incentivized people outside of the firearms industry to produce firearms. For example, on August 2, 1775, a committee appointed by Maryland's Provincial Convention "to enquire into the practicality of establishing a manufactory of Arms within this Province" determined that "Arms may be furnished sooner, and at less expense by engaging immediately all Gun Smiths, and others concerned in carrying on that business." *Journal of the Maryland Convention July 26 – August 14, 1775*, at 64-65 (William Hand Browne ed. 1892).

39.     In January 1776, the New Hampshire House of Representatives passed a resolution to pay each person who "made" a firearm to certain specifications. "[E]very good firearm Manufactured In this Colony" was rewarded with "three pounds for each." 8 *Documents and Records Relating to the State of New-Hampshire During the Period of the American Revolution, From 1776 to 1783*, at 15-16 (Nathaniel Bouton ed. 1874).

40.     In March of 1776, a committee of New York's Provincial Congress published notice "in all the publick Newspapers in this Colony" that "this Committee are ready to receive proposals from & treat with any Person or Persons who are willing to engage in manufacturing good Muskets, or the Locks, Barrels, or any necessary parts thereof." 5 *American Archives, Fourth Series,* 1418 (Peter Force ed. 1844). The Provincial Congress offered rewards for the manufacturers who could produce the largest number of arms for the colony, but excluded "any person with whom the Congress or Committee of Safety have already contracted" – thus incentivizing those capable of manufacturing arms but not necessarily in the firearms business.

41.     A month later, the North Carolina Provincial Congress call for "all Gunsmiths, and other mechanicks, who have been accustomed to make, or assist in making Muskets" to be recruited to manufacture arms for the colony. 5 *American Archives, Fourth Series,* 1338. And further, "that they be furnished, at the expense of this Colony, with tools, implements and utensils, and materials for carrying on the said work." *Id.*

42.     Certainly, James Madison, who drafted what would become the Second Amendment, and the ratifiers of the Second Amendment contemplated that the young country owed its independence to and depended on the manufacture of firearms, including by those outside the firearms industry, for its continued survival, and intended to protect that activity through the guarantee that the "right of the people to keep and bear arms *shall not be infringed." Cf.* Madison,

James (Publius), Federalist 46 (discussing the advantage for securing liberty possessed by the armed American population compared to the citizens of the European nations). Indeed, building firearms was entirely unregulated during the colonial and founding eras in America. And there were no restrictions on who could be a gunsmith or make guns.

43.     "Our citizens have always been free to make, vend, and export arms.  It is the constant occupation and livelihood of some of them." Secretary of State Thomas Jefferson, letter to George Hammond, British Ambassador to the U.S., May 15, 1793, in 7 *The writings of Thomas Jefferson* 325 (Paul Ford ed. 1904).

44.     Thus, American history shows that the right to keep and bear arms was always understood to include the right to manufacture one's own firearms for self-defense and other lawful purposes. And rightly so as the Second Amendment, through its text as informed by history and tradition, is intended to guarantee this right as part of the fundamental liberty it secures. *See Heller,* 554 U.S. at 598 ("when the able-bodied men of a nation are trained in arms and organized, they are better able to resist tyranny.").

####     D.     Polymer frame pistols.

45.     Traditionally, handguns (as well as other firearms) were made almost entirely of metal, except for the grips or stocks. For hundreds of years, manufacturers constructed handgun frames from steel or other metallic alloys due to their availability and durability. Although these materials were durable, they were heavy, and weighed shooters down. In the 1950s, aluminum started replacing steel frames in some designs. Aluminum is much lighter than steel and almost as durable. For more than twenty years, aluminum was the go-to lightweight metal for handgun frame manufacturing.

46.     In 1970, German firearms maker Heckler and Koch ("H&K") introduced the VP70 polymer-framed handgun. Although the VP70 was ahead of its time, the semi-automatic pistol version suffered from a very heavy trigger pull, making it hard to shoot, and it fell out of favor. Polymer frame pistols would not gain popularity for more than ten years.

47.     Pistols from an Austrian company named Glock were introduced in the early 1980s. Glock's 9 mm G-17 combined an extremely rugged yet lightweight polymer frame and a better trigger than the H&K VP70 pistol. As the first commercially successful polymer-framed pistol, the Glock 17 set the stage for polymer frame handguns moving forward.

48.     As discussed above, metal frame handguns tend to be heavy. An advantage of a heavy handgun it that the weight counters the felt recoil and makes a pistol more comfortable to shoot. However, the weight that makes metal-framed pistols advantageous for shooting is a hindrance when it comes to carrying the firearm. If a handgun is strictly for target practice on the range, weight is not a substantial issue. However, the weight of a metal frame gun can make carrying the firearm awkward and uncomfortable. The takeaway is that heavier pistols are more comfortable to shoot than to carry.

49.     The light weight of polymer-framed pistols makes them more comfortable to carry than metal-frame pistols, all other things being equal. This has made polymer framed pistols the preferred handgun type for law enforcement and for civilians who carry a handgun for personal protection.

50.     Following the disastrous 1986 FBI Miami shootout, where two agents were killed and five others seriously wounded,[3] the FBI switched from 38 special revolvers to semi-automatic

---

[3] *See* Edmundo & Elizabeth Mireles, FBI Miami Firefight: Five Minutes that Changed the Bureau (2017); FBI, *A Bite Out of History: Fatal Firefight in Miami* (April 11, 2011), available at https://www.fbi.gov/news/stories/fatal-firefight-in-miami; Massad Ayoob, *The FBI Dadeland*

pistols and eventually settled on the Glock polymer frame pistol.[4] Police departments around the nation soon followed. Most police departments around the country now issue polymer framed semi-automatic pistols to their officers. *See, e.g.,* https://www.tactical-life.com/firearms/handguns/largest-departments-police-sidearms/;

https://www.policeforum.org/assets/docs/Free_Online_Documents/Gun_Violence_Reduction/police%20department%20service%20weapon%20suvey%202013.pdf. Indeed, the District's MPD issues the polymer frame Glock 17 or Glock 19 pistol to the vast majority of its officers. The gun's light weight, capacity and reliability enhance its utility as a law enforcement personal protection firearm.

51.     For similar reasons, polymer frame pistols are very popular with civilians. An article charting the top 10 pistols sold in the year 2020 on the web site guns.com revealed that all 10 models were polymer frame pistols. *See https://www.guns.com/news/2020/12/29/top-selling-pistols-on-gunscom-in-2020.*[5]

**E.     Undetectable firearms.**

52.     An undetectable firearm is one that cannot be detected by typical airport screening devices. Congress addressed the matter of undetectable firearms in the 1980's. At that time, the

---

*Shootout: Hero Agent Ed Mireles Speaks,* American Handgunner (2018), available at https://americanhandgunner.com/our-experts/the-fbi-dadeland-shootout-hero-agent-ed-mireles-speaks/.

[4]  *See* Slowik, Mark, *FBI Awards Glock with $85 Million Contract for 9 mm Pistols,* Guns America Digest (June 30, 2016), available at https://www.gunsamerica.com/digest/fbi-awards-glock-with-85-million-contract-for-9mm-pistols/.

[5] In order of sales (most to least), the guns were: Glock 19, Glock 17, Sig P365, Glock 43X, Sig P320, Smith & Wesson ("S&W") M&P Shield, S&W M&P 9, Glock 44, Ruger 57 and Taurus G2C. All are polymer frame pistols.

Glock 17 handgun had started to be imported into the United States for sale. It would later be manufactured in Smyrna, Georgia. A mistaken concern arose, powered by gun control advocates, a Washington Post column by Jack Anderson, and repeated in the Bruce Willis movie, *Die Hard II*, that the Glock 17 was not detectible by airport metal detectors because the frame of the firearm is constructed of lightweight polymer.[6] In fact, erroneous reports arose that the firearm was constructed of virtually no metal whatsoever. However, the Glock and various other popular polymer framed guns, like the FN 509, H&K VP 9, the Ruger 57, Sig Sauer 320 and 365, the S&W M&P 9 and M&P Shield are not plastic guns. Their barrels and slide mechanisms are composed almost entirely of metal. They are readily detectible as firearms when passing through an X-ray machine or an airport style metal detector. *See* Koppel, *The 1986 Plastic Gun Panic*, *supra*, available at https://reason.com/volokh/2018/08/07/the-1986-plastic-gun-panic/.

     53.     To deal with the potential issue of undetectable firearms, however, Congress enacted 18 U.S.C. § 922(p), which in pertinent part provides:

> (1)  It shall be unlawful for any person to manufacture, import, sell, ship, deliver, possess, transfer, or receive any firearm—
>
> (A)  that, after removal of grips, stocks, and magazines, is not as detectable as the Security Exemplar, by walk-through metal detectors calibrated and operated to detect the Security Exemplar; or
>
> (B)  any major component of which, when subjected to inspection by the types of x-ray machines commonly used at airports, does not generate an image that

---

[6] *See* Kopel, David, *The 1986 Plastic Gun Panic,* Reason Magazine (August 7, 2018), available at https://reason.com/volokh/2018/08/07/the-1986-plastic-gun-panic/. In *Die Hard II*, McClane (Bruce Willis) identifies the Glock 17 handgun depicted in the movie to Chief Lorenzo (Dennis Franz) as a "Glock 7," (no such model exists) and recites a string of inaccuracies, describing it as "a porcelain gun made in Germany that doesn't show up on your airport metal detectors and costs more than you make in a month." That scene can be viewed at https://video.search.yahoo.com/search/video?fr=mcafee&ei=UTF-8&p=Die+Hard+II+glock&type=E211US105G0#id=3&vid=8aa6f8d471f33ea0ec2ea07d3ac285c2&action=click.

accurately depicts the shape of the component. Barium sulfate or other compounds may be used in the fabrication of the component.

(2) For purposes of this subsection—

(A) the term "firearm" does not include the frame or receiver of any such weapon;

(B) the term "major component" means, with respect to a firearm, the barrel, the slide or cylinder, or the frame or receiver of the firearm; and

(C) the term "Security Exemplar" means an object, to be fabricated at the direction of the Attorney General, that is—

(i) constructed of, during the 12-month period beginning on the date of the enactment of this subsection, 3.7 ounces of material type 17–4 PH stainless steel in a shape resembling a handgun; and

(ii) suitable for testing and calibrating metal detectors ….

54.    Federal law is significantly more narrowly tailored to address the issue of undetectable firearms than the D.C. legislation at issue here. Rather than removing all parts other than the receiver, which by itself cannot fire a projectile, federal law asks whether the functioning gun (after removing the grip, stocks and magazine – which generally have no role in determining whether the firearm can fire) can be detected when passing through a metal detector, or whether the various components including the frame when passing through an X-ray machine generate an image that accurately depicts their actual shape.

55.    All polymer pistols legally sold or imported in the United States comply with this federal statute. Such guns contain more than the equivalent of 3.7 ounces of metal in their slides and barrels, and the frames of these guns are accurately depicted when passing through an X-ray machine. Thus, the federal statute prevents someone from passing a functioning gun through an airport type metal detector or even a stripped down frame through an X-ray machine.

56.    By contrast, the District's definition of "Ghost Gun" requires that a pistol's frame alone, exclusive of the slide and barrel, contain the equivalent of 3.7 ounces of metal. Because of

that requirement, District law outlaws all models of the Glock handgun as well as most polymer framed pistols sold or possessed in the United States. (We say most, because the polymer frame of the S&W M&P series is constructed over a metal chassis that may or may not contain sufficient metal to comply with the D.C. statute.

57.     There are millions of polymer frame firearms in circulation in the United States and upon information and belief, many thousands of such firearms registered with MPD. They are among the more popular handguns in the country. All of these aforementioned guns are readily detectible by airport style metal detectors and X-ray machines; yet with the possible exception of the S&W M&P series, each is prohibited based on the literal wording of D.C.'s definition of "Ghost Gun."

58.     As has been shown earlier by the confusion between semi-automatic and full-automatic firearms, it may very well be the case that the District City Council and the District Government are so lacking in knowledge of firearms technology that they simply do not know what they have done. In any event, plainly grave constitutional issues are presented with the District's definition of the pejorative term "Ghost Gun."

*Count I, 42 U.S.C. § 1983, Second Amendment (as to Mr. Heller): D.C.'s prohibition on manufacture of firearms violates Mr. Heller's Constitutional right to build, possess and register a serialized firearm. It is facially unconstitutional and unconstitutional as applied to Mr. Heller.*

59.     D.C. law violates Mr. Heller's Second Amendment right to make and possess a registered, serialized firearm. D.C. Code § 7-2504.01 bans the manufacture of a Constitutionally protected item. This prohibition on manufacture is facially invalid under any standard of Constitutional review applied to enumerated Constitutional rights. *See Heller,* 554 U.S. at 628-29. A prohibition on manufacturing a Constitutionally protected item necessarily infringes on the right of the people of the District to keep and bear arms. If an item cannot be produced, the people

cannot acquire it, keep it, or bear it. We know of no other jurisdiction in the United States that has purported to ban the manufacture of firearms. Perhaps the District can point one out. Even if the District could do so, just as the District's ban on handguns in *Heller* (*see Id.* at 629) was an outlier, so is its prohibition on manufacturing firearms.

60.    D.C. may say that firearms can be made in other jurisdictions and that the people of the District are not prohibited from acquiring firearms produced in other jurisdictions. That argument fails, because if D.C. can ban the manufacture of firearms consistent with the Second Amendment, then all other jurisdictions could ban their manufacture as well. This would render the Second Amendment right to keep and bear arms a nullity. The 7th Circuit rejected a similar argument in the *Ezell* case, which invalidated Chicago's ban on shooting ranges. *See Ezell v. Chicago,* 651 F.3d 684. Moreover, any suggestion that banning only a subset of firearms is no burden because there are other classes of firearms available is foreclosed by *Heller*, 554 U.S. at 629; *see also Parker v. District of Columbia*, 478 F.3d 370, 400 (D.C. Cir. 2007) *aff'd sub nom. Heller*, 554 U.S. 570 ("frivolous" to suggest that banning one type of firearm while allowing others "does not implicate the Second Amendment . . . It could be similarly contended that all firearms may be banned so long as sabers were permitted.").

61.    Consider the analogous case of abortion. Say the District decided to ban abortions conducted in D.C. on the theory that a woman desiring an abortion could simply obtain an abortion in another jurisdiction. The court would make short work of such a ban as it should this particular ban on manufacturing firearms. Likewise, consider a law that banned the publishing of books in the District on the theory that books produced in other jurisdictions could be sold in the District. To even state such an example illustrates its absurdity.

22

62.     The District may say that it has a legitimate interest in *regulating* the manufacture of firearms under its general police power. That may well be true. But the instant prohibition on the manufacture of any and all firearms in the District is not a narrowly tailored regulation addressed to a specific compelling or even substantial public interest concern, it is a grossly overbroad remnant of unconstitutional animus toward the fundamental Constitutional right to keep and bear arms. It is not regulation, it is prohibition. And if *Heller* means anything, it is that the District simply cannot prohibit the manufacture of a Constitutionally protected item.

63.     D.C. may very well be entitled to enact legislation regulating the making of firearms, but it may not, consistent with the Constitution, flatly prohibit their manufacture. In this case, the District laws in question have prevented Mr. Heller from acquiring and possessing in the District the precursor parts necessary for him to construct a firearm; moreover, even if he could legally construct the firearm in the District – which District law prohibits – he is forbidden to possess the constructed firearm and may not register it to comply with District law. The District has thus violated his Second Amendment right to make a firearm and to possess the firearm once made. Accordingly, Mr. Heller prays this court to enjoin the enforcement of D.C.'s ban on manufacture of firearms; to declare the prohibition void as repugnant to the Constitution; and to award Mr. Heller suitable damages, attorneys' fees and costs.

***Count II: 42 U.S.C. § 1983, Second Amendment (All Plaintiffs). D.C.'s definition of a so-called "Ghost Gun" violates the Second Amendment in that it outlaws commonly owned polymer frame firearms.***

64.     Like its statute that outright bans the manufacture of firearms, D.C.'s prohibition on so-called "Ghost Guns" violates the Second Amendment because the definition of "Ghost Guns" outlaws commonly owned polymer frame pistols that are not "dangerous and unusual."

65.     We start with what is at least a legitimate governmental concern. The provisions which constitute the District's "Ghost Gun" prohibition are directed toward untraceable firearms – guns lacking a serial number – that could end up in the hands of persons disqualified from possessing firearms, for one reason or another, such as felons, domestic abusers, or those suffering from a mental illness. *See Mayor Bowser Announces Emergency Ghost Gun Legislation* (February 18, 2020), available at https://dc.gov/release/mayor-bowser-announces-emergency-ghost-gun-legislation. Given this admittedly legitimate governmental interest, it is astounding that the D.C. Ghost Gun legislation doesn't say a word about requiring serial numbers. Nonetheless, we do not contest that the intent of the legislation may be to address a legitimate governmental concern. It just does not do it very well at all.

66.     Additionally, the District is apparently concerned with 3-D printed firearms that are supposedly not detectible when passed through an X-ray machine or a metal detector like those used at airports and government buildings. *See Id.* Again, this is a legitimate concern. We do not contest that the District can address such concerns. The problem is that the District has legislated by blindingly wielding a meat axe when the Constitution requires it to carve carefully with a scalpel so as not to intrude upon Constitutionally protected freedom. And in acting here, D.C.'s legislation is so overbroad that it outlaws the very handgun it issues to its police force as well as a multitude of other commonly owned handguns that it regularly registers to D.C. residents.

67.     D.C.'s overbroad "Ghost Gun" legislation outlaws firearms constructed with non-metallic polymer receivers, such as the registered firearms owned and possessed by plaintiffs Hanson and Godwin, and that would be possessed by plaintiff Mr. Heller once he constructs the polymer frame firearm from the kit D.C. prohibits him from possessing. This is apparent in analyzing how the District defines a "Ghost Gun." The very first definition of "Ghost Gun" is:

> A firearm that, after the removal of all parts other than a receiver, is not as detectable as the Security Exemplar, by walk-through metal detectors calibrated and operated to detect the Security Exemplar;

D.C. Code 7-2501.01(9B)(a)(i). Removing all the parts of a polymer frame firearm except the receiver leaves one with the bare polymer frame. The polymer frame, being made of polymer, plainly lacks 3.7 ounces of metal. Thus, this definition outlaws most of if not the entire class of polymer frame pistols, a class of firearms immensely popular with law enforcement and citizens alike.

68.     Polymer frame pistols have been around for some 40 years. There is no record of persons being able to smuggle polymer frame guns through metal detectors. Although the frames (or receivers) are made of polymer, the barrels and slide assemblies contain sufficient metal to be detected by standard metal detectors.[7]

69.     Congress specifically addressed the concern of undetectable firearms in the 1980s with a focused, narrowly drawn statute that fully covered the issue. *See* 18 U.S.C. § 922(p). Nothing in the legislative history of the legislation here at issue indicates that D.C. has suffered a security breach from someone passing a stripped down, undetectable polymer frame firearm through a metal detector. Rather the legislative history indicates the concern was that unserialized firearms had been recovered from crime scenes, and an additional concern with respect to the potential of 3-D printed firearms made entirely of material other than metal. *See generally* Public Hearing on B23-0018 (October 3, 2019). This case is not about 3-D printed guns lacking the requisite amount of metal.

---

[7] To be sure various firearms, knives, and other weapons have made it though airport X-Ray machines, not because they are undetectable, but through human error or inattention.

70.     The fear that polymer frame guns are undetectable was unfounded. As Professor

David Kopel has pointed out:

> Phillip McGuire testified to Congress on behalf of the Bureau of Alcohol, Tobacco
> and Firearms. McGuire was not exactly an opponent of gun control. He would later
> take a job with the leading gun control group of the day, Handgun Control, Inc.
> McGuire testified before Congress:
>
>> There is still no evidence that we hold that a firearm intrinsically
>> capable of passing undetected through conventional x-ray and metal
>> detector systems exists or is feasible under any current technology
>> immediately available to us.
>
> Testimony of Phillip C. McGuire, Associate Director, Office of Law Enforcement,
> Bureau of Alcohol, Tobacco and Firearms before the Senate Committee on
> Judiciary, Subcommittee on the Constitution, July 28, 1987.
>
> At that same hearing, Raymond A. Salazar, Director of Civil Aviation Security for
> the Federal Aviation Administration testified: "We are aware of no current 'non-
> metal' firearm which is not reasonably detectable by present technology and
> methods in use at our airports today."
>
> FAA Director for Civil Aviation Security Billie Vincent told Congress: "despite a
> relatively common impression to the contrary, there is no current non-metal firearm
> which is not reasonably detectably by present technology and methods in use in our
> airports today, nor to my knowledge is anyone on the threshold of developing such
> a firearm."
>
> Congress was shown photos of Glocks under a metal detector . . . [which revealed]
> the Glock's easily visible profile. Even when the Glocks were disassembled, the
> photos showed the parts to be easily detected.

Kopel, *The 1986 Plastic Gun Panic*, *supra,* available at https://reason.com/volokh/2018/08/07/the-

1986-plastic-gun-panic/.

71.     Testimony was produced on the legislation at issue here indicating that plans are

available on the Internet for a firearm that is mostly non-metallic. *See* Public Hearing on B23-

0018.     This     is     the     Cody     Wilson     designed     Liberator     firearm.     *See*

https://www.vam.ac.uk/articles/the-liberator-the-worlds-first-3d-printed-handgun.[8] However, the legislation at issue here sweeps well beyond addressing such a firearm, which federal law in any event already outlaws unless such firearm contains the requisite amount of metal necessary for detection by airport type metal detectors and X-ray machines.

72.     There is no compelling state interest for the District to have outlawed the entire class of commercially or privately manufactured polymer frame pistols in an effort to prohibit 3-D printed potentially undetectable firearms. A stripped down polymer pistol frame is incapable of firing a projectile. It has no barrel; it has no slide; it has no firing pin (called a striker with respect to polymer frame pistols); it has no magazine to hold the ammunition it lacks. It needs those other metal parts to become a functional firearm. Indeed, it would appear that the District never intended to and does not realize that it has outlawed run of the mill commercially produced polymer frame firearms, as on information and belief, MPD continues to approve registration of Glocks and similar polymer frame firearms, including the FN 509, H&K VP 9, and the Sig Sauer P365 and P320.

73.     Nonetheless, the District has now outlawed the registered pistols possessed by plaintiffs Hanson and Godwin. Although they understand that perhaps the District does not intend at this time to take enforcement action against them – likely because the District doesn't even know what it has done – they nonetheless fear the potential for prosecution of themselves and/or confiscation of their lawfully acquired firearms. Because D.C. Code 7-2501.01(9B)(a)(i) outlaws an entire class of immensely popular firearms via its grossly overbroad reach, the District has

---

[8] Mr. Wilson produced a firearm where all parts except two were made via a 3-D printing process employing a plastic compound. *Id.* The firearm was equipped with a metallic part insert to comply with 18 U.S.C. § 922(p). *Id.* The firearm was capable of firing one round without manual reloading. To reload the firearm, it had to be disassembled. The firearm is essentially a novelty.

violated the Second Amendment rights of plaintiffs and this court must enjoin the enforcement of

D.C. Code 7-2501.01(9B)(a)(i), and declare the legislation in question unconstitutional.

74.     We emphasize that all D.C. had to do to make this provision Constitutional was to

track the wording of 18 U.S.C. § 922(p)(1)(A), by prohibiting the possession of a firearm, but not

a receiver or frame:

> that, after removal of grips, stocks, and magazines, is not as detectable as the
> Security Exemplar, by walk-through metal detectors calibrated and operated to
> detect the Security Exemplar;

For whatever reason, the District was not content simply to track existing federal law.

75.     In sum Plaintiffs pray this court to enjoin enforcement of D.C. Code 7-

2501.01(9B)(a)(i) and declare it unconstitutional in violation of the Second Amendment.[9]

---

[9] Although D.C. Code § 7-2501.01(9B)(a)(i) is unconstitutional, the second component of D.C.'s
"Ghost Gun" definition is much less problematic and we believe likely would survive
Constitutional scrutiny.  That sub-section reads:

> Any major component of a firearm which, when subjected to inspection by the
> types of detection devices commonly used at secure public buildings and transit
> stations, does not generate an image that accurately depicts the shape of the
> component;

D.C. Code § 7-2501.01(9B)(a)(ii). This portion of the "Ghost Gun" definition comports closely
with 18 U.S.C. § 922(p)(1)(B) with the exception that it omits to define the term "major
components." The term major components is defined in the federal statute to encompass the
"barrel, the slide or cylinder, or the frame or receiver of the firearm." 18 U.S.C. § 922(p)(2)(B).
We do not believe the omission of the definition of "major components" likely renders D.C. Code
§ 7-2501.01(9B)(a)(ii) void for vagueness in light of the corresponding definition in federal law.
A reviewing court would likely save this portion of the statute from a vagueness challenge by
limiting the term "major component" to the 18 U.S.C. 922(p) definition. We believe a different
result is required, however, with respect to D.C.'s ban on unfinished receivers, as we discuss *infra*.

***Count III, 42 U.S.C. § 1983, Second and Fifth Amendments (as to Mr. Heller). D.C.'s prohibition on possessing an "unfinished receiver" violates both the Second and Fifth Amendments.***

76.     D.C. law further defines a "Ghost Gun" to include an unfinished receiver, and in turn defines that term as:

> (i) … a frame or receiver of a firearm that is not yet a component part of a firearm, but which may without the expenditure of substantial time and effort be readily made into an operable frame or receiver through milling, drilling, or other means; and
>
> (ii) Includes any manufactured object, any incompletely manufactured component part of a firearm, or any combination thereof that is not a functional frame or receiver but is designed, manufactured, assembled, marketed, or intended to be used for that purpose, and can be readily made into a functional frame or receiver.

D.C. Code 7-2501.01(17B)(A). D.C.'s characterization of an unfinished receiver as a prohibited "Ghost Gun" violates Mr. Heller's Second Amendment right to make a firearm. In addition, the definition of unfinished receiver is Constitutionally infirm because of vagueness. We discuss the vagueness issue first.

**A.     D.C. Code § 7-2501.01(17B)(A) is void for vagueness.**

77.     Exactly what the "without the expenditure of substantial time and effort be readily made" in subsection (i) and "readily made" in subsection (ii) means in D.C. Code § 7-2501.01(17B)(A) raises the obvious problem that this definition is unconstitutionally vague and thus void.

78.     The Due Process Clause of the Fourteenth Amendment prohibits the enactment or enforcement of vague legislation. *Sessions v. Dimaya*, 138 S.Ct. 1204, 1212 (2018) ("the prohibition of vagueness in criminal statutes … is an 'essential' of due process, required by both 'ordinary notions of fair play and the settled rules of law"). A penal statute must "define the criminal offense with sufficient definiteness that ordinary people can understand what conduct is

prohibited and in a manner that does not encourage arbitrary and discriminatory enforcement." *Kolender v. Lawson*, 461 U.S. 352, 357 (1983). "[A] vague law is no law at all." *United States v. Davis*, 139 S. Ct. 2319, 2323 (2019). *See also Grayned v. City of Rockford*, 408 U.S. 104, 108-109 (1972) ("A vague law impermissibly delegates basic policy matters to policemen, judges, and juries for resolution on an ad hoc and subjective basis"): *Giovani Carandola, Ltd. v. Fox*, 470 F.3d 1074, 1079 (4th Cir. 2006) (recognizing that "[a] statute is impermissibly vague if it either (1) fails to provide people of ordinary intelligence a reasonable opportunity to understand what conduct it prohibits or (2) authorizes or even encourages arbitrary and discriminatory enforcement" (internal quotations omitted)). *See also Federal Communications Commission v. Fox Television Stations, Inc.,* 567 U.S. 239 (2012).

79.    Such a statute need not be vague in all possible applications to be void for vagueness under the Due Process Clause. *Johnson v. United States*, 576 U.S. 591, 602 (2015). "*Johnson* made clear that our decisions 'squarely contradict the theory that a vague provision is constitutional merely because there is some conduct that clearly falls within the provision's grasp.'" *Sessions v. Dimaya*, 138 S.Ct. at 1214 n.3. A court also "cannot construe a criminal statute on the assumption that the Government will use it responsibly," *United States v. Stevens*, 559 U.S. 460, 480 (2010), and "cannot find clarity in a wholly ambiguous statute simply by relying on the benevolence or good faith of those enforcing it." *Wollschlaeger v. Governor, Fla.*, 848 F.3d 1293, 1322 (11th Cir. 2017) (en banc).

80.    In *Springfield Armory v. City of Columbus*, 29 F.3d 250, 252 (6th Cir. 1994), the court found a Columbus, Ohio so-called assault weapons ban unconstitutionally vague because in addition to banning a lengthy list of firearms, it purported to also ban firearms with "similar action designs" or with "slight modifications." The court stated that the use of the term "slight

modifications" made the ordinance vague because it did not give any criteria to determine what constituted a "slight" modification; however, the court also found that the use of the term "modification" itself was also vague because it would require the person to know if his firearm was designed based upon one of the listed firearms. *Id.* at 253. *See also Peoples Rights Organization v. City of Columbus,* 152 F.2d 522, 538 (6th Cir. 1998) (finding the term "may be readily assembled" to be void for vagueness in connection with a municipal assault weapons ban).

81.    Likewise D.C.'s use of the indefinite terms in discussing unfinished receivers of "readily made" and "without the expenditure of substantial time and effort be readily made" without providing criteria to determine exactly what is prohibited, leaves the average citizen like Mr. Heller with no understanding of what is in fact prohibited as to an unfinished receiver.[10] Because the D.C. definition or "unfinished receiver" lacks specificity, this portion of the statute must be declared void for vagueness.

82.    Manufacturing an unfinished receiver into a "functional receiver" is not a trivial process, as pointed out in court filings submitted by the ATF and the Department of Justice. For

---

[10] The Department of Justice and the ATF recently published a proposed rule in the Federal Register that seeks to clarify the definition of a "receiver." *See Definition of "Frame or Receiver" and Identification of Firearms*, 86 Fed. Reg. 27720-01, 27730, 2021 WL 2012830 (May 21, 2021) (refining the definition of "receiver" by reference to a list of factors to be considered in determining whether an object can be "readily converted" to a firearm within the meaning of Section 921(a)(3)). By contrast, D.C.'s definition of an "unfinished receiver" lacks any such discussion that would clarify what is and what is not an "unfinished receiver."

It is noteworthy that ATF implicitly recognizes the Second Amendment right for a private individual to make his or her own firearm as nothing in those proposed rules would regulate the possession or manufacture of privately manufactured firearms for personal use. *See* 86 Fed. Reg. at 27725 ("nothing in this rule would restrict persons not otherwise prohibited from possessing firearms from making their own firearms at home without markings solely for personal use (not for sale or distribution) in accordance with Federal, State, and local law"). The proposed Rule thus would regulate federal firearm licensees, but not regulate private individuals who make their own firearms. *See* 86 Fed. Reg. at 27732.

example, in *State of California v. BATF*, No. 20-cv-6761 (N.D. Cal.), the Department of Justice

and the ATF explained the process of finishing a lower receiver for an AR type rifle (the part of

the rifle ATF considers to constitute a firearm when completed):

> An unfinished receiver that has not yet had "machining of any kind performed in the area of the trigger/hammer (fire-control) recess (or cavity)," see ATF Firearms Technology Branch Technical Bulletin 14-01 ("Bulletin 14-01"), filed in Calif. Rifle and Pistol Ass'n v. ATF, Case No. 1:14-cv-01211, ECF No. 24 at 285 (E.D. Cal. Jan. 9, 2015), requires that numerous steps be performed simply to yield a receiver, that then in turn must be assembled with other parts into a device that can expel a projectile by the action of an explosive. These milling and metalworking steps—each of which require skills, tools, and time—include: 1) "milling out of fire-control cavity"; 2) "drilling of selector-lever hole"; 3) "cutting of trigger slot"; 4) "drilling of trigger pin hole; and 5) "drilling of hammer pin hole." Compl. Ex. 9.
>
> * * * *
>
> The need to conduct these machining steps from scratch, without indexing, and "carefully" means a working gun cannot be produced "without difficulty." Id. And the work to excavate the cavities and drill holes in a solid, unmachined substrate requires care rather than speed to avoid doing so raggedly or in the wrong area. See id. Therefore, the receiver cannot be completed "without delay," even leaving aside the further assembly with many other parts needed to have a weapon that can expel a bullet by explosive action. A receiver blank therefore may not "readily be converted" into a firearm.

Federal Defendants' Notice of Motion And Motion To Dismiss Plaintiffs' Complaint For

Declaratory And Injunctive Relief, at 16-17 (filed Nov. 30, 2020). Is this the type of process the

District considers to be "readily made without the expenditure of substantial time and effort"? How

is anyone to know?

83.     D.C. Code § 22-4514(a) is the statute which criminalizes possession of a so-called

Ghost Gun as defined by D.C. Code § 7-2501.01. There is no *mens rea* requirement set forth in

the statute. However, *City of Chicago v. Morales*, 527 U.S. 41, 55 (1999), stressed, that a *mens rea*

requirement is especially critical to the question of facial validity under the Due Process Clause.

In that case, the Court found highly significant that the ordinance was a "criminal law that contains

no *mens rea* requirement" and concluded "[w]hen vagueness permeates the text of such a law, it

is subject to facial attack." See also *Hill v. Colorado*, 530 U.S. 703, 732 (2000) (stressing the importance of "a scienter requirement" in a vagueness challenge).

84.    The Supreme Court has repeatedly stressed the importance of *mens rea* in addressing federal firearms law as well. *See, e.g., Rehaif v. United States*, 139 S.Ct. 2191, 2196 (2019) (noting "a basic principle that underlies the criminal law, namely, the importance of showing what Blackstone called 'a vicious will'"); *Staples v. United States*, 511 U.S. at 610-11 (imposing a *mens rea* requirement for the illegal possession of a machine gun, noting that "there is a long tradition of widespread lawful gun ownership by private individuals in this country," and explaining that "despite their potential for harm, guns generally can be owned in perfect innocence"). D.C.'s so-called Ghost Gun ban has no such *mens rea* or scienter requirement and thus criminalizes conduct and activities regardless of intent or knowledge of a person. Vagueness, coupled with the total absence of any *mens rea* requirement, renders the definition of "Ghost Gun" in D.C. Code § 7-2502.01(17B)(A) facially invalid.

**B.    D.C. Code § 7-2502.01(17B)(A) violates the Second Amendment because it is grossly overbroad and not narrowly tailored.**

85.    D.C.'s ban on owning an unfinished receiver – assuming D.C. could define that term with sufficient definiteness to avoid the void for vagueness infirmity discussed above – also violates the Second Amendment for the same reasons that D.C.'s ban on manufacturing a firearm violates the Second Amendment. The manufacture of a firearm necessarily entails the manufacture of various parts, including a frame or receiver. (Under federal law, a completed frame or receiver is classified as a firearm.) At some point in the manufacturing process an object will meet the definition of what D.C. defines as an unfinished receiver on the way to becoming a complete receiver and thus a firearm – putting aside that we don't know from D.C.'s definition exactly when that point is. And at that point, the maker of the firearm, for example, Mr. Heller or some other

person, would be in violation of District law. So, the prohibition on possessing an unfinished receiver, amounts to a second prohibition on manufacturing a firearm, a Constitutionally protected item. As such, the flat-out prohibition on possessing an unfinished receiver necessarily violates the Second Amendment.

86.     Mr. Heller sought to import an unfinished polymer receiver kit into the District to construct a registered, serialized firearm. Because District law prohibits him from possessing the unfinished receiver, it denies him his right under the Second Amendment to manufacture a firearm.

87.     As we discussed above, the District of Columbia has a legitimate government interest in preventing persons such as felons, mentally ill persons, domestic abusers, and other prohibited persons from acquiring unfinished receivers and making guns incapable of being traced because they lack a serial number. (We note that federal law does not allow the transfer of firearms lacking a serial number. We also note that Mr. Heller is not a prohibited person). The problem is that the District again has swept far too broadly in addressing this concern. Because the Second Amendment right is a fundamental right, limitations on that right must be supported not only with a legitimate compelling governmental interest, but must be narrowly drawn to achieve that interest and not infringe on protected rights more than necessary to achieve that legitimate governmental interest.

88.     Seeking to address a genuine concern with broad prophylactic rules devalues the notion of a Constitutional right and are contrary to the demands of heightened scrutiny in the First Amendment context and elsewhere. *See NAACP v. Button*, 371 U.S. 415, 438 (1963) ("Broad prophylactic rules in the area of free expression are suspect."); *Id.* ("Precision of regulation must be the touchstone in an area so closely touching our most precious freedoms."); *Turner Broadcasting System, Inc. v. FCC*, 512 U.S. 622, 682-83 (1994) (O'Connor, J., concurring in part

and dissenting in part) ("A regulation is not 'narrowly tailored' – even under the more lenient [standard applicable to content-neutral restrictions] – where ... a substantial portion of the burden on speech does not serve to advance [the State's content-neutral] goals …. Broad prophylactic rules in the area of free expression are suspect. Precision of regulation must be the touchstone[.]") (brackets in original) (citations and quotations omitted); *In re Primus*, 436 U.S. 412, 29 432-33 (1978) (because First Amendment rights require "breathing space to survive, government may regulate in [this] area only with narrow specificity." [Cleaned up]). Constitutionally protected rights cannot be restricted merely because criminals might abuse those rights. *See Southeastern Promotions Ltd. v. Conrad*, 420 U.S. 546, 559 (1975). *Accord Ashcroft v. Free Speech Coal.*, 535 U.S. 234, 245 (2002); *Stanley v. Georgia*, 394 U.S. 557, 567 (1969); *Vincenty v. Bloomberg*, 476 F.3d 74, 84-85 (2d Cir. 2007); *Robb v. Hungerbeeler*, 370 F.3d 735, 743 (8th Cir. 2004).

89.     Indeed, computing devices connected to the Internet are now the most common tool for engaging in lawful, protected First Amendment activities, but undoubtedly also the most common tool for engaging in many unprotected and sometimes illegal forms of speech (e.g., defamation, true threats) and other illegal conduct (e.g., child pornography, hacking, and identity theft) as well. The latter hardly can justify restricting lawful use of computers connected to the Internet by law-abiding people who wish to publish their protected content and viewpoints.

90.     Generalized risk does not warrant restrictions as to all persons, and "a preventative rule" aimed at such generic hazards is "justified only in situations 'inherently conducive to'" the specific dangers identified. *Edenfield*, 507 U.S. at 774 (quoting *Ohralik v. Ohio State Bar Ass'n*, 436 U.S. 447, 464 (1978)). By prohibiting even citizens who pass a government background check from constructing a commonly owned type of firearm such as a 9 mm Glock that would include a serial number and that they would register with the District, the law imposes considerably more

burden on law-abiding citizens than is warranted by the rare instances of criminal violence using

such firearms. Just as any law restricting speech must meet the requirements of narrow tailoring,

any law restricting Second Amendment rights must meet the requirement of narrow tailoring as

well. D.C. Code § 7-2501.01 (17B)(A) plainly does not.

91.     Moreover, even a narrowly tailored restriction on Second Amendment rights may

not excessively restrict protected activity. *See United States v. O'Brien*, 391 U.S. 367, 377 (1968)

("incidental restriction on alleged First Amendment freedoms is no greater than is essential" to

further the government's important interests); *McCutcheon v. FEC*, 134 S. Ct. 1434, 1456-1457

(2014) (chosen means must be "'closely drawn'" to achieve genuine interest without

"'unnecessary abridgment'" of constitutionally protected conduct (quoting *Buckley v. Valeo*, 424

U.S. 1, 25 (1976)).

92.     To the extent a law imposes an undue burden on protected rights it should be

declared unconstitutional and enjoined regardless of whether it accomplishes some other salutary

purpose. In the First Amendment context, it is inconceivable that government could ban private

use of the printing press, restrict the Internet, or limit the capacity of personal computers to reduce

the speed, reach, and effectiveness of speech simply because such qualities could be (and are) used

by slanderers or child pornographers as well as by persons engaging in lawful and protected public

debate. Regardless of whether such extreme measures would genuinely reduce harmful speech,

their impact on protected rights is too great.

93.     In the Second Amendment context, it is likewise inconceivable that government

could simply ban the making by private citizens of a category of otherwise lawful guns, even if

that might prevent accidents, reduce the effectiveness of attempted suicides, reduce mass or

impulse shootings, or in this case limit the potential for prohibited persons to gain access to a

firearm. Nor could government simply ban all men from owning firearms, regardless of the fact that most crimes with guns are committed by men. Such proposals likely would fail the narrow tailoring requirement as well, but they would also fail because they would excessively burden Second Amendment rights.

94.     Here the District has made no attempt to narrowly tailor its regulation to address the specific harm to which the law is addressed, despite many potential alternatives. Although the ban on unfinished receivers may limit the ability of prohibited persons to acquire what the District calls a Ghost Gun, the law does so by prohibiting persons who are not prohibited from possessing firearms from exercising their Second Amendment right to make their own firearms.

95.     The District's concern with traceability of firearms made from unfinished receivers could easily be addressed by requiring registration of unfinished receivers and the placement of a serial number on such receivers. This would also serve to address the District's concern to prevent prohibited persons from obtaining guns made from unfinished receivers as prohibited persons are not allowed to register firearms in the District. The District could further address this issue by requiring that transfers of unfinished receivers be conducted by a licensed dealer in the District accompanied by a background check. D.C. law already prohibits with very minor exceptions any transfer of a firearm except through a licensed dealer. These potential alternative regulations fully address any legitimate concern the District may have while being substantially less burdensome of the Second Amendment rights of D.C. residents such as Mr. Heller than the regulations at issue here.

96.     Perhaps understanding that a ban such as D.C.'s would be unconstitutional, the State of California – hardly reticent when it comes to regulating firearms – took this more narrowly tailored approach. In that state, a person can (and is required to) "[a]pply to the [California]

Department of Justice for a unique serial number or other mark of identification" prior to constructing a firearm. Cal. Penal Code § 29180(b)(1). Before the Department issues the serial number to an applicant, it conducts a background check. Cal. Penal Code § 29182(b)(1). And if the applicant is not disqualified, the Department "shall grant" such an application "in the form of serial numbers pursuant to Section 23910 to, persons who wish to manufacture or assemble firearms pursuant to subdivision (b) of Section 29180."

97.     And to the extent the District could claim a legitimate compelling interest in, for example, ensuring that a self-made firearm otherwise comports with its other firearm regulations – not a concern that has been expressed in connection with the subject legislation to date – the District could impose a requirement that the firearm be subject to MPD inspection. It just cannot simply ban the manufacture of all firearms in the District.[11]

> **C.    Mr. Heller has suffered damage resulting from defendants' enforcement of D.C. Code § 7-2501.01 (17B)(A).**

98.     The District's ban on the possession of an unfinished frame or receiver prohibits Mr. Heller from realizing his desire to make a firearm from an unfinished receiver kit. As such, it violates his Second Amendment rights. The Second Amendment right to keep and bear arms necessarily includes the right to acquire arms, and the District's so-called Ghost Gun prohibition is an unjustified burden on that right. *Cf. Ezell*, 651 F.3d 684. Although the District may regulate commercial transactions in arms, it plainly cannot ban the sale or transfer of arms in the District because that would make the right to keep and bear arms illusory. If citizens cannot legally obtain

---

[11] Indeed, although we are not suggesting the need to do so, the District could conceivably impose a myriad of other regulations on the making of firearms for personal use consistent with the Constitution. It could perhaps require the submission of plans in advance of construction; require the maker to obtain a license to construct the firearm, specify the location of serial numbers, etc. What it cannot do is to enact a prophylactic ban on the making of any firearms or on the possession of precursor parts of a firearm such as an unfinished frame or receiver.

an arm, they cannot keep nor bear such arm. The right to manufacture an arm is equivalent to the right to acquire an arm. If Mr. Heller cannot acquire the precursor parts for a firearm, such as an unfinished receiver, whatever that is under District law, he cannot make a firearm. The actions of the District through MPD have prevented Mr. Heller from acquiring the precursor parts to make a firearm. Accordingly, he has been damaged by the denial of his Second Amendment rights and is due financial recompense for this violation of his Constitutional rights in addition to the requested injunctive and declaratory relief. Accordingly, Mr. Heller prays this court to award him monetary damages in an amount to be proved at trial.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs request that judgement be entered in their favor and against Defendants as follows:

1. Enter a declaratory judgement that the District of Columbia's prohibition on manufacture of a firearm as set forth in D.C. Code § 7-2504.01 violates the Second Amendment to the United States Constitution and is thus void.

2. Enter a declaratory judgement that D.C. Code §7-2501.01(9B)(A)(1) violates the Second Amendment to the United States Constitution and is thus void.

3. Enter a declaratory judgement that D.C. Code §7-2501.01(9B)(B) violates the Second Amendment to the United States Constitution and is thus void.

4. Enter a declaratory judgement that D.C. Code §7-2501.01(17B)(A) violates the Fifth Amendment to the United States Constitution and is thus void for vagueness.

5. Enter a declaratory judgement that D.C. Code §7-2501.01(17B)(A) violates the Second Amendment to the United States Constitution and is thus void.

6. Enter an order preliminarily and permanently enjoining Defendants, their officers, agents, servants, employees, and all persons in active concert or participation with them who receive actual notice of the injunction, from enforcing D.C. Code §7-2504.01 to ban the making of firearms within the District of Columbia;

7. Enter an order preliminarily and permanently enjoining Defendants, their officers, agents, servants, employees, and all persons in active concert or participation with them who receive actual notice of the injunction, from enforcing D.C. Code §22-4514 as to what the District defines as "Ghost Guns";

8. Enter an order preliminarily and permanently enjoining Defendants, their officers, agents, servants, employees, and all persons in active concert or participation with them who receive actual notice of the injunction, from enforcing D.C. Code §s 7-2501.01(9B)(A)(1), 7-2501.019B(2) and 7-2501.01(17B)(A) as to what the District defines as "Ghost Guns";

9. Enter an order preliminarily and permanently enjoining Defendants, their officers, agents, servants, employees, and all persons in active concert or participation with them who receive actual notice of the injunction, from refusing to register firearms made by District of Columbia residents which otherwise are consistent with and registerable under District law;

10. Enter an order awarding plaintiff Dick Anthony Heller damages as against the defendants in an amount to be determined owing to the defendants' violation of his Second Amendment rights.

11. Enter an order awarding plaintiffs their costs of suit, including attorney fees, related expenses and costs pursuant to 42 U.S.C. §1988; and

12. Enter an order providing any other and further relief that the court deems just and

appropriate.

Respectfully submitted,

**DICK ANTHONY HELLER**

**ANDREW HANSON**

**ELBY GODWIN**

By:     /s/ George L. Lyon, Jr.
George L. Lyon, Jr. (D.C. Bar No. 388678)
Arsenal Attorneys
4000 Legato Rd, Suite 1100
Fairfax, VA. 22033

1929 Biltmore Street NW
Washington, DC 20009
202-669-0442, fax 202-483-9267
Attorneys for Plaintiffs
gll@arsenalattorneys.com

Dated:   September 8, 2021