## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| Dick Anthony Heller, et al. | ) |
| | ) |
| Plaintiffs, | ) |
| | ) Civil Action No. 21 cv 02376-APM |
| v. | ) |
| | ) |
| District Of Columbia, et al. | ) |
| | ) |
| Defendants. | ) |
| _____ | ) |


### APPLICATION FOR PRELIMINARY INJUNCTION


**DICK ANTHONY HELLER**

**ANDREW HANSON**

**ELBY GODWIN**

George L. Lyon, Jr. (D.C. Bar No. 388678)
Arsenal Attorneys
1929 Biltmore Street NW
Washington, DC 20009
202-669-0442, fax 202-483-9267
Attorney for Plaintiffs
gll@arsenalattorneys.com


September 14, 2021

# TABLE OF CONTENTS

I.      Introduction ……………………………………………………………… 1

II.     The Parties ……………………………………………………………….. 5

III.    Standing ………………………………………………………………….. 7

IV.     Plaintiffs are entitled to a preliminary injunction against
        enforcement of the District statutes at issue in this case ………………………… 10

        A.  Plaintiffs have a high likelihood of success on the merits …………………………. 11

            1.  Factual background ……………………………………………… 11

                a.  The Second Amendment ……………………………….................. 11

                b.  District law …………………………………………… 12

                c.  Self-made firearms …………………………………………… 14

                d.  Polymer frame pistols …………………………………… 17

                e.  Undetectable firearms ……………………………………… 20

            2.  D.C.'s prohibition on manufacture of firearms violates
                Mr. Heller's Constitutional right to build, possess and
                register a serialized firearm. It is therefore facially
                unconstitutional and as applied to Mr. Heller ………………………………… 22

            3.  D.C.'s definition of a so-called "Ghost Gun" violates
                the Second Amendment right of plaintiffs in that it
                outlaws commonly owned polymer frame firearms …………………………… 24

            4.  D.C.'s prohibition on possessing an "unfinished receiver"
                violates both the Second and Fifth Amendments …………………………… 29

                a.  D.C. Code § 7-2501.01(17B)(A) is void for vagueness …………… 30

                b.  D.C. Code § 7-2501.01(17B)(A) violates the Second Amendment
                    because is it grossly overbroad and not narrowly tailored …….......… 34

        B.  Plaintiffs are suffering irreparable harm from the challenged provisions ………….. 39

        C.  The balance of equities tips overwhelmingly in plaintiffs' favor ……………..…… 41

        D.  An injunction is in the public interest ……………………………………………… 42

V.      The court should enter final judgment for plaintiffs …………………………………… 43

VI.     Conclusion ………………………………………………………………….... 44

Exhibit 1, Declaration of Dick Anthony Heller

Exhibit 2, Declaration of Andrew Hanson

Exhibit 3, Declaration of Elby Godwin

Exhibit 4, Declaration of Richard Vasquez

i

# TABLE OF AUTHORITIES

## Cases

*Aamer v. Obama*,
   742 F.3d 1023 (D.C. Cir. 2014) …………………………………………………….… 10

*Arnett v. Kennedy*,
   416 U.S. 134 (1974) …………………………………………………………………...… 10

*Ashcroft v. Free Speech Coal.*,
   535 U.S. 234 (2002) …………………………………………………………………….. 36

*Babbitt v. United Farm Workers Nat'l Union*,
   442 U.S. 289 (1979) ………………………………………………………………...…. 9

*Barton v. Dist. of Columbia*,
   131 F.Supp.2d 236 (D.D.C. 2001) ………………………………………………….... 10

*Benten v. Kessler*,
   505 U.S. 1084(1992) …………………………………………………………………… 10

*Bridenbaugh v. Freeman-Wilson*,
   227 F.3d 848 (7th Cir. 2000) ………………………………………………………….. 9

*Buckley v. Valeo*,
   424 U.S. 25 (1976) …………………………………………………………………….... 37

*Caetano v. Massachusetts*,
   577 U.S. __, 136 S.Ct. 1027 (2016) ………………………………………………….. 11

*Chaplaincy of Full Gospel Churches v. England*,
   454 F.3d 290 (D.C. Cir. 2006) …………………………………………………………. 40

*CityFed Fin. Corp. v. Office of Thrift Supervision*,
   58 F.3d 738 (D.C. Cir. 1995) ………………………………………………………….. 10

*City of Chicago v. Morales*,
   527 U.S. 41 (1999) …………………………………………………………………….. 33

*Curtis 1000, Inc. v. Suess*,
   24 F.3d 941 (7th Cir. 1994) …………………………………………………………..… 43

*Davenport v. Intl Bhd. of Teamsters*,
   166 F.3d 356 (D.C. Cir. 1999) …………………………………………………………. 10

*Denotes principal cases relied upon

*Davis v. District of Columbia,*
    158 F.3d 1342 (D.C. Cir. 1998) …………………………………………………… 40

*Dearth v. Holder,*
    641 F.3d 499 (D.C. Cir. 2011) …………………………………………………… 8

*\*District of Columbia v. Heller,*
    554 U.S. 570 (2008) ……………………………………………….. 1, 8, 11, 12, 13, 22, 23

*Edenfield v. Fame,*
    507 U.S. 761 (1993) ……………………………………………………...… 36

*Elrod v. Burns,*
    427 U.S. 347 (1976) ……………………………………………………… 40

*\*Ezell v. Chicago,*
    651 F.3d 684 (7th Cir. 2011) ………………………………………….. 4, 12, 23, 39, 40, 41

*FCC v. Fox Television Stations, Inc.,*
    567 U.S. 239 (2012) ……………………………………………………… 30

*Freeman v. Corzine,*
    629 F.3d 146 (3rd Cir. 2010) ……………………………………………... 9

*Giovani Carandola, Ltd. v. Fox,*
    470 F.3d 1074 (4th Cir. 2006) …………………………………………...… 30

*Gordon v. Holder,*
    721 F.3d 638 (D.C. Cir. 2013) …………………………………………..… 40, 42

*Grayned v. City of Rockford,*
    408 U.S. 104 (1972) ……………………………………………………… 30

*Heller v. District of Columbia,*
    670 F.3d 1244 (D.C. Cir. 2011) ………………………………………………… 2, 35

*Heller v. District of Columbia,*
    801 F.3d 264 (D.C. Cir. 2015) ……………………………………………….... 2

*Hill v. Colorado,*
    530 U.S. 703 (2000) ……………………………………………………... 33

*In re Primus,*
    436 U.S. 412 (1978) ……………………………………………………… 35

*Johnson v. United States*,
576 U.S. 591 (2015) ………………………………………………….. 31

*K.A. ex rel. Ayers v. Pocono Mountain Sch. Dist.*,
710 F.3d 99 (3d Cir. 2013) …………………………………………… 42

*Kolender v. Lawson*,
461 U.S. 352 (1983) …………………………………………………… 30

*Lujan v. Defenders of Wildlife*,
504 U.S. 555 (1992) …………………………………………………… 7

*McCutcheon v. FEC*,
572 U.S. 185 (2014) ………………………………………………….. 37

*McDonald v. Chicago*,
561 U.S. 742 (2010) ………………………………………………….. 11

*Moore v. Madigan*,
702 F.3d 933 (7th Cir. 2012) ……………………………………… 43, 44

*Morris v. District of Columbia*,
38 F. Supp. 3d 57 (D.D.C. 2014) …………………………………….. 43

*Mova Pharm. Corp. v. Shalala*,
140 F.3d 1060 (D.C. Cir. 1998) ……………………………………… 10

*NAACP v. Button*,
371 U.S. 415 (1963) ………………………………………………….. 35

*NRA v. BATFE*,
700 F.3d 185 (5th Cir. 2012) ………………………………………… 9

*Ohralik v. Ohio State Bar Ass'n*,
436 U.S. 447 (1978) …………………………………………….... 3, 6

*Palmer v. District of Columbia*,
59 F.Supp.3d 173 (D.D.C. 2014) …………………………………... 2, 3, 11

*\*Parker v. District of Columbia*,
478 F.3d 370 (D.C. Cir. 2007) …………………………………… 1, 8, 12, 23

*People v. Aguilar*,
2 N.E.3d 321 (Ill. 2013) ……………………………………………… 24

*Peoples Rights Organization v. City of Columbus,*
    152 F.2d 522 (6th Cir. 1998) ………………………………………………... 31, 32

*Planned Parenthood of Southeastern Pennsylvania v. Casey,*
    505 U.S. 833 (1992) …………………………………………………… 23

*Rehaif v. United States,*
    139 S.Ct. 2191 (2019) ………………………………………………….. 33

*Reno v. ACLU,*
    521 U.S. 844 (1997) …………………………………………………….. 10

*Robb v. Hungerbeeler,*
    370 F.3d 735 (8th Cir. 2004) ……………………………………………… 35

*Serono Labs., Inc. v. Shalala,*
    158 F.3d 1313 (D.C. Cir. 1998) …………………………………………… 10

*Sessions v. Dimaya,*
    584 U.S. __, 138 S.Ct. 1204 (2018) …………………………………… 30, 31

*Skyline Wesleyan Church v. Cal. Dep't of Managed Health Care,*
    968 F.3d 738 (9th Cir. 2020) ………………………………………………. 9

*Southeastern Promotions Ltd. v. Conrad,*
    420 U.S. 546 (1975) …………………………………………………… 36

*Springfield Armory v. City of Columbus,*
    29 F.3d 250 (6th Cir. 1994) ……………………………………………….. 31

*Stanley v. Georgia,*
    394 U.S. 557 (1969) …………………………………………………… 36

*Staples v. United States,*
    511 U.S. 600 (1994) ………………………………………………….. 2, 33

*Turner Broadcasting System, Inc. v. FCC,*
    512 U.S. 622 (1994) …………………………………………………… 35

*United States v. Davis,*
    139 S.Ct. 2319 (2019) ………………………………………………….. 30

*United States v. O'Brien,*
    391 U.S. 367 (1968) …………………………………………………… 36

*United States v. Stevens*,
    559 U.S. 460 (2010) ……………………………………………….. 31

*Va. State Bd. Of Pharmacy v. Va. Citizens Consumer Council, Inc.*,
    425 U.S. 748 (1976) ……………………………………………… 9

*Vincenty v. Bloomberg*,
    476 F.3d 74 (2d Cir. 2007) ……………………………………… 36

*Winter v. NRDC*,
    555 U.S. 7 (2008) ………………………………………………….. 39

*Wollschlaeger v. Governor, Fla.*,
    848 F.3d 1293 (11th Cir. 2017) (en banc) …………………………………… 31

**Wrenn v. District of Columbia*,
    864 F.3d 650 (D.C. Cir. 2017) …………………………………..… 3, 11, 12, 22, 43

*Wright v. District of Columbia*,
    Case No. 1:2016 cv 01556 (D.D.C.) ……………………………...… 3

*Yukutake v. Connors*,
    Civ. No. 19-00578, *slip op.* at 31 (August 16, 2021) …………………………… 23

## Statutes and Rules

18 U.S.C. § 922(p) ………………………………………………… 20, 26, 27, 28, 29

26 U.S.C. § 5845(b)(2) ………………………………………....……………………… 2

Cal. Penal Code § 29180(b)(1) ……………………………………… 38

Cal. Penal Code § 29182(b)(1) ……………………………………… 38

D.C. Code § 7-2501.01 ………………………………….. 13, 14, 26, 28, 29, 32, 33, 34, 36

D.C. Code § 7-2502.02(a) …………………………………………… 14

D.C. Code § 7-2504.01(a) …………………………………………… 4, 12

D.C. Code § 7-2505.01(b) …………………………………………… 38

D.C. Code § 7-2505.02 ……………………………………………… 38

D.C. Code § 22–4506 ……………………………………………… 2

D.C. Code § 22.4514 …………………………………………………………………… 12, 13, 33

D.C. Law 1-85, Firearms Control Regulations Act of 1975 (effective September 24, 1976) … 1, 2

Fed. R. Civ. P. 65(a)(2) ……………………………………………………………………… 43

## Other authorities

1 *A New and Complete Law Dictionary* (1771) …………………………………………………… 11

1 Charles Winthrop Sawyer, *Firearms in American History* (Boston: 1910) ………………….... 15

1 Dictionary of the English Language (4th ed.) ……………………………………………………… 15

3 *Federal and State Constitutions: Colonial Charters, and Other Organic*
    *Laws of the States, Territories, and Colonies Now or Heretofore*
    *Forming the United States of America* (Francis Thorpe ed. 1909) ……………………… 15

5 *American Archives, Fourth Series* (Peter Force ed. 1844) ………………………………………… 16

7 *Federal and State Constitutions: Colonial Charters, and Other Organic*
    *Laws of the States, Territories, and Colonies Now or Heretofore*
    *Forming the United States of America* (Francis Thorpe ed. 1909) ……………………… 15

8 *Documents and Records Relating to the State of New-Hampshire*
    *During the Period of the American Revolution, From 1776*
    *to 1783* (Nathaniel Bouton ed. 1874) ……………………………………………………... 16

*A History of FBI Handguns*, American Rifleman (August 22, 2011),
    available at https://www.americanrifleman.org/content/a-history-of-fbi-handguns/ ...… 19

Ayoob, Massad, *The FBI Dadeland Shootout: Hero Agent Ed Mireles Speaks,*
    American Handgunner (2018), available at
    https://americanhandgunner.com/our-experts/the-fbi-dadeland-shootout-hero-agent-ed-
    mireles-speaks/ …………………………………………………………………………… 18

Brown, M.L., *Firearms in Colonial America: The Impact on History and*
    *Technology 1492-1792* (Smithsonian: 1980) …………………………………………… 15

D.C. B21-0886, Stun Gun Regulation Amendment Act of 2016 & Public
    Hearing Record (October 17, 2016), available at
    https://lims.dccouncil.us/downloads/LIMS/36420/Hearing_Record/B21-0886-
    HearingRecord1.pdf …………………………………………………………………... 18

Definition of Frame or Receiver and Identification of Firearms,
86 Fed. Reg. 27720. 2021 WL 2012830 (May 21, 2021) ………………………………… 32

FBI, A Bite Out of History: Fatal Firefight in Miami (April 11, 2011),
available at https://www.fbi.gov/news/stories/fatal-firefight-in-miami ……………….. 18

Federal Defendants' Notice Of Motion And Motion To Dismiss Plaintiffs'
Complaint For Declaratory And Injunctive Relief, at 16-17 (filed
Nov. 30, 2020), *State of California v. BATF*, No. 20-cv-6761 (N.D. Cal.) …………….. 33

https://www.barearms.com/ …………………………………………………………………… 6

*https://www.guns.com/news/2020/12/29/top-selling-pistols-on-gunscom-in-2020* …………..… 19

https://www.tactical-life.com/firearms/handguns/largest-departments-police-sidearms/ ……… 19

https://www.policeforum.org/assets/docs/Free_Online_Documents/Gun_Violence_Reduction/pol
ice%20department%20service%20weapon%20suvey%202013.pdf …………………………..… 19

https://www.vam.ac.uk/articles/the-liberator-the-worlds-first-3d-printed-handgun …………... 19

Ghost Guns Prohibition Emergency and Temporary Amendment Acts of 2020 Number,
MPD CIR-20-01, available at https://go.mpdconline.com/GO/CIR_20_01.pdf ………… 7

Jefferson, Thomas, Letter to George Hammond, British Ambassador to the U.S.,
May 15, 1793, in 7 The writings of Thomas Jefferson 325 (Paul Ford ed. 1904) ……… 17

Journal of the Maryland Convention July 26 – August 14, 1775
(William Hand Browne ed. 1892) ……………………………………………………… 16

Kopel, David, *The 1986 Plastic Gun Panic,* Reason Magazine (August 7, 2018), available at
https://reason.com/volokh/2018/08/07/the-1986-plastic-gun-panic/ …………… 20, 21, 27

*Mayor Bowser Announces Emergency Ghost Gun Legislation* (February 18, 2020), available
at https://dc.gov/release/mayor-bowser-announces-emergency-ghost-gun-legislation … 25

Mihaler, Donald J., Police Sidearms: The Handguns of America's 10 Largest
Departments, *Tactical-Life* (May 18, 2018), available at
*https://www.tactical-life.com/firearms/handguns/largest-departments-police-sidearms/* 19

Mireles, Edmundo & Elizabeth, *FBI Miami Firefight: Five Minutes that Changed
the Bureau* (2017) ……………………………………………………………………… 18

MPD General Order 901.2, Wearing of Personal, Non-Issued Pistols and Holsters,
available at https://go.mpdconline.com/GO/GO_901_02.pdf …………………………..… 19

Peterson, Harold L., *Arms and Armor in Colonial America, 1526-1783* (Stackpole Co.1956) … 15

Portnoy, Jenna, *GOP congressman wants his colleagues to be able to carry guns
    everywhere, including in D.C.*, The Washington Post (June 19, 2017),
    available at https://www.washingtonpost.com/local/dc-politics/gop-congressman-wants-
    members-of-congress-to-be-able-to-carry-guns-everywhere-including-
    dc/2017/06/19/881d3dfc-5523-11e7-a204-ad706461fa4f_story.html …………………... 3

Public Hearing on B23-0018 (October 3, 2019), available at,
    https://lims.dccouncil.us/downloads/LIMS/41601/Hearing_Record/B23-0018-
    HearingRecord2.pdf …………………………………………………………………... 26, 27

Whisker, James, *The Gunsmith's Trade* (Mellen Press: 1992) …………………………… 15

**APPLICATION FOR PRELIMINARY INJUNCTION**

COMES NOW Plaintiffs, Dick Anthony Heller, Andrew Hanson and Elby Godwin, by counsel, and move this court for an order enjoining enforcement of certain parts of the District of Columbia's Code which outlaw the manufacture of one's own firearm and which unintentionally criminalizes ownership of handguns already lawfully owned by the public and by the District's own police force. As shown below the portions of the D.C. Code at issue here violate the Second Amendment and in one case the Fifth Amendment rights of Plaintiffs.

**I.      Introduction.**

Since the U.S. Congress granted it home rule in 1976, the District of Columbia has enacted wide ranging restrictions on firearms. *See* D.C. Law 1-85, Firearms Control Regulations Act of 1975 (effective September 24, 1976). Underlying the history of gun control in the District of Columbia has been a combination of what can only be described as obfuscation and obstinance. Indeed, the District has consistently misapplied basic firearms concepts, while consistently placing itself at odds with the US Constitution as well as case law from its own defeats in court. After 30 years, however, the reckoning began.

In March of 2007, the D.C. Circuit struck down the District's ban on handgun ownership by ordinary citizens. *See Parker v. District of Columbia,* 478 F.3d 370 (D.C. Cir. 2007), *affirmed, District of Columbia v. Heller*, 554 U.S. 570 (2008). District law had also rendered rifles and shotguns useless for self-defense by requiring such long guns to be unloaded and either disassembled or trigger-locked. Like the handgun prohibition, *Parker* and *Heller* invalidated the District's prohibition on bearing operable rifles or shotguns for immediate self-defense. *See Heller,* 540 U.S. at 630; *Parker,* 478 F.3d at 400-01.

Despite the Supreme Court's holding in *Heller*, the District continued to impose invalid restrictions on the right to keep and bear arms. The D.C. Circuit struck down several of those restrictions in a second *Heller* case. *See Heller v. District of Columbia,* 801 F.3d 264, 277-280 (D.C. Circuit 2015). In his dissent, then Judge Kavanaugh would have upended the bulk of the District's post *Heller* gun registration scheme. *See Heller v. District of Columbia,* 670 F.3d 1244, 1269-96 (D.C. Cir. 2011) (Kavanaugh, J., dissenting).

The District has premised firearms restrictions on blatantly false use of firearms terminology. It banned most semi-automatic firearms by erroneously classifying any semi-automatic firearm with a capacity of 12 or more rounds as a machine gun (i.e., fully automatic), *see* D.C. Law 1-85, § 101(10)(B), in plain conflict with the commonly understood definition of a machine gun under federal law, which is "Any weapon which shoots, is designed to shoot, or can be readily restored to shoot, automatically more than one shot without manual reloading, *by a single function of the trigger*." See 26 U.S.C. § 5845(b); *Staples v. United States,* 511 U.S. 600 (1994) (emphasis added).

Similarly, the District followed the same *modus operandi* regarding the carrying of firearms. D.C. law had provided for issuance of handgun carry licenses, but D.C. prohibited handgun ownership in the first place. Later it was a matter of judicial notice that no one actually was ever issued a carry license in the District.[1] *See Palmer v. District of Columbia,* 59 F.Supp.3d 173, 176 (D.D.C. 2014) ("Former D.C. Code § 22–4506 empowered the District of Columbia's police chief to issue licenses to carry handguns to individuals, including to individuals not residing

---

[1] This resulted in the anomalous situation where persons were prosecuted for the felony of carrying a handgun without a license, having no prospect they could be issued such a license.

in the District of Columbia. However, it was Defendant District of Columbia's policy for many years not to issue such licenses.")

In December 2008, after the handgun ban was struck down, D.C. repealed the Police Chief's authority to issue handgun carry licenses, altogether, removing any possibility for the average citizen to carry a firearm outside the home for personal protection. *Palmer v. District. of Columbia*, 59 F.Supp.3d at 176. This court in June of 2014 overturned the D.C.'s flat ban on citizen carry of handguns for self-defense. *Id.* at 173. When the District begrudgingly enacted a scheme to issue gun carry licenses, it was so restrictive that only 125 such licenses were issued according to a published report. *See* Portnoy, Jenna, *GOP congressman wants his colleagues to be able to carry guns everywhere, including in D.C.*, The Washington Post (June 19, 2017), available at https://www.washingtonpost.com/local/dc-politics/gop-congressman-wants-members-of-congress-to-be-able-to-carry-guns-everywhere-including-dc/2017/06/19/881d3dfc-5523-11e7-a204-ad706461fa4f_story.html. The D.C. Circuit found that the scheme violated the Second Amendment. *See Wrenn v. District of Columbia,* 864 F.3d 650 (D.C. Cir. 2017).

The District, however, had not learned its lesson. It pursued an agenda placing it in the extreme of U.S. jurisdictions. Indeed, D.C. was of one of a very few jurisdictions to ban *non-lethal* stun guns. It did so by erroneously placing stun guns and Tasers in the same category as destructive devices, i.e., bombs. As should have been expected, this infringement was eliminated after D.C. residents successfully sued to invalidate this infringement of their Second Amendment rights. *See Wright v. District of Columbia,* Case No. 1:2016 cv 01556 (D.D.C.) (D.C. repeals the ban on electronic arms following the entry of a stipulated preliminary injunction). Under this pressure, D.C. then repealed its requirement that possessors of pepper spray register such devices with the Metropolitan Police Department ("MPD"), a requirement the then acting police chief stated had

3

served no purpose. *See* D.C. B21-0886, Stun Gun Regulation Amendment Act of 2016 & Public Hearing Record (October 17, 2016), available at https://lims.dccouncil.us/downloads/LIMS/36420/Hearing_Record/B21-088-HearingRecord1.pdf.

As the District's once wide-ranging restrictions on the right to keep and bear arms have gradually been invalidated by the courts, D.C. has pursued the same agenda by restricting the supply of firearms. For example, the District restricts the location of firearm dealers so severely that it has made it impossible for any stocking gun retailer to exist in the City. *Cf. Ezell v. Chicago,* 651 F.3d 684 (7th Cir. 2011).

The immediate case arises from the fact that D.C. flatly prohibits the manufacture of a firearm; not a particularly dangerous and unusual firearm, *see, e.g., Heller,* 554 U.S. at 571 (discussing that laws forbidding the carrying of dangerous and unusual weapons were presumptively valid), but *any* firearm. *See* D.C. Code § 7-2504.01(a).

Imagine were the District to ban the act of publishing one's own words or prevent the opening of brick and mortar churches. Would this court not see such actions as utterly invalid under any standard of review? Similarly, how can there be a right to keep and bear arms, if there is no right to make an arm in the first place? Can there be any justification for an outright prohibition on the manufacture of a firearm, which is a Constitutionally protected item? This case presents that issue for this court's consideration.

Ironically, D.C. law recognizes an individual's right to manufacture his or her own ammunition. Per D.C. Code § 7-2504.01, a person "may engage in hand loading, reloading, or custom loading ammunition for his registered firearms." Conversely, the District recently supplemented its ban on making a gun by prohibiting even the import and possession of parts

4

necessary for the manufacture of a firearm by outlawing what it pejoratively calls "Ghost Guns." That is so poorly crafted that it effectively outlaws the possession of a vast array of popular, common handguns that the District regularly allows residents to register, including the very handgun it issues to the vast majority of its own police officers. Accordingly, this so-called "Ghost Gun" prohibition is hopelessly flawed and must be found invalid under the Second and Fifth Amendments.

## II.      The Parties.

Plaintiff Dick Anthony Heller is well known to this court. He is a natural person and a citizen of the United States and of the District of Columbia. He is a special police officer commissioned by the city to provide security services and carry a firearm on the job. He holds registration certificates for a number of firearms he personally owns. He holds a Concealed Pistol Carry License ("CPL") issued by MPD as well as a Concealed Firearm Permit issued by the Utah Department of Public Safety. He regularly legally carries a concealed firearm for personal protection within the District. Mr. Heller is also an NRA Certified Handgun Instructor. He is also a Second Amendment activist and was a plaintiff in each of the aforementioned *Heller* cases raising Constitutional issues with the District's firearm infringements.

Mr. Heller has desired for some time to try his hand at building a firearm. *See* Exhibit 1 (Declaration Under Penalty of Perjury of Dick Anthony Heller). After extensively researching the matter, on February 18, 2021, Mr. Heller contacted Adjunct Professor Stephen Bozich, owner of Bare Arms, LLC, located in Robbins, North Carolina. *Id.* Bare Arms offers several complete kits to build handguns: specifically, the metal frame 1911 Government model pistol chambered in .45 caliber, and the polymer frame Glock 17, 19 and 26 pistols, chambered in 9 mm parabellum. *Id.* Each kit comes with an unfinished frame, also called a receiver, and appropriate jigs and tools to

aid in the machining of the unfinished receiver into what ATF classifies as a firearm. *Id. See* https://www.barearms.com/. Mr. Heller subsequently purchased a kit to make a Glock style 9 mm handgun from Bare Arms. *See* Exhibit 1.

Desiring to ensure compliance with the District's requirement to register all firearms, Mr. Heller directed Bare Arms to ship the kit to one of the District's Federal Firearm Licensees ("FFL"), DC Security Associates ("DCSA") at 1413 K Street, 10th Floor, Washington, DC 20005-4577. *Id.* The kit was shipped on or about April 8, 2021, and received by DCSA on or about April 9, 2021. *Id.* On or about April 9, 2021, DCSA received direction from MPD that it was not to try to register the kit, was not to possess the kit in inventory and was to return the kit to the sender. *Id.* DCSA promptly returned the kit to Bare Arms. *Id.* On information and belief, MPD's direction was pursuant to the District's so-called "Ghost Gun" prohibition and its prohibition on manufacture of firearms. The District's so-called "Ghost Gun" prohibition and its ban on manufacture of firearms thus prevents Mr. Heller from making a firearm. He invokes this court's jurisdiction to remedy this violation of his Second Amendment rights. *See* Exhibit 1.

Plaintiff Andrew Hanson is a natural person and a citizen of the United States and of the District of Columbia. *See* Exhibit 2 (Declaration Under Penalty of Perjury of Andrew Hanson). He holds a registration certificate for a polymer frame handgun, specifically a Glock 43 9 mm handgun. *Id.* As we discuss below, because D.C. has apparently unwittingly made Mr. Hanson's polymer frame handgun illegal, Mr. Hanson fears confiscation of his registered polymer frame handgun and prosecution under the District's so-called "Ghost Gun" prohibition. He seeks this court's jurisdiction to enjoin the enforcement of this legislation against him with respect to his registered polymer framed handgun. *Id.*

Plaintiff Elby Godwin is a natural person and a citizen of the United States and of the District of Columbia. *See* Exhibit 3 (Declaration Under Penalty of Perjury of Elby Godwin). He holds a registration certificate for a polymer framed handgun, specifically a FN 509 9 mm handgun. As we discuss below, because the District has apparently unwittingly made Mr. Godwin's polymer frame handgun illegal, Mr. Godwin fears confiscation of his registered firearm and prosecution under the District's so-called "Ghost Gun" prohibition. He seeks this court's jurisdiction to enjoin the enforcement of this legislation against him with respect to his registered polymer framed handgun. *Id*.

Defendant District of Columbia is a municipal entity organized under the Constitution and laws of the United States. It is the seat of government of the United States. Article I, § 8 of the Constitution gives Congress plenary authority to make laws governing the seat of government of the United States. Congress has chosen to delegate the majority of its power to make laws for the governing of the District of Columbia to the mayor and city council of the District.

Defendant Robert Contee is the Chief of the MPD. Chief Contee is responsible for executing and administering the District of Columbia's laws, customs, practices, and policies at issue in this lawsuit; has enforced the challenged laws, customs and practices against plaintiffs, and is in fact presently enforcing the challenged laws, customs and practices. Defendant Contee is sued in both his individual and official capacities. *See* Ghost Guns Prohibition Emergency and Temporary Amendment Acts of 2020 Number, MPD CIR-20-01, available at https://go.mpdconline.com/GO/CIR_20_01.pdf.

### III.   Standing.

Plaintiffs have standing to bring this action. To show standing, they must allege a concrete and particularized injury that is either actual or imminent. *Lujan v. Defenders of Wildlife*, 504 U.S.

555, 560 (1992). That injury must be both fairly traceable to the challenged action of the defendants and redressable by the court. *Id*. at 560-61.  Plaintiffs plainly meet this requirement. Mr. Heller is suffering an immediate and continuing injury because the District has denied him the ability to acquire, possess and use a kit to make a firearm he would register and use within the District of Columbia for personal self-defense. There was a similar injury sufficient for standing in *Parker v. District of Columbia*, 478 F.3d at 376, where Mr. Heller was denied registration of a handgun to keep in his home for self-defense. Likewise, there was a similar injury in *Dearth v. Holder*, 641 F.3d 499 (D.C. Cir. 2011).  There the D.C. Circuit said

> We agree with Dearth that the Government has denied him the ability to purchase a firearm and he thereby suffers an ongoing injury. Dearth's injury is indeed like that of the plaintiff in *Parker*, who had standing to challenge the District of Columbia's ban on handguns because he had been "denied a registration certificate to own a handgun." 478 F.3d at 376. As we there stated, "a license or permit denial pursuant to a state or federal administrative scheme" that can "trench upon constitutionally protected interests" gives rise to "an Article III injury"; "the formal process of application and denial, however routine," suffices to show a cognizable injury.

Id. at 502.

Significantly in *Dearth*, the Government argued *Parker* did not control because the Government itself did not affirmatively deny Mr. Dearth's firearm purchase application. *Id.* The D.C. Circuit rejected that claim stating, "the Government cannot so easily avoid suit when it has erected a regulatory scheme that precludes Dearth from truthfully completing the application form the Government requires for the purchase of a firearm. Like Dick Heller in the *Parker* case, Mr. Dearth twice attempted to go through the 'formal process' of applying to purchase a firearm and each time failed because of the laws and regulations he now challenges." *Id.*

Mr. Heller bought the kit in question, had it shipped to DCSA so he could go through the formal process of applying to register the kit to comply with D.C.'s registration requirement, only

to have MPD order the FFL to return the kit to the seller. *See* Exhibit 1. So MPD is directly responsible for the injury Mr. Heller suffers. Thus, Mr. Heller suffer a concrete and continuing injury as a result of the challenged provisions of the D.C. Code and MPD's enforcement thereof. *See Va. State Bd. Of Pharmacy v. Va. Citizens Consumer Council, Inc.,* 425 U.S. 748, 750-57, 755 n.12 (1976) (consumers had standing to challenge constitutionality of state statute prohibiting pharmacists from advertising prescription drug prices); *NRA v. BATFE,* 700 F.3d 185, 190-91 (5th Cir. 2012) (18-20 year-olds had standing to challenge federal ban on purchase of a handgun by persons under 21). *See also Freeman v. Corzine,* 629 F.3d 146 (3rd Cir. 2010) (consumers had standing to challenge prohibition against interstate shipment of wine directly to consumers). *Accord Bridenbaugh v. Freeman-Wilson*, 227 F.3d 848, 849-50 (7th Cir. 2000). Inasmuch as the requested relief herein would redress Mr. Heller's injury by allowing him to acquire the kit, construct and register a firearm from that kit, favorable action from this court would resolve the injury Mr. Heller suffers as a result of the District's unconstitutional legislation enforced by the defendants. He thus has standing to bring this action.

Plaintiffs Hanson and Godwin have standing as well. They each possess a registered polymer frame handgun which the District's so-called "Ghost Gun" statute has now made unregistrable and unlawful to possess. District law now brands them as criminals, and they fear prosecution, or that the District may take action to confiscate their firearms or to revoke their firearm registrations for their polymer frame firearms. This plainly qualifies as a concrete injury. As detailed in the Complaint each of these plaintiffs face "a realistic danger of sustaining a direct injury as a result of the [law's] operation or enforcement." *Babbitt v. United Farm Workers Nat'l Union*, 442 U.S. 289, 298 (1979); *Skyline Wesleyan Church v. Cal. Dep't of Managed Health Care*, 968 F.3d 738, 747-48 (9th Cir. 2020). As Justice Marshall once explained, the inchoate threat of

prosecution is like the sword of Damocles in that the value of such a threat "is that it hangs – not

that it drops." *Arnett v. Kennedy*, 416 U.S. 134, 231 (1974) (Marshall, J., dissenting). *See also*

*Reno v. ACLU*, 521 U.S. 844, 882 (1997). Favorable action by this court will ameliorate the injury

these two plaintiffs face by invalidating the District laws which outlaw their polymer frame pistols.

Accordingly, they have standing as well.

## IV. Plaintiffs are entitled to a preliminary injunction against enforcement of the District statutes at issue in this case.

The court assesses a preliminary injunction request by looking at four factors. "A plaintiff

seeking a preliminary injunction must establish [1] that he is likely to succeed on the merits, [2]

that he is likely to suffer irreparable harm in the absence of preliminary relief, [3] that the balance

of equities tips in his favor, and [4] that an injunction is in the public interest." *Aamer v. Obama*,

742 F.3d 1023, 1038 (D.C. Cir. 2014) (quotation marks omitted). *See Mova Pharm. Corp. v.*

*Shalala*, 140 F.3d 1060, 1066 (D.C. Cir. 1998) (quoting *CityFed Fin. Corp. v. Office of Thrift*

*Supervision*, 58 F.3d 738, 746 (D.C. Cir. 1995)); *Serono Labs., Inc. v. Shalala*, 158 F.3d 1313,

1317-18 (D.C. Cir. 1998). "These factors interrelate on a sliding scale and must be balanced against

each other. 'If the arguments for one factor are particularly strong, an injunction may issue even if

the arguments in the other areas are rather weak.'" *Serono Labs*., 158 F.3d at 1318 (quoting

*CityFed Fin. Corp*., 58 F.3d at 746). Thus, "[a]n injunction may be justified, for example, where

there is a particularly strong likelihood of success on the merits even if there is a relatively slight

showing of irreparable injury." *CityFed Fin. Corp.*, 58 F.3d at 747.

Notwithstanding the fluid nature of this four-part inquiry, "[i]t is particularly important for

the [movant] to demonstrate a substantial likelihood of success on the merits." *Barton v. Dist. of*

*Columbia*, 131 F.Supp.2d 236, 242 (D.D.C. 2001) (citing *Benten v. Kessler,* 505 U.S. 1084 1085

(1992)). If the movant fails to do so, "it would take a very strong showing with respect to the other

preliminary injunction factors to turn the tide in plaintiffs' favor." *Davenport v. Intl Bhd. of Teamsters*, 166 F.3d 356, 366 (D.C. Cir. 1999). In this case each of the four factors heavily supports grant of a preliminary injunction. We turn now to application of each of the four preliminary injunction factors to this case.

A.    **Plaintiffs have a high likelihood of success on the merits.**

1.   **Factual background.**

a.  **The Second Amendment.**

The Second Amendment to the United States Constitution provides: "A well regulated Militia being necessary to the security of a free State, the right of the people to keep and bear Arms shall not be infringed." The Second Amendment guarantees individuals the fundamental right to keep and carry arms for self-defense and defense of others in the event of a violent confrontation. *District of Columbia v. Heller*, 554 U.S. 570; *McDonald v. Chicago*, 561 U.S. 742 (2010); *Caetano v. Massachusetts,* 577 U.S. __, 136 S.Ct. 1027 (2016); *Wrenn v. District of Columbia,* 864 F.3d 650; *Palmer v. District of Columbia,* 59 F.Supp.3d 173.

Arms are "'weapons of offence, or armour of defence.' 1 Dictionary of the English Language 107 (4th ed.). They are anything that a man [or woman] wears for his defense, or takes into his hands, or uses in wrath to cast at or strike another.' 1 A New and Complete Law Dictionary (1771)." *Heller*, 554 U.S. at 581. The Second Amendment extends, *prima facie*, to all instruments that constitute bearable arms, even those that were not in existence at the time of the founding. *Id.* at 582; *Caetano v. Massachusetts*, 577 U.S. at __, 136 S.Ct.1027. Under the Second Amendment, the District retains the ability presumptively to regulate the manner of keeping and carrying arms, including handguns, and may prohibit certain arms in narrowly defined sensitive places, prohibit the carrying of arms that are not within the scope of Second Amendment's protection, such as

unusually dangerous arms, disqualify specific, particularly dangerous individuals from possessing or carrying arms, and regulate the commercial sale of arms. *See Heller,* 554 U.S. at 627; *Wrenn v. District of Columbia,* 864 F.3d at 662-63 & n. 5. However, "[o]nce it is determined – as we have done – that handguns are "Arms" referred to in the Second Amendment, it is not open to the District to ban them." *Parker v. District of Columbia,* 478 F.3d at 400.

It follows from the guarantee of the Second Amendment that activities necessary for the exercise of the right to keep and bear arms themselves are protected by the amendment. *See Ezell v. City of Chicago*, 651 F.3d 684 (city could not ban firing ranges in the city while making range training a prerequisite of lawful firearms ownership). Thus, for example, the government cannot ban the manufacture of firearms, or the possession of materials from which firearms can be made, as the District has here done, as this would limit the people from acquiring new firearms, and over time result in a shortage of firearms as they wear out or break.

### b. District law.

D.C. Code § 7-2504.01 flatly bans the manufacture of firearms in the city:

**§ 7–2504.01. Manufacture of firearms, destructive devices or ammunition prohibited; requirement for dealer's license.**

(a)   No person or organization shall manufacture any firearm, destructive device or parts thereof, or ammunition, within the District; provided, that persons holding registration certificates may engage in hand loading, reloading, or custom loading ammunition for his registered firearms; provided further, that such person may not hand load, reload, or custom load ammunition for others.

D.C. Code § 22.4514 further outlaws what it pejoratively calls "Ghost Guns":

**§ 22–4514. Possession of certain dangerous weapons prohibited; exceptions.**

(a)   No person shall within the District of Columbia possess any … ghost gun …; provided, however, that … ghost gun, … may be possessed by the members of the Army, Navy, Air Force, or Marine Corps of the United States, the National Guard, or Organized Reserves when on duty, the Post Office Department or its employees when on duty, marshals, sheriffs, prison or jail wardens, or their

deputies, policemen, or other duly-appointed law enforcement officers, including any designated civilian employee of the Metropolitan Police Department, or officers or employees of the United States duly authorized to carry such weapons, banking institutions, public carriers who are engaged in the business of transporting mail, money, securities, or other valuables, wholesale dealers and retail dealers licensed under § 22-4510.

A "Ghost Gun" is defined in D.C. Code § 7-2501.01 as follows:

**§ 7–2501.01. Definitions.**

As used in this unit the term:

(9B) "Ghost gun":

> (A) Means:

> (i) A firearm that, after the removal of all parts other than a receiver, is not as detectable as the Security Exemplar, by walk-through metal detectors calibrated and operated to detect the Security Exemplar; or

> (ii) Any major component of a firearm which, when subjected to inspection by the types of detection devices commonly used at secure public buildings and transit stations, does not generate an image that accurately depicts the shape of the component; and

> (B) Includes an unfinished frame or receiver.

D.C. Code § 7-2501.01 defines a receiver as:

(12B) "Receiver" means the part of a firearm that provides the action or housing for the hammer, bolt, or breechblock and firing mechanism.

D.C. Code § 7-2501.01, in turn, defines an unfinished receiver as:

(17B)(A) "Unfinished frame or receiver":

> (i) Means a frame or receiver of a firearm that is not yet a component part of a firearm, but which may without the expenditure of substantial time and effort be readily made into an operable frame or receiver through milling, drilling, or other means; and

> (ii) Includes any manufactured object, any incompletely manufactured component part of a firearm, or any combination thereof that is not a functional frame or receiver but is designed, manufactured, assembled,

13

marketed, or intended to be used for that purpose, and can be readily made into a functional frame or receiver.

(B) For the purposes of this paragraph, the term:

(i) "Manufacture" means to fabricate, make, form, produce or construct, by manual labor or by machinery; and

(ii) "Assemble" means to fit together component parts.

D.C. Code § 7-2501.01 defines the security exemplar as:

(15A) "Security Exemplar" means an object, to be fabricated at the direction of the Mayor, that is:

(A) Constructed of 3.7 ounces of material type 17-4 PH stainless steel in a shape resembling a handgun; and

(B) Suitable for testing and calibrating metal detectors.

D.C. Code § 7-2502.02(a), in pertinent part, prohibits the registration of what DC defines as a "Ghost Gun," stating "A registration certificate shall not be issued for a: … (8) Ghost gun."

In sum, the District makes it a crime to make a firearm in the District, and makes it a crime to possess an unfinished firearm frame or receiver. Also, the District makes it a crime to possess a firearm the bare frame or receiver of which is less detectible than 3.7 ounces of ferrous metal. As discussed herein, these provisions raise grave Constitutional issues under the Second Amendment and the due process clause of the Fifth Amendment.

### c.  Self-made firearms.

The ability to self-manufacture arms has always been part of the Second Amendment right, as well as American history and tradition. Exhibit 4 at 5, Declaration Under Penalty of Perjury of Richard Vasquez. Although federal law now requires a license to engage in the business of manufacture of firearms, federal law has never prohibited a person from making one's own firearm. *Id.* The vast majority of states place few or no restrictions on self-made firearms either.

The colonists in the first permanent English settlements had the express right to import arms and the items necessary to make them. Binding his "Heirs and Successor," King James I in 1606 granted the "Southern Colony" (Virginia) the right to import from Great Britain "the Goods, Chattels, Amour, Munition, and Furniture, needful to be used by them, for their said Apparel, Food, Defence or otherwise." 7 Federal and State Constitutions: Colonial Charters, and Other Organic Laws of the States, Territories, and Colonies Now or Heretofore Forming the United States of America, 3787-88 (Francis Thorpe ed. 1909) (hereinafter "Federal and State Constitutions"). Similarly, the 1620 Charter of New England granted the colonists the right "to take, load, carry and transport in . . . Shipping, Armour, Weapons, Ordinances, Munitions, Powder, Shott, Victuals, and all Manner of Clothing, Implements, Furniture, Beasts, Cattle, Horses, Mares, and all other Things necessary for the said Plantation, and their Use and Defense, and for Trade with the People there." 3 Federal and State Constitutions, 1834-35. And "[f]rom the earliest periods American gunsmiths had made and repaired military firearms." Peterson, Harold L., *Arms and Armor in Colonial America* 178 (1956).

"The influence of the gunsmith and the production of firearms on nearly every aspect of colonial endeavor in North America cannot be overstated, and that pervasive influence continuously escalated following the colonial era." Brown, M.L., *Firearms in Colonial America: The Impact on History and Technology* 1492-1792 at 149 (1980). As historian Charles Winthrop Sawyer explained, "in the smaller shops which formed the great majority – mere cabins on the outskirts of the wilderness – one man with or without an apprentice did every part of the work." 1 Charles Winthrop Sawyer, *Firearms in American History* 145 (1910). Moreover, many gunsmiths worked primarily in other trades and built or repaired firearms on a non-commercial basis. *See* Whisker, James, *The Gunsmith's Trade*, 145-63 (1992).

15

During the Revolutionary War, many colonies relied on and incentivized people outside of the firearms industry to produce firearms. For example, on August 2, 1775, a committee appointed by Maryland's Provincial Convention "to enquire into the practicality of establishing a manufactory of Arms within this Province" determined that "Arms may be furnished sooner, and at less expense by engaging immediately all Gun Smiths, and others concerned in carrying on that business." *Journal of the Maryland Convention* July 26 – August 14, 1775, at 64-65 (William Hand Browne ed. 1892).

In January 1776, the New Hampshire House of Representatives passed a resolution to pay each person who "made" a firearm to certain specifications. "[E]very good firearm Manufactured I this Colony" was rewarded with "three pounds for each." 8 *Documents and Records Relating to the State of New-Hampshire During the Period of the American Revolution, From 1776 to 1783*, at 15-16 (Nathaniel Bouton ed. 1874).

In March of 1776, a committee of New York's Provincial Congress published notice "in all the publick Newspapers in this Colony" that "this Committee are ready to receive proposals from & treat with any Person or Persons who are willing to engage in manufacturing good Muskets, or the Locks, Barrels, or any necessary parts thereof." 5 *American Archives, Fourth Series,* 1418 (Peter Force ed. 1844). The Provincial Congress offered rewards for the manufacturers who could produce the largest number of arms for the colony but excluded "any person with whom the Congress or Committee of Safety have already contracted" – thereby incentivizing those capable of manufacturing arms but not necessarily in the firearms business.

A month later, the North Carolina Provincial Congress call for "all Gunsmiths, and other mechanicks, who have been accustomed to make, or assist in making Muskets" to be recruited to manufacture arms for the colony. 5 *American Archives, Fourth Series,* 1338. And further, "that

they be furnished, at the expense of this Colony, with tools, implements and utensils, and materials for carrying on the said work." *Id.*

Certainly, James Madison, who drafted what would become the Second Amendment, and the ratifiers of the Second Amendment contemplated that the young country owed its independence to and depended on the non-commercial manufacture of firearms for its continued survival and intended to protect that activity through the guarantee that the "right of the people to keep and bear arms *shall not be infringed."* Indeed, building firearms was entirely unregulated during early American history, and there were no restrictions making one's own arms.

"Our citizens have always been free to make, vend, and export arms.  It is the constant occupation and livelihood of some of them." Secretary of State Thomas Jefferson, letter to George Hammond, British Ambassador to the U.S., May 15, 1793, in 7 The writings of Thomas Jefferson 325 (Paul Ford ed. 1904). History thus paints a picture of Americans free to manufacture firearms for self-defense and other lawful purposes, and rightly so as the Second Amendment, through its text, as informed by history and tradition, is intended to protect this right as part of the fundamental liberty it secures.

### d.  Polymer frame pistols.

Traditionally, handguns (and other firearms) were made almost entirely out of metal except for the grips or stock. Exhibit 4 at 2. For hundreds of years, manufacturers constructed handguns including the frames, from steel or other metallic alloys due to their availability and durability. *Id.* Although these materials were durable, they were heavy, and weighed shooters down. *Id.* In the 1950s, aluminum and other light weight metals such as scandium started replacing steel frames in some designs. *Id.* Aluminum is much lighter than steel and almost as durable. For over twenty years, aluminum was the go-to lightweight metal for handgun frame manufacturing. *Id.*

17

In 1970, German firearms maker Heckler and Koch (H&K) introduced the VP70 polymer-framed handgun. *Id.* Although the VP70 was ahead of its time, the semi-automatic pistol version suffered from a very heavy trigger pull, making it hard to shoot, and it fell out of favor. *Id.* Polymer frame pistols would not gain popularity for more than ten years. *Id.* Pistols from an Austrian company named Glock were introduced in the United States in the mid-1980s. *Id.* Glock's 9 mm G-17 combined an extremely rugged yet lightweight polymer frame and a much more user-friendly trigger than the H&K VP70 pistol. *Id.* As the first commercially successful polymer-framed pistol, the Glock 17 set the stage for polymer frame handguns moving forward. *Id.*

As discussed above, metal frame handguns tend to be heavy. An advantage of a heavy handgun it that the weight counters the felt recoil and makes a pistol more comfortable to shoot. *Id.* However, the weight that makes metal-framed pistols advantageous for shooting is a hindrance when it comes to carrying the firearm. *Id.* If a handgun is strictly for target practice on the range, weight is not a substantial issue. *Id.* However, the weight of a metal frame gun can make carrying the firearm awkward and uncomfortable. *Id.* The takeaway is that heavier pistols are more comfortable to shoot than to carry. *Id.* The light weight of polymer-framed pistols makes them more comfortable to carry than metal-frame pistols, all other things being equal. *Id.* This has made polymer framed pistols the preferred handgun type for law enforcement and for civilians who carry a handgun for personal protection. *Id.* at 3.

Following the disastrous 1986 FBI Miami shootout, where two agents were killed and five others seriously wounded,[2] the FBI switched from 38 special revolvers to semi-automatic pistols,

---

[2] *See* Edmundo & Elizabeth Mireles, *FBI Miami Firefight: Five Minutes that Changed the Bureau* (2017); FBI, *A Bite Out of History: Fatal Firefight in Miami* (April 11, 2011), available at https://www.fbi.gov/news/stories/fatal-firefight-in-miami; Ayoob, Massad *The FBI Dadeland Shootout: Hero Agent Ed Mireles Speaks,* American Handgunner (2018), available at

eventually settling on the Glock polymer frame pistol. *See A History of FBI Handguns*, American Rifleman (August 22, 2011), available at https://www.americanrifleman.org/content/a-history-of-fbi-handguns/. Police departments around the nation soon followed, and a substantial majority of police departments around the country now issue polymer framed semi-automatic pistols to their officers. *See, e.g.,* https://www.tactical-life.com/firearms/handguns/largest-departments-police-sidearms/; https://www.policeforum.org/assets/docs/Free_Online_Documents/Gun_Violence_Reduction/police%20department%20service%20weapon%20suvey%202013.pdf.   Indeed, the District's MPD issues the polymer frame Glock 17 or Glock 19 pistol to the vast majority of its officers. *See* Mihaler, Donald J., *Police Sidearms: The Handguns of America's 10 Largest Departments*, Tactical-Life (May 18, 2018), available at *https://www.tactical-life.com/firearms/handguns/largest-departments-police-sidearms/*. *See also* MPD General Order 901.2, *Wearing of Personal, Non-Issued Pistols and Holsters* at p.3, available at https://go.mpdconline.com/GO/GO_901_02.pdf (authorizing the carry of Glock 19 and Glock 26 as permissible off-duty personal weapons). The guns' light weight, capacity and reliability enhance their utility as a law enforcement personal protection firearm. *See* Exhibit 4 at 3. For similar reasons, polymer frame pistols are popular with civilians.  An article charting the top 10 pistols sold in the year 2020 on the web site guns.com revealed that all 10 models were polymer frame pistols. *See https://www.guns.com/news/2020/12/29/top-selling-pistols-on-gunscom-in-2020.*[3]

---

https://americanhandgunner.com/our-experts/the-fbi-dadeland-shootout-hero-agent-ed-mireles-speaks/.

[3] In order of sales (most to least), the guns were: Glock 19, Glock 17, Sig P365, Glock 43X, Sig P320, Smith & Wesson ("S&W") M&P Shield, S&W M&P 9, Glock 44, Ruger 57 and Taurus G2C. All are polymer frame pistols. *Id.*

### e.  Undetectable firearms.

An undetectable firearm is a firearm which is not detectible by a walk-through metal detector, or which does not depict its actual shape when passed through a screening X-ray machine. *See* Exhibit 4 at 3. Congress addressed the matter of undetectable firearms in the 1980's. *Id.* At that time, the Glock 17 handgun had started to be imported into the United States for sale. *Id.* It would later be manufactured in Smyrna, Georgia. *Id.* A mistaken concern arose, powered by gun control advocates, a Washington Post column by Jack Anderson, and repeated in the Bruce Willis movie, *Die Hard II*, that the Glock 17 was not detectible by airport metal detectors because the frame of the firearm is constructed of lightweight polymer.[4] *Id.* In fact, erroneous reports arose that the firearm was constructed of virtually no metal whatsoever. *Id.* However, the Glock and various other popular polymer framed guns, like the H&K VP9 and the FN 507, are not plastic guns. *Id.* at 3-4. Their barrels and slide mechanisms are composed almost entirely of metal. *Id.* at 4. They are readily detectible as firearms when passing through an X-ray machine or an airport style metal detector. *See* Koppel, *The 1986 Plastic Gun Panic*, *supra,* available at https://reason.com/volokh/2018/08/07/the-1986-plastic-gun-panic/. *See also* Exhibit 4 at 4.

To deal with the potential issue of undetectable firearms, Congress enacted 18 U.S.C. § 922(p), which in pertinent part provides:

(1)  It shall be unlawful for any person to manufacture, import, sell, ship, deliver, possess, transfer, or receive any firearm—

---

[4] *See* Kopel, David, *The 1986 Plastic Gun Panic,* Reason Magazine (August 7, 2018), available at https://reason.com/volokh/2018/08/07/the-1986-plastic-gun-panic/. In *Die Hard II*, McClane (Bruce Willis) identifies the Glock 17 handgun depicted in the movie to Chief Lorenzo (Dennis Franz) as a "Glock 7," (no such model exists) and recites a string of inaccuracies, describing it as "a porcelain gun made in Germany that doesn't show up on your airport metal detectors and costs more than you make in a month." That scene can be viewed at https://video.search.yahoo.com/search/video?fr=mcafee&ei=UTF-8&p=Die+Hard+II+glock&type=E211US105G0#id=3&vid=8aa6f8d471f33ea0ec2ea07d3ac285c2&action=click.

(A)   that, after removal of grips, stocks, and magazines, is not as detectable as the Security Exemplar, by walk-through metal detectors calibrated and operated to detect the Security Exemplar; or

(B)   any major component of which, when subjected to inspection by the types of x-ray machines commonly used at airports, does not generate an image that accurately depicts the shape of the component. Barium sulfate or other compounds may be used in the fabrication of the component.

(2) For purposes of this subsection —

(A) the term "firearm" does not include the frame or receiver of any such weapon;

(B) the term "major component" means, with respect to a firearm, the barrel, the slide or cylinder, or the frame or receiver of the firearm; and

(C) the term "Security Exemplar" means an object, to be fabricated at the direction of the Attorney General, that is—

(i) constructed of, during the 12-month period beginning on the date of the enactment of this subsection, 3.7 ounces of material type 17–4 PH stainless steel in a shape resembling a handgun; and

(ii) suitable for testing and calibrating metal detectors ….

Federal law is significantly more narrowly tailored to address the question of undetectable firearms than the D.C. statute. Rather than removing all parts other than the receiver, which by itself cannot fire a projectile, federal law asks whether the functioning gun (after removing the grip, stocks and magazine – which generally have no role in determining whether the firearm can fire) can be detected when passing through a metal detector, or whether the various components when passing through an X-ray machine generate an image that accurately depicts their actual shape. *See* Exhibit 4 at 4.

All polymer pistols legally sold or imported in the United States comply with this federal statute. *Id*. Such guns contain sufficient metal in their slides and barrels to register when passed through a metal detector, and the frames of these guns are accurately depicted when passing

through an X-ray machine. *Id.* at 4-5. The federal statute prevents someone from passing a functioning gun through an airport type metal detector or even a stripped-down frame through an X-ray machine without it being detectable. *Id.* at 5.

By contrast, the D.C. definition of "Ghost Gun" requires that the frame of a pistol contain at least 3.7 ounces of metal. *Id.* Because of that requirement, D.C. outlaws all models of the Glock handgun as well as most polymer framed pistols sold or possessed in the United States. *Id.* There are millions of such firearms in circulation in the United States. *Id.* Upon information and belief, many thousand such firearms are registered with MPD. They are among the more popular handguns in the country. *Id.* All of these aforementioned guns are readily detectible by airport style metal detectors and X-ray machines; yet based on the literal wording of D.C.'s definition of "Ghost Gun," are prohibited. *Id.* It may be that the D.C. Council and Government are so ignorant of firearm technology that they simply do not know what they have done. In any event, plainly grave constitutional issues are presented by the city's definition of the term "Ghost Gun."

### 2. *D.C.'s prohibition on manufacture of firearms violates Mr. Heller's Constitutional right to build, possess and register a serialized firearm. It is therefore facially unconstitutional and as applied to Mr. Heller.*

D.C. law violates Mr. Heller's Second Amendment right to make and possess a registered, serialized firearm. D.C. bans the manufacture of a Constitutionally protected item. This prohibition on manufacture is facially invalid under any standard of review applied to enumerated Constitutional rights. *See District of Columbia v. Heller,* 554 U.S. at 628-29; *Wrenn v. District of Columbia,* 864 F.3d at 664-67. A prohibition on manufacturing a Constitutionally protected item necessarily infringes on the right of the people of the District to keep and bear arms. If an item cannot be produced, the people cannot acquire it, keep it or bear it. We know of no other jurisdiction in the United States that has purported to ban the manufacture of firearms. Perhaps the

District can point one out. Even if the District could do so, just as the District's ban on handguns in *Heller* (*see Id.* at 629) was an outlier, so is its prohibition on manufacturing firearms. *See also Yukutake v. Connors,* Civ. No. 19-00578, *slip op.* at 31 (August 16, 2021) (enjoining Hawaii requirement for in person inspection and registration of firearms, noting that Hawaii was the only state to so require).

D.C. may say that firearms can be produced in other jurisdictions and that the people of the District are not prohibited from acquiring firearms produced in other jurisdictions. That argument fails, because if D.C. can ban the manufacture of firearms consistent with the Second Amendment, then all other jurisdictions could ban their manufacture as well. This would render the Second Amendment right to keep and bear arms a nullity. The 7th Circuit rejected a similar argument in *Ezell*, which invalidated Chicago's ban on shooting ranges. *See Ezell v. Chicago,* 651 F.3d 684. Moreover, any suggestion that banning only a subset of firearms is no burden because other classes of firearms are available is foreclosed by *Heller*. *See* 554 U.S. at 629. *See also Parker v. District of Columbia*, 478 F.3d at 400 ("frivolous" to suggest that banning one type of firearm while allowing others "does not implicate the Second Amendment …. It could also be contended that all firearms may be banned so long as sabers were permitted."). To ban making a firearm, it must at least be both dangerous *and* unusual. *See Heller,* 554 U.S. at 623, 627 (discussing the historical ban on carrying dangerous and unusual weapons). Yet, the District bans the making of *all* firearms.

Consider the analogous case of abortion. Say the District decided to ban abortions conducted in D.C. on the theory that a woman desiring an abortion could simply obtain an abortion in another jurisdiction. The court would make short work of such a ban, *see, e.g., Planned Parenthood of Southeastern Pennsylvania v. Casey,* 505 U.S. 833 (1992), as it should this particular ban on manufacturing firearms. Likewise, consider a law that banned the publishing of

books in the District on the theory that books could be sold in the District produced in other jurisdictions. To even state the proposition is to highlight its obvious unconstitutionality.

D.C. may say that it has a legitimate interest in *regulating* the manufacture of firearms under its general police power. That may well be true. But the instant prohibition on the making of any and all firearms in the District is not a narrowly tailored regulation addressed to a specific compelling or even substantial public interest concern; it is a grossly overbroad remnant of unconstitutional animus toward the fundamental Constitutional right to keep and bear arms. It is not regulation, it is prohibition. If *Heller* means anything, it is that the District simply cannot prohibit the manufacture of a Constitutionally protected item in the guise of regulating such item. *See. People v. Aguilar,* 2 N.E.3d 321 (Ill. 2013) (striking down as facially invalid Illinois's prohibition on carrying a firearm outside the home stating, "we cannot escape the reality that, in this case, we are dealing not with a reasonable regulation but with a comprehensive ban ...").

D.C. may very well be entitled to enact legislation regulating the making of firearms, but it may not consistent with the Constitution, flatly prohibit their manufacture. In this case, the District laws in question have prevented Mr. Heller from acquiring and possessing in the District the precursor parts necessary for him to construct a firearm; moreover, even if he could legally construct the firearm in the District – which District laws prohibit – he is forbidden to possess the constructed firearm and may not register it to comply with District law. The District has thus violated his Second Amendment right to make a firearm and to possess it. Mr. Heller is likely to succeed on the merits of his claim against the District in this regard.

### 3.   D.C.'s definition of a so-called "Ghost Gun" violates the Second Amendment right of plaintiffs in that it outlaws commonly owned polymer frame firearms.

Like its statute that outright bans the making of firearms, D.C.'s prohibition on so-called "Ghost Guns" violates the Second Amendment because the definition of "Ghost Gun" is so over-

broad that it outlaws commonly owned polymer frame pistols such as the Glock pistol it issues to its police officers. We start with what is admittedly a legitimate governmental concern. The D.C. legislation which constitutes its "Ghost Gun" ban is apparently directed toward untraceable firearms – guns lacking a serial number – that could end up in the hands of persons disqualified from possessing firearms, for one reason or another – for example, because they are felons, domestic abusers, or suffer from a mental illness. *See Mayor Bowser Announces Emergency Ghost Gun Legislation* (February 18, 2020), available at https://dc.gov/release/mayor-bowser-announces-emergency-ghost-gun-legislation. Given this admittedly legitimate governmental interest, it is astounding that the D.C. Ghost Gun legislation, doesn't say a word about lack of a serial number on a so-called "Ghost Gun." Nonetheless, we do not contest that the intent of the legislation is to address a legitimate governmental concern. It just does not do it very well at all.

Additionally, the District is apparently concerned with 3-D printed firearms that are supposedly not detectible when passed through an X-ray machine or a metal detector like those used at airports and government buildings. *See Id*. We do not contest that the District can address such concerns. The problem is that the District has legislated by blindly wielding a meat axe when the Constitution requires it to carve carefully with a scalpel so as not to slice away Constitutionally protected liberty. And in acting here, D.C.'s legislation is so overbroad that it outlaws the very handgun it issues to its police force, the Glock pistol, as well as a multitude of other popular handguns that it regularly registers to D.C. residents.

D.C.'s overbroad "Ghost Gun" legislation outlaws firearms constructed with polymer receivers, such as the registered firearms owned and possessed by Mr. Hanson and Mr. Godwin, and that would be possessed by Mr. Heller once he constructs the polymer frame firearm from the

kit D.C. prohibits him from acquiring and possessing in the District. This is apparent in analyzing how the District defines a "Ghost Gun." The very first definition of "Ghost Gun" is:

> A firearm that, after the removal of all parts other than a receiver, is not as detectable as the Security Exemplar, by walk-through metal detectors calibrated and operated to detect the Security Exemplar;

D.C. Code § 7-2501.01(9B)(a)(i). Removing all the parts of a polymer frame firearm except the receiver leaves one with the polymer frame. The polymer frame, being made of polymer, it plainly lacks 3.7 ounces of metal. *See* Exhibit 4 at 5. Thus, this definition outlaws the entire class of polymer frame pistols, with the possible exception of the Smith & Wesson M&P series, a class of firearms immensely popular with law enforcement and citizens alike. *Id.* Polymer frame pistols have been around for more than 40 years. Despite the fear occurring in their early introduction in this country, there is no record of persons being able to smuggle polymer frame guns through metal detectors. Although the frames (or receivers) are made of polymer, the barrels and slide assemblies contain sufficient metal to be detected by standard metal detectors. *Id.* at 4-5.

Congress specifically addressed the issue of undetectable firearms in the 1980s with a narrowly drawn statute that fully covered the issue. *See Id.* at 4*;* 18 U.S.C. § 922(p). Nothing in the legislative history of the provisions at issue here indicates that D.C. has suffered a security breach from someone passing a stripped-down polymer receiver through a metal detector. Rather the legislative history indicates the stated concern was that several unserialized firearms had been recovered from crime scenes, and a concern with respect to 3-D printed firearms made entirely of material other than metal of which there is no record of any such firearm being used in a crime or discovered in the District of Columbia). *See generally* Public Hearing on B23-0018 (October 3, 2019).

The fear that polymer frame guns are undetectable was unfounded. As Professor Kopel pointed out:

> Phillip McGuire testified to Congress on behalf of the Bureau of Alcohol, Tobacco and Firearms. McGuire was not exactly an opponent of gun control. He would later take a job with the leading gun control group of the day, Handgun Control, Inc. McGuire testified before Congress:
>
> > There is still no evidence that we hold that a firearm intrinsically capable of passing undetected through conventional x-ray and metal detector systems exists or is feasible under any current technology immediately available to us.
>
> Testimony of Phillip C. McGuire, Associate Director, Office of Law Enforcement, Bureau of Alcohol, Tobacco and Firearms before the Senate Committee on Judiciary, Subcommittee on the Constitution, July 28, 1987.
>
> At that same hearing, Raymond A. Salazar, Director of Civil Aviation Security for the Federal Aviation Administration testified: "We are aware of no current 'non-metal' firearm which is not reasonably detectable by present technology and methods in use at our airports today."
>
> FAA Director for Civil Aviation Security Billie Vincent told Congress: "despite a relatively common impression to the contrary, there is no current non-metal firearm which is not reasonably detectably by present technology and methods in use in our airports today, nor to my knowledge is anyone on the threshold of developing such a firearm."
>
> Congress was shown photos of Glocks under a metal detector, reveal[ing] the Glock's easily visible profile. Even when the Glocks were disassembled, the photos showed the parts to be easily detected.

Kopel, *The 1986 Plastic Gun Panic*, available at https://reason.com/volokh/2018/08/07/the-1986-plastic-gun-panic/. *See also* Exhibit 4.

Testimony was produced on the legislation at issue here indicating that plans are in circulation on the Internet for a firearm that is mostly non-metallic. *See* Public Hearing on B23-0018. This is the Cody Wilson designed "Liberator" firearm. *See*

https://www.vam.ac.uk/articles/the-liberator-the-worlds-first-3d-printed-handgun.[5] However, the legislation at issue here sweeps well beyond addressing such a firearm, which federal law in any event already outlaws unless that firearm contains the requisite amount of metal necessary for detection by airport type metal detectors.

There is no compelling state interest for the District to have outlawed the entire class of commercially (or privately) manufactured polymer framed pistols in an effort to prohibit 3-D printed undetectable firearms. A stripped-down polymer pistol frame is incapable of firing a projectile. *See* Exhibit 4 at 4. It has no barrel; it has no slide; it has no firing pin (called a striker with respect to polymer frame pistols); it has no magazine to hold the ammunition it lacks.  It needs those other metal parts to become a functional firearm. *See Id.* at 4 Indeed, it would appear that the District never intended to and does not realize that it has outlawed run of the mill commercially produced polymer frame firearms, as on information and belief, MPD continues to approve the registration of Glocks and similar polymer frame firearms.

Nonetheless, the District has now (likely unwittingly) outlawed the registered pistols possessed by plaintiffs Mr. Hanson and Mr. Godwin. Although they understand the District may not intend at this time to take enforcement action against them, they nonetheless fear potential prosecution of themselves and/or confiscation of their lawfully acquired firearms. Because D.C. Code § 7-2501.01(9B)(a)(i) outlaws an entire class of immensely popular firearms via its grossly overbroad reach, the District has violated the Second Amendment rights of plaintiffs and plaintiffs

---

[5] Mr. Wilson produced a firearm where all parts except two were made via a 3-D printing process employing a plastic compound. *Id.* The firearm was equipped with a 6 ounce metallic insert to comply with 18 U.S.C. § 922(p). *Id.* The firearm was capable of firing one round without manual reloading. *Id.*  To reload the firearm, it had to be disassembled. *Id. See also* Exhibit 4 at 6.

are likely to prevail on their request that the court permanently enjoin the enforcement of D.C.

Code § 7-2501.01(9B)(a)(i) and declare the provision in question to be unconstitutional.

We emphasize that all D.C. had to do to make this provision Constitutional was to track

the wording of 18 U.S.C. § 922(p)(1)(A), by prohibiting possession of a firearm, but not a receiver

or frame:

> that, after removal of grips, stocks, and magazines, is not as detectable as the
> Security Exemplar, by walk-through metal detectors calibrated and operated to
> detect the Security Exemplar[.]

Because the provision at issue is grossly overbroad, plaintiffs are likely to prevail on the merits of

their claims.[6]

### 4. D.C.'s prohibition on possessing an "unfinished receiver" violates both the Second and Fifth Amendments.

D.C. law further defines a "Ghost Gun" to include an unfinished receiver, and in turn

defines that term as:

> (i) … a frame or receiver of a firearm that is not yet a component part of a firearm,
> but which may without the expenditure of substantial time and effort be readily

---

[6] Although D.C. Code § 7-2501.01(9B)(a)(i) is unconstitutional, the second component of D.C.'s "Ghost Gun" definition is less problematic, and we believe likely would survive Constitutional scrutiny. That sub-section reads:

> Any major component of a firearm which, when subjected to inspection by the
> types of detection devices commonly used at secure public buildings and transit
> stations, does not generate an image that accurately depicts the shape of the
> component;

D.C. Code § 7-2501.01(9B)(a)(ii). This portion of the "Ghost Gun" definition comports closely with 18 U.S.C. § 922(p)(1)(B) with the exception that it omits to define the term "major components." The term "major components" is defined in the federal statute to encompass the "barrel, the slide or cylinder, or the frame or receiver of the firearm." 18 U.S.C. § 922(p)(2)(B). We do not believe the omission of the definition of "major components" likely renders D.C. Code § 7-2501.01(9B)(a)(ii) void for vagueness in light of the corresponding definition in federal law. A reviewing court would likely save this portion of the statute by limiting the term "major component" to the 18 U.S.C. § 922(p) definition. We believe a different result is required, however, with respect to D.C.'s ban on unfinished receivers as we discuss *infra*.

made into an operable frame or receiver through milling, drilling, or other means; and

(ii) Includes any manufactured object, any incompletely manufactured component part of a firearm, or any combination thereof that is not a functional frame or receiver but is designed, manufactured, assembled, marketed, or intended to be used for that purpose, and can be readily made into a functional frame or receiver.

D.C. Code § 7-2501.01(17B)(A). D.C.'s characterization of an unfinished receiver as a prohibited "Ghost Gun" violates Mr. Heller's Second Amendment right to make a firearm. In addition, the definition of unfinished receiver is Constitutionally infirm because of vagueness. Accordingly, plaintiffs are likely to succeed in invalidating these provisions. We discuss vagueness first.

### a.   D.C. Code § 7-2501.01(17B)(A) is void for vagueness.

Exactly what the terms "without the expenditure of substantial time and effort be readily made" in subsection (i) and "readily made" in subsection (ii) means in the statute defining a "Ghost Gun" raises the obvious problem that these definitions are unconstitutionally vague and thus void. The Due Process Clause of the Fourteenth Amendment prohibits the enactment or enforcement of vague legislation. *Sessions v. Dimaya*, 584 U.S. __, 138 S.Ct. 1204, 1212 (2018) ("the prohibition of vagueness in criminal statutes … is an 'essential' of due process, required by both 'ordinary notions of fair play and the settled rules of law'"). A penal statute must "define the criminal offense with sufficient definiteness that ordinary people can understand what conduct is prohibited and in a manner that does not encourage arbitrary and discriminatory enforcement." *Kolender v. Lawson*, 461 U.S. 352, 357 (1983). "[A] vague law is no law at all." *United States v. Davis*, 139 S.Ct. 2319, 2323 (2019). *See also Grayned v. City of Rockford*, 408 U.S. 104, 108-109 (1972) ("A vague law impermissibly delegates basic policy matters to policemen, judges, and juries for resolution on an ad hoc and subjective basis"): *Giovani Carandola, Ltd. v. Fox*, 470 F.3d 1074, 1079 (4th Cir. 2006) (recognizing that "[a] statute is impermissibly vague if it either (1) fails to provide people of

ordinary intelligence a reasonable opportunity to understand what conduct it prohibits or (2) authorizes or even encourages arbitrary and discriminatory enforcement" (internal quotations omitted)). *See also FCC v. Fox Television Stations, Inc.,* 567 U.S. 239 (2012).

Such a statute need not be vague in all possible applications to be void for vagueness under the Due Process Clause. *Johnson v. United States*, 576 U.S. 591, 602 (2015). "*Johnson* made clear that our decisions 'squarely contradict the theory that a vague provision is constitutional merely because there is some conduct that clearly falls within the provision's grasp.'" *Sessions v. Dimaya*, 138 S.Ct. at 1214 n.3. A court also "cannot construe a criminal statute on the assumption that the Government will use it responsibly," *United States v. Stevens*, 559 U.S. 460, 480 (2010), and "cannot find clarity in a wholly ambiguous statute simply by relying on the benevolence or good faith of those enforcing it." *Wollschlaeger v. Governor, Fla.*, 848 F.3d 1293, 1322 (11th Cir. 2017) (en banc).

In *Springfield Armory v. City of Columbus*, 29 F.3d 250, 252 (6th Cir. 1994) (hereinafter "*Springfield Armory")*, the court found a Columbus, Ohio so-called assault weapons ban unconstitutionally vague because in addition to banning a lengthy list of firearms, it purported to also ban firearms with "similar action designs" or with "slight modifications." The court stated that the use of the term "slight modifications" made the ordinance vague because it did not give any criteria to determine what constituted a "slight" modification. The court also found that the use of the term "modification" itself was also vague because it would require the person to know if his firearm was designed based upon one of the listed firearms. *Id.* at 253. *See also Peoples Rights Organization v. City of Columbus,* 152 F.2d 522, 538 (6th Cir. 1998) (hereinafter *"Peoples Rights")* (finding the term "may be readily assembled" to be void for vagueness in connection with a municipal assault weapons ban).

31

Likewise, D.C. Code § 7-2501.01(17B)(A)'s use of the indefinite terms in discussing unfinished receivers of "readily made" and "without the expenditure of substantial time and effort be readily made" without providing criteria to determine exactly what is prohibited, leaves the average citizen like Mr. Heller with no understanding of what is in fact prohibited as to an unfinished receiver.[7] What does "readily made" actually mean? What does "the expenditure of substantial time and effort" mean." An hour's work? A day's work? A week's work? D.C. residents are left to guess. Because the D.C. definition of "unfinished receiver" suffers from the same infirmities as the statutes at issue in *Springfield Armory* and *Peoples Rights*, D.C. Code § 7-2501.01(17B)(A) must be declared void for vagueness.

Manufacturing an unfinished receiver into a "functional receiver" is not a trivial process, as pointed out in court filings submitted by the ATF and the Department of Justice. For example, in *State of California v. BATF*, No. 20-cv-6761 (N.D. Cal.), the Department of Justice and the ATF explained the process of finishing a lower receiver for an AR type rifle (the part of the rifle ATF considers to constitute a firearm when completed):

An unfinished receiver that has not yet had "machining of any kind performed in

---

[7] The Justice Department and ATF recently published a proposed rule in the Federal Register that seeks to clarify the definition of a "receiver." *See Definition of "Frame or Receiver" and Identification of Firearms*, 86 Fed. Reg. 27720-01, 27730, 2021 WL 2012830 (May 21, 2021) (refining the definition of "receiver" by reference to a list of factors to be considered in determining whether an object can be "readily converted" to a firearm within the meaning of § 921(a)(3)). By contrast, D.C.'s definition of an "unfinished receiver" lacks any such discussion that would clarify what is and what is not an "unfinished receiver."

It is noteworthy that ATF implicitly recognizes the Second Amendment right for a private individual to make his or her own firearm as nothing in its proposed rules would regulate the possession or manufacture of privately manufactured firearms for personal use. *See* 86 Fed. Reg. at 27725 ("nothing in this rule would restrict persons not otherwise prohibited from possessing firearms from making their own firearms at home without markings solely for personal use (not for sale or distribution) in accordance with Federal, State, and local law"). The proposed rule thus would regulate federal firearm licensees, but not private individuals who make their own firearms. *See* 86 Fed. Reg. at 27732.

the area of the trigger/hammer (fire-control) recess (or cavity)," see ATF Firearms Technology Branch Technical Bulletin 14-01 ("Bulletin 14-01"), filed in Calif. Rifle and Pistol Assn v. ATF, Case No. 1:14-cv-01211, ECF No. 24 at 285 (E.D. Cal. Jan. 9, 2015), requires that numerous steps be performed simply to yield a receiver, that then in turn must be assembled with other parts into a device that can expel a projectile by the action of an explosive. These milling and metalworking steps—each of which require skills, tools, and time—include: 1) "milling out of fire-control cavity"; 2) "drilling of selector-lever hole"; 3) "cutting of trigger slot"; 4) "drilling of trigger pin hole; and 5) "drilling of hammer pin hole." Compl. Ex. 9.

* * * *

The need to conduct these machining steps from scratch, without indexing, and "carefully" means a working gun cannot be produced "without difficulty." Id. And the work to excavate the cavities and drill holes in a solid, unmachined substrate requires care rather than speed to avoid doing so raggedly or in the wrong area. See id. Therefore, the receiver cannot be completed "without delay," even leaving aside the further assembly with many other parts needed to have a weapon that can expel a bullet by explosive action. A receiver blank therefore may not "readily be converted" into a firearm.

Federal Defendants' Notice Of Motion And Motion To Dismiss Plaintiffs' Complaint For Declaratory And Injunctive Relief, at 16-17 (filed Nov. 30, 2020). Is this the type of process the District considers to be "readily made without the expenditure of substantial time and effort"? How is anyone to know?

D.C. Code § 22-4514(a) is the statute which criminalizes possession of a so-called Ghost Gun as defined by D.C. Code § 7-2501.01. There is no *mens rea* requirement in the statute. However, the Supreme Court in *City of Chicago v. Morales*, 527 U.S. 41, 55 (1999), stressed, that a *mens rea* requirement is especially critical to the question of facial validity under the Due Process Clause. In that case, the Court found highly significant that the ordinance was a "criminal law that contains no *mens rea* requirement" and concluded "[w]hen vagueness permeates the text of such a law, it is subject to facial attack." See *Hill v. Colorado*, 530 U.S. 703, 732 (2000) (stressing the importance of "a scienter requirement" in a vagueness challenge).

The Supreme Court has repeatedly stressed the importance of *mens rea* in addressing federal firearms law as well. *See, e.g., Rehaif v. United States*, 139 S.Ct. 2191, 2196 (2019) (noting

"a basic principle that underlies the criminal law, namely, the importance of showing what Blackstone called 'a vicious will'"); *Staples v. United States*, 511 U.S. at 610-11 (imposing a *mens rea* requirement for the crime of illegal possession of a machine gun, noting that "there is a long tradition of widespread lawful gun ownership by private individuals in this country," and explaining that "despite their potential for harm, guns generally can be owned in perfect innocence"). D.C.'s so-called Ghost Gun ban has no such *mens rea* or scienter requirement and thus criminalizes conduct and activities regardless of intent or knowledge of a person. Vagueness, coupled with the total absence of any *mens rea* requirement, renders the definition of "Ghost Gun" in D.C. Code § 7-2501.01(17B)(A) facially invalid.

### b. D.C. Code § 7-2501.01(17B)(A) violates the Second Amendment because is it grossly overbroad and not narrowly tailored.

D.C.'s ban on owning an unfinished receiver – assuming D.C. could define that term with sufficient definiteness to avoid the void for vagueness infirmity discussed above – also violates the Second Amendment for the same reasons that D.C.'s ban on manufacturing a firearm violates the Second Amendment. The manufacture of a firearm necessarily entails the manufacture of various parts, including a frame or receiver. (Under federal law, a completed receiver is classified as a firearm.) At some point in the manufacturing process an object will meet the definition of what D.C. defines as an unfinished receiver on the way to becoming a complete receiver and thus a firearm – putting aside that we don't know from D.C.'s definition exactly when that point is. And at that point, the maker of the firearm, for example, Mr. Heller or some other person, would be in violation of District law. So, the prohibition on possessing an unfinished receiver, amounts to an additional prohibition on manufacturing a firearm, a Constitutionally protected item. As such, the flat-out prohibition on possessing an unfinished receiver necessarily violates the Second Amendment. Mr. Heller sought to import an unfinished receiver kit into the District to construct a

registered, serialized firearm. Because District law prohibits him from possessing the unfinished receiver, it denies to him his right under the Second Amendment to manufacture a firearm.

As we discussed above, the District has a legitimate government interest in preventing persons such as felons, mentally ill persons, domestic abusers and other prohibited persons from making guns incapable of being traced because of the lack of a serial number.  (We note federal law does not allow the transfer of firearms lacking a serial number. We also note that Mr. Heller is not a prohibited person). The problem is D.C. again has swept far too broadly in addressing this concern. Because Second Amendment rights are fundamental, limitations on those rights must be supported not only with a legitimate compelling governmental interest, but must be narrowly drawn to achieve that interest and not infringe on protected rights more than necessary to achieve that legitimate governmental interest.  *Heller v. District of Columbia,* 670 F.3d at 1252 ("the District must establish a tight 'fit' between the registration requirements and an important or substantial governmental interest, a fit 'that employs not necessarily the least restrictive means but ... a means narrowly tailored to achieve the desired objective.'").

Seeking to address a genuine concern with broad prophylactic rules devalues the notion of a Constitutional right and is contrary to the demands of heightened scrutiny in the First Amendment context and elsewhere. *See NAACP v. Button*, 371 U.S. 415, 438 (1963) ("Broad prophylactic rules in the area of free expression are suspect."); *Id.* ("Precision of regulation must be the touchstone in an area so closely touching our most precious freedoms."); *Turner Broadcasting System, Inc. v. FCC*, 512 U.S. 622, 682-83 (1994) (O'Connor, J., concurring in part and dissenting in part) ("A regulation is not 'narrowly tailored' – even under the more lenient [standard applicable to content-neutral restrictions] – where ... a substantial portion of the burden on speech does not serve to advance [the State's content-neutral] goals …. Broad prophylactic

rules in the area of free expression are suspect. Precision of regulation must be the touchstone[.]") (brackets in original) (citations and quotations omitted); *In re Primus*, 436 U.S. 412, 29 432-33 (1978) (because First Amendment rights require "breathing space to survive, government may regulate in [this] area only with narrow specificity." (Cleaned up)). Constitutionally protected rights cannot be restricted merely because criminals might abuse those rights. *See Southeastern Promotions Ltd. v. Conrad*, 420 U.S. 546, 559 (1975). *Accord Ashcroft v. Free Speech Coal.*, 535 U.S. 234, 245 (2002); *Stanley v. Georgia*, 394 U.S. 557, 567 (1969); *Vincenty v. Bloomberg*, 476 F.3d 74, 84-85 (2d Cir. 2007); *Robb v. Hungerbeeler*, 370 F.3d 735, 743 (8th Cir. 2004).

Computing devices connected to the Internet are now the most common tool for engaging in lawful, protected First Amendment activities, but undoubtedly also the most common tool for engaging in many unprotected and sometimes illegal forms of speech (e.g., defamation, true threats) and other illegal conduct (e.g., child pornography, hacking, and identity theft) as well. The latter hardly can justify restricting lawful use of computers connected to the Internet by law-abiding people who wish to publish their protected content and viewpoints.

Generalized risk does not warrant restrictions as to all persons, and "a preventative rule" aimed at such generic hazards is "justified only in situations 'inherently conducive to'" the specific dangers identified. *Edenfield v. Fame*, 507 U.S. 761, 774 (1993) (quoting *Ohralik v. Ohio State Bar Ass'n*, 436 U.S. 447, 464 (1978)). By prohibiting even citizens who pass a government background check from constructing a commonly owned type of firearm, the law imposes considerably more burden on law-abiding citizens than is warranted by the rare instances of criminal violence using such firearms. Thus, any law restricting the Second Amendment right to construct a firearm must meet the requirement of narrow tailoring. D.C. Code § 7-2501.01 (17B)(A) plainly does not.

Moreover, even a narrowly tailored restriction on Second Amendment rights may not excessively restrict protected activity. *See United States v. O'Brien*, 391 U.S. 367, 377 (1968) ("incidental restriction on alleged First Amendment freedoms is no greater than is essential" to further the government's important interests); *McCutcheon v. FEC*, 572 U.S. 185, 218 (2014) (chosen means must be "'closely drawn'" to achieve genuine interest without "'unnecessary abridgement'" of constitutionally protected conduct (quoting *Buckley v. Valeo*, 424 U.S. 1, 25 (1976)).

To the extent a law imposes an undue burden on protected rights it should be declared unconstitutional and enjoined regardless of whether it accomplishes some other salutary purpose. In the First Amendment context, it is inconceivable that government could ban private use of the printing press, restrict the Internet, or limit the capacity of personal computers to reduce the speed, reach, and effectiveness of speech simply because such qualities could be (and are) used by slanderers as well as by persons engaging in lawful and protected public debate. Regardless whether such measures would reduce harm, their impact on protected rights is too great.

In the Second Amendment context, it is likewise inconceivable that government could simply ban the making by private citizens of a category of otherwise lawful guns outright, even if that might marginally help prevent accidents, reduce the effectiveness of suicides, reduce mass or impulsive shootings, or in this case limit the potential for prohibited persons to gain access. Nor could government simply ban all men from owning firearms, despite that most gun crimes are committed by men. Although such proposals likely would fail the narrow tailoring requirement as well, even if they did not they would excessively burden Second Amendment rights.

Here D.C. has made no attempt to tailor its regulation to address the specific harm to which the law is plainly addressed, despite many potential alternatives. Although the ban on unfinished

receivers may serve to limit the ability of prohibited persons to acquire what the District calls a "Ghost Gun," the law does so by prohibiting persons who are not prohibited from possessing firearms from exercising their Second Amendment right to make their own firearms.

D.C.'s concern with traceability of firearms made from unfinished receivers could easily be met by requiring registration and placement of serial numbers on unfinished receivers. *See* Exhibit 4 at 6. This would also address the District's concern to prevent prohibited persons from obtaining guns made from unfinished receivers as prohibited persons are not allowed to register firearms in the District. The District could further address this issue by requiring that transfers of unfinished receivers be conducted by a licensed dealer in the District accompanied by a background check. *See Id.* D.C. law already prohibits the transfer of a firearm except through a licensed dealer with very minor exceptions. *See* D.C. Code §§ 7-2505.01(b)(4)-(5) and 7-2505.02.

Likely understanding that a ban such as D.C.'s would be unconstitutional, California – hardly reticent when it comes to regulating firearms – took a more narrowly tailored approach. *Id.* In that state, a person can (and is required to) "[a]pply to the [California] Department of Justice for a unique serial number or other mark of identification" prior to constructing a firearm. Cal. Penal Code § 29180(b)(1). Before the Department issues the serial number to an applicant, it conducts a background check. Cal. Penal Code § 29182(b)(1). If the applicant is not disqualified, the Department "shall grant" such an application "in the form of serial numbers pursuant to Section 23910 to, persons who wish to manufacture or assemble firearms pursuant to subdivision (b) of Section 29180." No reason exists why D.C. could not adopt a similarly tailored approach.

To the extent the District could claim a legitimate compelling interest in, for example, ensuring that a self-made firearm otherwise comports with its other regulations – not a concern that has been expressed in connection with the subject legislation to date – D.C. could require

MPD to inspect the completed firearm. And although we do not suggest the need to do so, the District could conceivably impose a myriad of other regulations on the making of firearms for personal use consistent with the Constitution. It could perhaps require the submission of plans in advance of construction; specify the location of serial numbers, etc. What it cannot do is to enact a flat prophylactic ban on the making of all firearms, commercially or privately made, or on the possession of precursor parts such as an unfinished frame or receiver.

In sum, D.C.'s ban on the possession of an unfinished receiver prohibits Mr. Heller from making a firearm from an unfinished receiver kit. As such, it violates his Second Amendment rights. The Second Amendment right to keep and bear arms necessarily includes the right to acquire arms. *Cf. Ezell v. City of Chicago,* 651 F.3d 684 (Second Amendment rights includes the right to train with firearms). Although D.C. may regulate commercial transactions in arms, it plainly cannot ban the sale or transfer of arms because that would make the right to keep and bear arms illusory. If citizens cannot legally obtain an arm, they cannot keep nor bear such arm. The right to manufacture an arm is equivalent to the right to acquire an arm. If Mr. Heller cannot acquire the precursor parts for a firearm such as an unfinished receiver, whatever that is, he cannot make a firearm. D.C.'s actions through MPD have prevented Mr. Heller from acquiring the precursor parts to make a firearm. Accordingly, Mr. Heller is likely to prevail on his claim that D.C.'s prohibition of possession of an unfinished receiver is unconstitutional.

**B.  Plaintiffs are suffering irreparable harm from the challenged provisions.**

Having demonstrated that plaintiffs are likely to prevail on the merits, we turn to whether plaintiffs will suffer irreparable harm unless an injunction issues. *See Winter v. NRDC*, 555 U.S. 7, 22 (2008). The irreparable harm inquiry requires the court to assume plaintiffs have demonstrated a likelihood of success on the merits and then to ask "whether that violation, if true,

inflicts irremediable injury." *Chaplaincy of Full Gospel Churches v. England*, 454 F.3d 290, 303 (D.C. Cir. 2006). Plainly here plaintiffs are suffering irreparable injury.

Where the defendants' actions violate the plaintiffs' constitutional rights the requirement of "irreparable injury" is satisfied. As the D.C. Circuit has explained, "[s]uits for declaratory and injunctive relief against the threatened invasion of a constitutional right do not ordinarily require proof of any injury other than the threatened constitutional deprivation itself." *Gordon v. Holder*, 721 F.3d 638, 653 (D.C. Cir. 2013) (brackets omitted) (quoting *Davis v. District of Columbia,* 158 F.3d 1342, 1346 (D.C. Cir. 1998)). Thus, "although a plaintiff seeking equitable relief must show a threat of substantial and immediate irreparable injury, a prospective violation of a constitutional right constitutes irreparable injury for these purposes." *Id.* (brackets omitted) (quoting *Davis v. District of Columbia,* 158 F.3d at 1346).

The principle that the violation of a constitutional right by itself constitutes irreparable harm derives from the Supreme Court's decision in *Elrod v. Burns* that "[t]he loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." 427 U.S. 347, 373 (1976). As the Seventh Circuit has explained in the context of a Second Amendment challenge:

> The loss of a First Amendment right is frequently presumed to cause irreparable harm based on the intangible nature of the benefits flowing from the exercise of those rights; and the fear that, if those rights are not jealously safeguarded, persons will be deterred, even if imperceptibly, from exercising those rights in the future.

*Ezell v. City of Chicago*, 651 F.3d at 699 (internal quotation marks omitted). The Second Amendment also protects "intangible and unquantifiable interests." *Id.* Indeed, its "central component is the right to possess [arms] for protection," and violations of that right plainly "cannot be compensated by damages." *Id.* Thus, for violations of Second Amendment rights, as for violations of First Amendment rights, "irreparable harm is presumed." *Id.*

40

For these reasons, law-abiding citizens like plaintiffs suffer irreparable harm each day the District imposes an ongoing deprivation of their Second Amendment rights. The allegation of the violation, without more, satisfies the irreparable injury requirement. Mr. Heller plainly has sustained an irreparable injury by MPD's direction to the FFL to return the unfinished receiver kit to the vendor. Likewise, plaintiffs Mr. Hanson and Mr. Godwin are suffering irreparable injury from D.C.'s outlawing their registered polymer receiver pistols. They risk being criminally charged and having their legally acquired and registered firearms confiscated, not to mention the mental anguish of being branded an outlaw. Of course, this injury cannot be compensated adequately through money damages, *see Ezell v. City of Chicago*, 651 F.3d at 699, though Mr. Heller does seek damages for the particular injury he has suffered.

### C.    The balance of equities tips overwhelmingly in plaintiffs' favor.

The equities weigh strongly in plaintiffs' favor. Plaintiffs continue to suffer an ongoing violation of their Constitutional rights, and this ongoing violation constitutes irreparable injury. The District has no legitimate interest in prohibiting the manufacture of a Constitutionally protected item. Nor does the District have any legitimate interest in outlawing commonly owned polymer frame pistols lawfully acquired and registered in the District. The interests D.C. does have can be adequately addressed through much narrower means than the District has chosen.

As indicated, the District does have a legitimate interest in preventing prohibited persons from possessing firearms, which it already does. The legislation at issue here is at best duplicative of the District's regulations which prohibit the possession of unregistered firearms. The District already has a comprehensive registration scheme to prevent prohibited persons from legally acquiring firearms. Of course, the court can take judicial notice that this scheme does not stop prohibited persons from illegally acquiring firearms because they get them through illegal

transfers, straw purchases and theft. Nor would any of the provisions at issue here serve to actually prevent prohibited persons from obtaining home-made firearms or kits from which to build firearms, since they could obtain them by the expedient of purchasing kits by traveling out of state or having them sent to an associate's address in Virginia or Maryland where such kits are legal. The real effect of the provisions at issue is to prevent law-abiding District residents from making their own guns which they would register and serialize in compliance with District law.

As to truly undetectable firearms, such as the Cody Wilson Liberator 3-D printed firearm, we acknowledge D.C. has a legitimate interest in preventing possession of truly undetectable guns, but again note federal law already covers that matter. Moreover, to date D.C. has not seen such a firearm hit the streets, and none of the plaintiffs seek to construct such a firearm. Mr. Heller merely seeks to make a registered serialized version of a Glock pistol, and the other plaintiffs simply want the court to protect their right to continue to possess their legally obtained, registered, commercially produced polymer receiver pistols. Finally, as we have pointed out above, the District is free to adopt narrowly tailored provisions addressing its legitimate concerns with respect to privately constructed firearms, it simply cannot Constitutionally ban them.

D.    **An injunction is in the public interest.**

For similar reasons, an injunction is also in the public interest. The D.C. Circuit has acknowledged the "obvious" fact that "enforcement of an unconstitutional law is always contrary to the public interest." *Gordon v. Holder*, 721 F.3d at 653. So too have other circuits. *E.g., K.A. ex rel. Ayers v. Pocono Mountain Sch. Dist.*, 710 F.3d 99, 114 (3d Cir. 2013) ("[T]he enforcement of an unconstitutional law vindicates no public interest."). Because enforcement of these unconstitutional provisions is by definition contrary to the public interest, the entry of a preliminary injunction serves the public interest as a matter of law.

**V.     The court should enter final judgment for plaintiffs.**

The Federal Rules of Civil Procedure permit this court to "advance the trial on the merits and consolidate it with the hearing" for a preliminary injunction. Fed. R. Civ. P. 65(a)(2). "[W]hen the eventual outcome on the merits is plain at the preliminary injunction stage, the judge should, after due notice to the parties, merge the stages and enter a final judgment." *Morris v. District of Columbia,* 38 F.Supp. 3d 57, 62 n.1 (D.D.C. 2014) (quoting *Curtis 1000, Inc. v. Suess*, 24 F.3d 941, 945 (7th Cir. 1994)). The D.C. Circuit employed this procedure in *Wrenn. See* 864 F.3d at 667.

Unless the District can make an adequate showing of the need to develop a factual record to support the provisions at issue, a permanent injunction is appropriate now. In that regard the court should require D.C. to identify the specific areas appropriate for discovery and resolution at trial. In the absence of such issues, final outcome of this case will not depend on any facts presented at trial, and no "genuine uncertainty [exists] at the preliminary injunction stage concerning what that outcome will be." *See Curtis 1000*, 24 F.3d at 945. Plaintiffs suggest that at this preliminary injunction stage, the court will have all the facts it needs and only questions of law will remain for resolution. As in *Moore v. Madigan,* "[t]he constitutionality of the challenged statutory provisions does not present factual questions for determination in a trial." 702 F.3d 933, 942 (7th Cir. 2012). To the extent any questions of disputed material fact exists, those questions involve only "legislative facts" that bear on the justification for legislation, not "adjudicative facts" that must be determined at trial. *Id.*

The Seventh Circuit's disposition in *Moore*, involving Illinois's complete ban on carrying firearms for personal protection, is particularly instructive here, as that court remanded for entry of a declaration of unconstitutionality and a permanent injunction upon reversing the district

court's judgment granting Illinois's motion to dismiss.  *See Moore*, 702 F.3d at 942. Likewise, here the court will have all the information it needs to make a final judgment upon conclusion of the preliminary injunction proceedings. The court should enter final judgment and put an end to the District's ban on law-abiding, responsible persons exercising their fundamental, Second Amendment right to make a firearm, and invalidate the District's ill-thought out and likely unknowing prohibition on polymer frame pistols.

## VI.    Conclusion.

The District is entitled to address legitimate concerns of potential violence from criminals and other unauthorized persons possessing unregistered and untraceable guns. In doing so, however, it may not trample on the rights of law-abiding citizens to make and register fully traceable firearms. Nor may the District through apparent inadvertence criminalize the possession of commonly owned polymer frame guns like the Glock handguns it issues to its police officers. Because the District has done so here, the court should preliminarily and permanently enjoin enforcement of the offending statutes at issue in this case.

Respectfully submitted,

**DICK ANTHONY HELLER**

**ANDREW HANSON**

**ELBY GODWIN**

By: /s/ George L. Lyon, Jr.
George L. Lyon, Jr. (D.C. Bar No. 388678)
Arsenal Attorneys
4000 Legato Rd, Suite 1100
Fairfax, VA. 22033

1929 Biltmore Street NW
Washington, DC 20009
202-669-0442, fax 202-483-9267
Attorney for Plaintiffs
gll@arsenalattorneys.com

Dated:   September 14, 2021

**CERTIFICATE OF SERVICE**

I, George L. Lyon, Jr., a member of the bar of this court, certify that I have served this 14th day of September, 2021, a copy of the foregoing Application for Preliminary Injunction by email on all counsel of record via the court's electronic filing system, and on the following via email:

DC Attorney General Karl Racine, karl.racine@dc.gov
DC Solicitor General Loren Alikhan, loren.alikhan@dc.gov
Deputy Attorney General Chad Copeland, chad.copeland@dc.gov
Stephanie Litos, Stephanie.litos@dc.gov
Tonia Robinson, tonia.robinson@dc.gov

And by certified mail, return receipt requested to:

Office of the Mayor
District of Columbia
1350 Pennsylvania Avenue, NW
Washington, DC 20004

Office of Chief Robert Contee
Metropolitan Police Department
300 Indiana Avenue, NW
Washington, DC 20004

/s/George L. Lyon, Jr., DC Bar 388678