**Declaration Under Penalty of Perjury of Richard Vasquez**

Rick Vasquez, under penalty of perjury, deposes and states as follows:

1. My name is Richard Vasquez. I am making this declaration under penalty of perjury for submission to the United States District Court for the District of Columbia in the case of Dick Anthony Heller v. District of Columbia.

2. I am competent to state and declare the following based on my training, experience, personal knowledge, and prior qualification in federal courts as an expert. If called as a witness, I can testify as follows.

3. Employment History(resume attached). Currently, I am an independent firearms technology consultant employed by those in the firearm community. In this capacity, I assist manufacturers, dealers, and others in understanding and complying with firearms laws and regulations. Additionally, I provide training on the Gun Control Act and the National Firearms Act to civilian and government organizations.

4. I am a former employee of the Bureau of Alcohol, Tobacco, Firearms and Explosives ("ATF"). During my 14-year tenure, I held the positions of Acting Chief of the Firearms Technology Branch ("FTB"), Assistant Chief (Senior Technical Expert) of the FTB, and Acting Chief of the Firearms Training Branch. I provided instruction for ATF personnel on the definitions of firearms in the Gun Control Act ("GCA") and the National Firearms Act ("NFA"). Additionally, I developed a machinegun identification course and instructed this course to ATF counsel, special agents, ATF investigators, and numerous federal prosecutors.

5. In these roles, I was responsible for evaluating firearms, non-firearms, and firearm accessories, consistent with the Standard Operating Procedures ("SOP") of the FTB. I was the one who wrote the first generation of these SOPs, and was responsible for overseeing determinations on whether a particular item constituted a firearm, non-firearm, or merely a firearm accessory. I also met with the scientists at the TSA Technology Center in DC to discuss the resonance of firearms in X-ray and other machines used at airports.

6. As a result of my knowledge, experience, and training, I have been qualified as an expert by numerous federal and state courts, and have provided testimony in a number of cases.

7.      Polymer frame/receiver firearms. Traditionally, handguns (as well as other firearms) were made almost entirely out of metal except for the grips or stocks for hundreds of years.  Manufacturers constructed handgun frames from steel or other metallic alloys due to their availability and durability. (When I am using the term frame it means the same as a receiver. The terms are used interchangeably. The frame or receiver is the serialized part of the firearm and is itself considered to be a firearm under federal law and ATF regulations.) Although these materials were durable, they were heavy, and weighed shooters down. In the 1950s, aluminum and other light weight metals such as scandium started replacing steel frames in some designs. Aluminum is much lighter than steel and almost as durable. For over twenty years, aluminum was the go-to lightweight metal for handgun frame manufacturing.

8.      In 1970, German firearms maker Heckler and Koch (H&K) introduced the VP70 polymer-framed handgun. Although the VP70 was ahead of its time, the semi-automatic pistol version suffered from a very heavy trigger pull, making it hard to shoot, and it fell out of favor. Polymer frame pistols would not gain popularity for more than ten years.

9.      Pistols from an Austrian company named Glock were introduced in the early 1980s. Glock's 9 mm G-17 combined an extremely rugged yet lightweight polymer frame and a much more user-friendly trigger than the H&K VP70 pistol. As the first commercially successful polymer frame pistol, the Glock 17 set the stage for polymer frame handguns moving forward. Today a wide variety of manufacturers produce polymer frame pistols.

10.     As discussed above, metal frame handguns tend to be heavy. An advantage of a heavy handgun it that the weight counters the felt recoil and makes a pistol more comfortable to shoot. However, the weight that makes metal-framed pistols advantageous for shooting is a hindrance when it comes to carrying the firearm. If a handgun is strictly for target practice on the range, weight is not a substantial issue. However, the weight of a metal frame gun can make carrying the firearm awkward and uncomfortable. The takeaway is that heavier pistols can be more comfortable to shoot than to carry.

11.     The light weight of polymer-framed pistols makes them more comfortable to carry than metal-frame pistols, all other things being equal. This has

made polymer framed pistols the preferred handgun type for law enforcement and for civilians who carry a handgun for personal protection. A substantial majority of law enforcement agencies around the country now issue polymer frame pistols to their officers. The guns' light weight, capacity and reliability enhance their utility as a law enforcement personal protection firearm.

12. Undetectable firearms. An undetectable firearm is a firearm which is not detectible by a walk-through metal detector, or which does not depict its actual shape when passed through a screening X-ray machine.

13. As a firearms technology expert, I was the first person to bring both homemade firearms and 3-D printing to the attention of ATF leadership. I assisted in developing the Advanced Firearms Identification Training for ATF's Industry Operations Investigators and while assigned to Firearms Operations Division, I was the technical expert that provided the expertise on a training program that provided knowledge on parts kit guns to all of ATF. Additionally, I provided this training to other federal agencies and foreign governments.

14. I have closely reviewed District of Columbia law relating to what it calls "Ghost Guns." The law is astonishing overbroad and criminalizes the possession of most, if not all, polymer framed guns, including the very handguns the District issues to most of its sworn police officers, the Glock 17. D.C. law does so by irrationally conflating and confusing two distinct concepts: undetectable firearms and home-made firearms and expanding the definition.

15. Congress addressed the matter of undetectable firearms in 1986. At that time, the Glock 17 handgun had started to be imported into the United States for sale. It would later be manufactured in Smyrna, Georgia. A mistaken concern arose, powered by gun control advocates, a Washington Post column by Jack Anderson, and repeated in the Bruce Willis movie, Die Hard II, that the Glock 17 was not detectible by airport metal detectors because the frame of the firearm is constructed of lightweight polymer. In fact, erroneous reports arose that the firearm was constructed of virtually no metal whatsoever. The Glock was a revolutionary firearm for many reasons, including its light weight, capacity, simplicity of operation and maintenance, and reliability. This has made the various models of the Glock as well as numerous other polymer framed firearms tremendously popular with both law enforcement and civilians. However, the Glock and various other popular polymer

framed guns are not plastic guns invisible to metal detectors and X-ray equipment. Their barrels and slide mechanisms are composed almost entirely of metal. In 18 U.S.C. Section 922(p), discussed below, the slide and barrel are considered the receiver not the actual receiver. I have personally witnessed the Glock models passing through airport style X-ray machines and metal detectors. They are readily detectible as firearms.

16. In any event 18 U.S.C. Section 922(p) in pertinent part provides:

**(1)** It shall be unlawful for any person to manufacture, import, sell, ship, deliver, possess, transfer, or receive any firearm—
**(A)** that, after removal of grips, stocks, and magazines, is not as detectable as the Security Exemplar, by walk-through metal detectors calibrated and operated to detect the Security Exemplar; or
**(B)** any major component of which, when subjected to inspection by the types of x-ray machines commonly used at airports, does not generate an image that accurately depicts the shape of the component. Barium sulfate or other compounds may be used in the fabrication of the component.
**(2)** For purposes of this subsection—
**(A)** the term "firearm" does not include the frame or receiver of any such weapon;
**(B)** the term "major component" means, with respect to a firearm, the barrel, the slide or cylinder, or the frame or receiver of the firearm; and
**(C)** the term "Security Exemplar" means an object, to be fabricated at the direction of the Attorney General, that is—
**(i)** constructed of, during the 12-month period beginning on the date of the enactment of this subsection, 3.7 ounces of material type 17–4 PH stainless steel in a shape resembling a handgun; and
**(ii)** suitable for testing and calibrating metal detectors ….

17. Federal law is significantly more narrowly tailored to address the question of undetectable firearms. Rather than removing all parts other than the receiver, which by itself cannot fire a projectile, Federal law asks whether the functioning gun (after removing the grip, stocks and magazine – which generally have no role in determining whether the firearm can fire) can be detected when passing through a metal detector, or whether the various components when passing through an X-ray machine generate an image that accurately depicts their actual shape. All polymer pistols legally sold or imported in the United States comply with both provisions of this federal statute. Such guns contain a sufficient amount of metal

in their slides and barrels to register when passing through a metal detector, and the frames of these guns are accurately depicted when passing through an X-ray machine. The federal statute prevents someone from passing a functioning gun through an airport type metal detector or even a stripped down frame through an X-ray machine without the gun being detectible.

18. Because the DC definition of "Ghost Gun" requires that the frame contain the equivalent of 3.7 ounces of metal, it outlaws all models of the Glock as well as most polymer framed pistols legally sold in the United States. There are millions of such firearms in circulation in the United States. They are among the more popular handguns in the country. Most law enforcement agencies in the country issue polymer frame pistols to their officers, Glock models predominating. A recent article named the top 10 pistols sold on the web site guns.com in 2020. All of them were polymer framed pistols. These were the Glock 17, 19, 43X and 44; the Smith & Wesson M&P 9 and M&P Shield; the Sig Sauer P320 and P365; the Ruger 57 and the Taurus G2C. All of these aforementioned guns are readily detectible by airport style metal detectors and X-ray machines; yet each except possibly the Smith & Wesson models appear to be prohibited based on the literal wording of D.C.'s definition of "Ghost Gun." I make the exception for the Smith & Wesson models because their polymer frames are built on a metal chassis which might provide sufficient metal to be detected passing through an airport style metal detector.

19. It may very well be the case that the District City Council and the District Government simply do not know what they have done. It is my understanding that MPD continues to register polymer frame pistols, including Glocks, despite that D.C. Code 7-2502.02 prohibits registering what D.C. defines as "Ghost Guns."

20. Home-made firearms. With respect to the matter of home-made firearms, these have never been prohibited under federal law and there has been a long tradition in the United States of home-made firearms by persons, including hobbyists and amateur gunsmiths. Such guns are not required by federal law to bear serial numbers when completed by an individual, neither are they required to be marked by an individual when sold into commerce. Self-made firearms have become more popular, however, with the proliferation of kits containing unfinished receivers, with jigs and guides to assist completing the firearm. Many of these kit guns, such as the Polymer 80, employ a partially unfinished receiver, but when completed, these guns are not undetectable and calling them Ghost Guns is a misnomer. The slides and barrels of such guns contain more than the 3.7 ounces of metal to meet federal law. Nothing in the federal law prevents a state or the District

5

of Columbia from requiring that the makers of these guns mark them with a serial number.

21. 3-D printing. Polymer receivers can be printed in readily completable form using a 3-D printer. Again, that does not make a polymer based firearm undetectable as the slide and barrel of such guns contain more than enough metal to be detected by typical metal detectors.

22. There have been a very limited number of firearms made through the 3-D printing process which could lack sufficient metal to meet federal requirements. Cody Wilson was able to make a one shot 3-D printed firearm that used a non-metal barrel. To make the gun legal, pursuant to advice he received from ATF, he had to add the required amount of metal to the gun. Even were someone to duplicate that firearm and not add the required amount of metal, that gun would be of limited utility other than as a curio since it is a one shot model that must be disassembled to reload it and the force of shooting anything other than a low powered cartridge would likely result in the catastrophic disintegration of the firearm. Tests of duplicates of Mr. Wilson's design indicated at most it could fire a few .380 caliber rounds before the barrel would disintegrate. Thus, it is a myth that there are substantial numbers of undetectable firearms floating out among the populace.

23. To the extent we are talking about untraceable firearms that may end up in the hands of prohibited persons, that is a matter of legitimate concern. However, there are several measures the District of Columbia could take short of prohibiting the building of self-made firearms. First, the District could require that any parts kit including uncompleted receivers only be shipped into the District to federally licensed dealers. (Alternatively, the District could require any person seeking to import such a parts kit to apply for and be approved for a license to do so). Second, the District could require that such parts kits be registered with MPD, subject to inspection upon completion and be equipped with a serial number. These measures would assure the traceability of any such firearm recovered from a crime scene without infringing on the right of persons to construct a self-made firearm. The State of California has enacted legislation very similar to these proposals.

The above statement, given under penalty of perjury is true and correct to the best of my knowledge, information and belief.

_____
Richard Vasquez

Dated: August 23, 2021

**Rick Vasquez Firearms, LLC**
104 Deer Creek Road
Hubert, NC 28539
540-535-6633

Social Security Number:
Country of Citizenship:  U.S.
Security Clearance:  Previous top secret

## EMPLOYMENT

**October, 2014 - Present**

**Independent Firearms Consultant**

- Prepared and presented to the Senate discussion on Ghost Guns
- Prepared a firearms identification manual and power point for the Center for Disease Control for firearms abstractors
- Provide firearms classification expertise to the Australian Crime Commission
- Registered broker under the Department of State
- Served as a firearms expert to the United Nations on the Small Arms and Light Weapons panel in Brussels, Belgium
- Prepared and presented firearms training based on the Gun Control Act (GCA) and the National Firearms Act (NFA) to the Federal Bar Association
- Provide expert advice and testimony in civil litigation pertaining to firearms
- Provide services related to firearms identification and classification, as applied to the GCA and the NFA, to the firearms industry and the private sector
- Conducted a firearms identification course to El Salvadoran prosecutors in El Salvador
- Provide evaluations of firearms functionality for product liability cases
- Provide training on all aspects of the GCA, NFA, and compliance to the firearms industry
- Developed and led team building events centered around firearms and leadership
- Instruct all levels of firearms use and training
- Provided expert testimony in cases relating to firearms
- Have performed product evaluations on firearms for importation and compatibility to current firearms laws
- Professional firearms/shooting instructor
- Provide expert advice on the identification of firearms and components for the importation of firearms in relation to the Arms Expert Control Act (AECA)
- Consultant is conversant on requirements of exporting firearms and components in relation to the International Traffic in Arms Regulations (ITAR)

**August, 2011 - September 2014**
**BUREAU OF ALCOHOL, TOBACCO, FIREARMS and EXPLOSIVES (ATF)**

**Firearms Trafficking and Interdiction Branch, Firearms Operations Division**

**Program Manager/ Branch Chief, Firearms Training Branch**

- Developed programs and training on firearms trafficking and interdiction
- Assisted Field Operations in identifying and instructing firearms trafficking trends
- Assisted in updating and writing all Standard Operating Procedures (SOPs) of the National Firearms Act Branch (NFA)
- Developed specific training on 3D printing, partially complete receivers, and counterfeit firearms
- Trained all Central American and Mexican federal law enforcement counterparts on U.S. firearms laws and regulations
- Served as the firearms expert for Field Operations on all firearms-related subjects
- Trained a cadre of the Mexican Naval Infantry in the use of foreign weapons and machineguns
- In conjunction with NATO forces I fired all Bosnian military firearms (in Bosnia) and recovered the cartridges for entry into NIBIN.  This evidence was used in prosecution in the War Crimes Tribunals.
- Presented United States firearms regulations and trafficking trends to Interpol and the Royal Canadian Mounted Police
- Developed foreign weapons identification courses
- Developed and presented a course on importation guidelines and United States Firearms laws to the Australian Federal Police, Australian Crime Commission and Australian Customs
- Provided firearms identification and trafficking training to the Judges of Guatemalan Supreme Court, which led to collaboration between our countries to destroy a large cache of firearms that were being trafficked to the U.S.

**June 1999 – August 2011**
**BUREAU OF ALCOHOL, TOBACCO, FIREARMS and EXPLOSIVES (ATF)**
**Firearms Technology Branch**
**Assistant Branch Chief, Acting Chief, Firearms Technology Branch (FTB)**

- Supervised, organized workload, and trained a staff of 14 personnel, including eight firearms enforcement officers, one evidence technician, one writer-editor, one program analyst, and two gunsmiths
- Developed training in all aspects of firearms use and identification.  Instrumental in developing and implementing training for law enforcement counterparts in several federal, state and local law enforcement agencies
- Served as the expert on all Gun Control Act (GCA) and National Firearms Act (NFA) identification and classifications
- Wrote Standard Operating Procedures (SOP) for all aspects of FTB operations. These SOPs have now been used to defend ATF policies in criminal and civil litigation
- Served as a Firearms (shooting) Instructor
- Instrumental in developing firearms identification training specifically for the "Southwest Border" program
- Reviewed and corrected all reports prepared on evidence submitted by ATF special agents

- Served as the expert on classification of items submitted by the firearms industry for classification under the GCA and the NFA
- Served as the expert on firearms importation guidelines and reviewed all items submitted for approval for importation
- Developed foreign weapons identification and use training and have provided this instruction to Secret Service, DEA, ATF, and other Law Enforcement agencies
- As a representative of ATF I provided firearms instruction to the Australian Crime Commission, Border Protection, and Federal Police.

**June 1996 - June 1999**
**DIPLOMATIC SECURITY SERVICE (DSS)**

**Firearms Instructor – November 1996 – June 1999**

- Conducted all manner of firearms training for DSS. Developed training syllabi for long-range rifle training, fire and maneuver tactics, submachine gun, handgun, and evacuation techniques under live fire
- Certified the Mobile Security Division and the Tactical Response team as firearms instructors
- Wrote training manuals and training syllabi to cover all aspects of firearms training
- Developed and conducted training in force protection, IED detection, surveillance, and counter terrorism
- Instructed the force continuum policy to DSS Special Agents

**August 1974 - April 1996**
**UNITED STATES MARINE CORPS**
   **Attained the rank of Master Sergeant and served in many key leadership roles.**

**August 1994 - April 1996**

   **Detachment Commander – American Embassy, Moscow, Russia -**

**January 1993-August 1994**
   **Detachment Commander – American Embassy, Kingston, Jamaica**

**January 1989- January 1993**
   **Floor Chief – Weapons Training Battalion – Quantico, Virginia**

- Chief instructor of the USMC precision weapons shop
- Instructed an armorer training course in Colombia, South America, in support of "Operation Snowcap"
- Certified as a High Risk Personnel (firearm trainer) instructor

**January 1974 - January 1989**
- Assisted with the development and introduction of the M16A2 while at Weapons Training Battalion

- Recruiter –Winston Salem NC – and other various duty stations
- Received the award as Non-Commissioned Officer-in-Charge of the Year and was meritoriously promoted to Gunnery Sergeant

**ADDITIONAL QUALIFICATIONS AND AWARDS**

- Interstate Nexus Instructor
- Testified over 50 times in federal and state court and certified as an expert witness on firearms statues and regulations
- Distinguished high power rifle shooter
- FFL holder, successful business in custom rifle repair and sales
- Certified armorer for the following gun companies, Ruger, Glock, Smith and Wesson, and Heckler and Koch
- Received manufacturing and historical instruction at the following firearms sites both in conus and overseas; Marlin, Savage, H&R Inc., Winchester, Mossberg, Springfield Armory, Wilson Tools, Sig, Glock, Walther, Mauser, Sig Sauer, etc.
- Completed course of instruction in Principles of Acoustics and the Measurement of Sound
- Developed a course in recognition of silencers/silencer components and served as an expert in the classification of silencers and silencer components under federal statutes
- Wrote numerous training lesson plans in the use and identification of firearms-related subjects
- Trained official government personnel in firearms identification in the following countries: France, Canada, Colombia, El Salvador, Mexico, Canada, Belize, Jamaica, Curacao and Guatemala, etc
- Conversant in all aspects of the NFA
- Knowledgeable in the requirements of importing firearms and firearms components
- Presented firearms regulations to the Guatemalan Supreme Court
- Received public service award from the United States Attorney in the 4th district
- Recipient of ATF's Distinguished Service Medal
- Recipient of numerous letters of appreciation from ATF, FBI, and foreign law enforcement
- Headquarters USMC representative to introduce the M16A2 into the hands of 6th Marine Regiment