## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| Dick Anthony Heller, et al. | ) |
| | ) |
| Plaintiffs, | ) |
| | ) Civil Action No. 21 cv 02376-APM |
| v. | ) |
| | ) |
| District Of Columbia, et al. | ) |
| | ) |
| Defendants. | ) |
| _____ | ) |

## REPLY TO OPPOSITION TO APPLICATION
## FOR PRELIMINARY INJUNCTION

**DICK ANTHONY HELLER**

**ANDREW HANSON**

**ELBY GODWIN**

Matthew J. Bergstrom (D.C. Bar. No. 989706)*
George L. Lyon, Jr. (D.C. Bar No. 388678)
Arsenal Attorneys
4000 Legato Rd, Suite 1100
Fairfax, VA 22033

1929 Biltmore Street NW
Washington, DC 20009
202-669-0442, fax 202-483-9267
Attorney for Plaintiffs
gll@arsenalattorneys.com

*Admission to D.C. District Court pending
November 18, 2021

# TABLE OF CONTENTS

I.     Introduction ………………………………………………………………………… 1

II.    Plaintiffs are likely to prevail on the merits of their claims ……………………..…….. 2

       a.  DC Code § 7-2504.01 does not allow Mr. Heller to manufacture a firearm,
           in violation of the Second Amendment ………………………..…………………….. 2

       b.  The Second Amendment protects Mr. Heller's right to make a Glock type firearm .... 6

       c.  DC's manufacturing ban fails any degree of heightened scrutiny ………………..……. 9

       d.  DC's ban on legally manufactured polymer receiver guns is unconstitutional …..…… 11

       e.  DC cannot arbitrarily restrict the firearms its citizens choose for self-protection ….. 15

       f.  Contrary to DC's suggestion, we are not claiming a right to build a gun without
           a serial number …………………………..…………………………………………….. 19

       g.  DC's unfinished receiver provision (DC Code § 7-2501.01(17B)(A) is still vague ... 20

III.   Plaintiffs have shown irreparable injury …………………………………………………... 22

IV.    The balance of equities and the public interest favor grant of the injunction …………… 23

V.     Conclusion …………………………………………………………………………… 24

Exhibit 1, Photographs of a Glock handgun

Exhibit 2, Statutes of States with Ghost Gun Laws

Exhibit 3, Declaration of Mark g. Briley

Exhibit 4, Declaration of Marina Galli

Exhibit 5, *Palmer v. District of Columbia,* Case No. 1:09-cv-01482 FJS, Doc. 66 (Sept. 19, 2014)

# TABLE OF AUTHORITIES

## Cases

*Adarand Constructors, Inc. v. Slater,*
        528 U.S. 216 (2000) ……………………………………………………………… 24

*Broadrick v. Oklahoma,*
        413 U.S. 601 (1973) ………………………………………………..…………… 6

*BST Holdings, L.L.C. v. OHSA,*
        Case No. 21-60845, slip op. (5th Cir. Nov. 12, 2021) ……………….…….………… 22

*Caetano v. Massachusetts,*
        577 U.S. __, 136 S.Ct. 1027 (2016) ……………………………..……………….. 8

*Chafin v. Chafin,*
        568 U.S. 165 (2013) ……………………………………………………………… 24

*Chaplaincy of Full Gospel Churches v. England*,
        454 F.3d 290 (D.C. Cir. 2006) …………………………………….………….. 22

*City of Clarksville v. FERC,* 888 F.3d 477 (D.C. Cir. 2018) ……………………….……… 2

*CityFed Fin. Corp. v. Office of Thrift Supervision*,
        58 F.3d 738 (D.C. Cir. 1995) …………………………………………………… 22

*District of Columbia v. Berretta U.S.A. Corp.*
        872 A.2d 633 (2005) ………………………………………………...………… 4

*District of Columbia v. Heller,*
        554 U.S. 570 (2008) ……………………………………..…….. 4, 6, 7, 9, 11, 15, 16, 18

*Elrod v. Burns*,
        427 U.S. 347 (1976) ……………………………………………………………… 22

*Ezell v. Chicago,*
        651 F.3d 684 (7th Cir. 2011) ……………………………….………………….. 5

*FCC v. Fox Television Stations, Inc.,*
        556 U.S. 502 (2009) …………………………………...………………………… 4

*Gordon v. Holder*,
        721 F.3d 638 (D.C. Cir. 2013) ……………………………….…….……….. 23

**\*Denotes principal cases relied upon**

*Heller v. District of Columbia,*
    670 F.3d 1244 (D.C. Cir. 2011) …………………………………..……..…………. 5, 16

*Heller v. District of Columbia,*
    801 F.3d 264 (D.C. Cir. 2015) …………………………………………..…….. 9, 10, 18

*K.A. ex rel. Ayers v. Pocono Mountain Sch. Dist.,*
    710 F.3d 99 (3d Cir. 2013) ………………………………………………………… 23

*Kyllo v. United States,*
    533 U.S. 27 (2001) ………………………………………………..……………… 8

*Knox v. Serv. Emps Int'l Union Local 1000,*
    567 U.S. 298 (2012) ………………………………………………………..……… 24

*McCullen v. Coakley,*
    573 U.S. 464 (2014) ………………………………………………………….. 11

*M-K Specialities Model M-14 Machinegun,*
    424 F.Supp.2d 862 (N.D.W.Va. 2006) ……………………………………........ 20, 21

*Mills v. District of Columbia,*
    571 F.3d 1304 (D.C. Cir. 2009) ………………………….………………………… 22

*New York State Rifle and Pistol v. Cuomo,*
    804 F.3d 242 (2d Cir. 2015) ………………………………………..…………… 18

*New York Times v. Sullivan,*
    403 U.S. 713 (1971) …………………………………………….…………… 22

*Palmer v. District of Columbia,*
    Case No. 1:09-cv-01482 FJS, Doc. 66 (Sept. 19, 2014) ………………..…………... 23

*Parents Involved in Cmty. Schs. V. Seattle Sch. Dist. No. 1,*
    551 U.S. 701 (2007) …………………………………………………………….. 24

*\*Parker v. District of Columbia,*
    478 F.3d 370 (D.C. Cir. 2007) …………………………………………..… 9, 15, 16

*Peoples Rights Organization v. City of Columbus,*
    152 F.2d 522 (6th Cir. 1998) ……………………………………….…….... 20, 21

*Reno v. ACLU,*
    521 U.S. 844 (1997) ……………………………………………..……….. 8

*Roe v. Wade,*
    410 U.S. 113 (1973) ……………………………………………………… 5

*Springfield Armory v. City of Columbus,*
    29 F.3d 250 (6th Cir. 1994) …………………………………………..….. 20, 21

*Turner Broadcasting Systems v. FCC,*
    520 U.S. 180 (1997) …………………………………………..……….. 5

*United States v. Aguilar-Espinosa,*
    57 F.Supp.2d 1359 (M.D. Fla. 1999) ………………………………………… 21

*United States v. Marzzarella,*
    614 F.3d 85 (3d Cir. 2010) …………………………………………….…... 5

*United States v. Salerno,*
    481 U.S. 739 (1987) …………………………………………………….... 6

*United States v. Smith,*
    477 F.2d 399 (8th Cir. 1973) …………………………………………… 21

*United States v. Stevens,*
    559 U.S. 460 (2010) …………………………………………………….... 5, 6

*Ward . Rock Against Racism,*
    491 U.S. 781 (1989) ………………………………………………..…….. 9

*Washington v. Glucksberg,*
    521 U.S. 745 (1997) ………………………………………………...……. 6

*\*Wrenn v. District of Columbia,*
    864 F.3d 650 (D.C. Cir. 2017) ………………………………………..…. 8, 16, 18

## Statutes and Rules

18 U.S.C. § 922(p) …………………………………………………..……… 13, 14

Cal. Penal Code § 17280 …………………………………………………...……… 13

Conn. Gen. Stat. 29-36a …………………………………………………………. 13

Conn. Gen. Stat. 29-36b …………………………………………………….... 13

D.C. Code § 7-2501.01 …………………………………………….... 1, 3, 7, 17, 19, 20, 21

D.C. Code § 7-2502.02(a) ………………………………………………………. 10

D.C. Code § 7-2504.01(a) …………………………………….…… 1, 2, 3, 4, 7, 9, 16

D.C. Code § 7-2504.01(b) ………………………………………….……… 3

D.C. Code § 7-2505.02 ……………………………………………….…… 1

D.C. Code § 22.4514 …………………………………………………….…. 1

Hawaii Rev. Stat. 134-10.2 …………………………………………….... 13

Nevada Bill AB-286 (effective Jan. 1, 2022) …………………...……………………. 13

N.J.S. 2C:39:1(ii) …………………………………………………….……. 13

NY Con. Laws § 265.55 ……………………………………………………. 13

New York Bill S 13A ……………………………………………….……….. 13

RCW § 9.41.010 (33) ………………………………………...……………. 14

RCW § 9.41.010 (35) ………………………………………………..……. 14

RCW § 9.41.190(1)(a) ………………………………………………………. 14

RCW § 9.41.190(1)(d) ………………………………………………………. 14

RCW § 9.41.325 ……………………………………………………..……. 14

R.I. Stat. § 11-47-2(8) ……………………………………………………….. 14

R.I. Stat. § 11-47-2(18) ………………………………………………….….. 14

## Other authorities

*Notice of Proposed Rule Making Definition of Frame or Receiver and Identification of Firearms,*
2021 R-05 ,86 Fed. Reg. 27720 (May 21, 2021) ……………………...……………. 11

https://www.atf.gov/firearms/docs/report/2019-firearms-commerce-report/download ………. 9

https://www.forbes.com/sites/denizc...-who=got-rich-off-glock-pistols/#7731cbc04e50 ……... 12

*https://www.oag.ca.gov/firearms/certified-handguns/search* ................................................ 13

Kopel, David, *The First Amendment Guide to the Second Amendment,*
   81 Tenn L. Rev. 417 (2014) …………………………………………………………… 5

Public Hearing on B23-0018 (October 3, 2019), available at,
   https://lims.dccouncil.us/downloads/LIMS/41601/Hearing_Record/B23-0018-
   HearingRecord2.pdf ……………………………………..………………………... 18

## I.    Introduction.

Plaintiff Dick A. Heller seeks a preliminary injunction against enforcement of various DC statutes which in toto prevent the manufacture of any firearm in the District, and which prevents him from manufacturing a Glock style hand gun from an unfinished receiver kit. Plaintiffs Andrew Hanson and Elby Goodwin seek a preliminary injunction against provisions of DC law which criminalize their possession of commercially manufactured, polymer frame pistols lawfully registered to them. Specifically, at issue are DC Code § 7-2504.01 which flatly bans the manufacture of a firearm in the District; DC Code § 22–4514 which criminalizes the possession of so-called Ghost Guns; and provisions of D.C. Code § 7-2501.01, specifically subsection (9B)A(i) and B, which so broadly define Ghost Guns so as to outlaw commercially manufactured, polymer receiver firearms such as the Glock series of handguns, and which prevent Mr. Heller from constructing a self-made Glock style, serialized pistol. D.C. Code § 7-2502.02(a) also prohibits the registration of what DC overbroadly defines as a Ghost Gun; however, once the definition of Ghost Gun is constitutionally narrowed,[1] Mr. Heller will be able to register his completed, serialized Glock style handgun.

We emphasize we do not suggest the Constitution protects unregistered or undetectable firearms. DC's suggestion to the contrary (Doc. 8 at 27) indicates a gross misreading – if not an intentional misstatement – of our position. As we said in our application for a preliminary injunction, Doc. 6 at 25, we acknowledge that the Ghost Gun legislation at least appears intended to address important governmental interests in

---

[1] We don't dispute the District's claim that the provisions of the Ghost Gun legislation are severable. *See* Doc. 8 at 42 n. 32.

preventing the proliferation of untraceable or undetectable firearms in the hands of prohibited persons, but the fatal flaw of that legislation is the lack of sufficient tailoring that the District acknowledges is required. *See* Doc. 8 at 22 ("the government must show that 'the means chosen are not substantially broader than necessary to achieve that interest.'" (Citation omitted.) Because the portions of these laws that we highlight are not narrowly tailored, Plaintiffs are likely to prevail on the merits and a preliminary injunction should be ordered.

## II.     Plaintiffs are likely to prevail on the merits of their claims.

### a.    DC Code § 7-2504.01 does not allow Mr. Heller to manufacture a firearm in violation of the Second Amendment.

DC commences its defense of DC Code § 7-2504.01(a), the manufacturing ban, by claiming the statute does not apply to Mr. Heller's self-manufacture of a firearm.[2] According to the District, that law only applies to commercial manufacture of a firearm. Doc. 8 at 15. DC argues the term manufacture is inherently commercial. *Id.* It cites two dictionary definitions of the word it claims imply the commercial nature of the word with specific emphasis on the words "wares" and "labor" as contained in those definitions. DC also claims the context of the prohibition connotes commercial activity. *Id.* at 16.

DC's argument is unavailing. DC is correct that the starting point for examining the meaning of the statute is its text. *Id.* at 15, citing *City of Clarksville v. FERC,* 888 F.3d 477, 482 (D.C. Cir. 2018). Reference to the full text of DC Code § 7-2504.01(a) shows an intent to prohibit **all** manufacturing of guns, not just commercial manufacture. The statute reads:

> No **person** or organization shall manufacture any firearm, destructive device or parts thereof, or ammunition, within the District**; provided, that persons holding registration certificates may engage in hand loading, reloading, or**

---

[2] The District agrees, however, that its Ghost Gun provisions prohibits Mr. Heller from making the Glock style pistol he sought to make. Doc. 8 at 14.

**custom loading ammunition for his registered firearms; provided further, that such person may not hand load, reload, or custom load ammunition for others.**

DC Code § 7-2504.01(a) (emphasis supplied). The statute's wording applies to **persons** as well as **organizations**. It is not limited with respect to the purpose for which a firearm is manufactured. Even more significantly, however, the statute contains an express carve out for manufacturing ammunition. Persons holding gun registration certificates are expressly allowed to manufacture ammunition for their registered firearms, but are prohibited from manufacturing ammunition for others. The ammunition carve out for personal use combined with no similar carve out for making a personal self-made firearm eviscerates DC's claim its statute only prohibits commercial firearm manufacture.

Moreover, unlike DC Code § 7-2504.01(a), subsection 7-2504.01(b) is expressly worded to apply to commercial enterprises, stating: "No person or organization shall engage in the business of selling, purchasing, or repairing any firearm, destructive device, parts therefor, or ammunition, without first obtaining a dealer's license…" So, the suggestion subsection (a) applies only to commercial manufacturing does not follow. If that were what the DC Council intended, it would have expressly said so just as it said so in subsection (b).

DC's reliance on two dictionary definitions of "manufacture" likewise offers no support for its claim. "Wares" are simply the items manufactured, and "labor" is how a "ware" is produced. The two definitions DC quotes make no commercial/noncommercial distinction. *See* Doc. 8 at 15. DC also omits entirely to acknowledge that its firearm laws define the word "manufacture."  DC Code § 7-2501.01(17B)(B)(i) states "Manufacture" means to fabricate, make, form, produce or construct, by manual labor or by machinery[.]" Again this definition contains no commercial/noncommercial distinction.

3

Additionally, *District of Columbia v. Beretta U.S.A. Corp.,* 872 A,2d 633 (2005), which the District cites (Doc. 8 at 16-17), provides the District no help. That case did not construe the statute in question to apply only to commercial manufacturing nor does it fairly imply a commercial only reach of the statute.

Finally, the court should decline DC's invitation to construe the statute to apply solely to commercial manufacturing as a matter of constitutional avoidance. Doc. 8 at 17. Read as DC suggests, the statute would still plainly be unconstitutional. DC cannot flatly prohibit commercial manufacture of firearms, a constitutionally protected right, any more than the city may prohibit possession of firearms. *See District of Columbia v. Heller,* 554 U.S. 570 (2008). DC plainly dislikes firearms. But that train left the station December 15, 1791. Thus, no constitutional construction exists of D.C. Code § 7-2504(a)'s gun manufacturing ban.

For these same reasons the court should reject DC's discussion concerning the facial validity of D.C. Code § 7-2504(a)'s firearm manufacture ban. Doc. 8 at 18. First, this statute is not ambiguous. *See FCC v. Fox Television Stations, Inc*., 556 U.S. 502, 516 (2009). As we have shown above, D.C. Code § 7-2504(a) plainly applies to Mr. Heller's efforts to make a firearm. Therefore, the court need only resolve his as applied challenge at this stage of the case since the statute clearly applies to him. Moreover we disagree that a facial challenge of the statute fails because the statute in question has no legitimate sweep. We agree DC likely could prohibit manufacture of firearms without serial numbers or of firearms which are not detectible when passed through an X-Ray machine. *Id.* But the statute does not address those matters. The statute is a blanket ban on manufacture of a constitutionally protected item.

DC's argument is akin to saying that the court could reject a facial challenge to a blanket abortion ban by claiming that the statute would be constitutional if applied to a third

4

trimester abortion not otherwise necessary to protect the health of the mother. *See Roe v. Wade,* 410 U.S. 113, 163-165 (1973). *Roe,* however, did not parse the abortion ban it faced; it simply declared the Texas blanket abortion ban unconstitutional. *Id.* Similarly, DC's logic would reject a facial challenge to a statute that prohibited accused persons from being represented by counsel on the theory that at least one constitutional application of the statute exists; for example, prohibiting representation by counsel who had failed to pass the state's bar exam. Although that would be a constitutional application of the statute, the overall sweep of the statute is such that the unconstitutional applications overwhelm any constitutional applications.

In that vein, D.C. simply misstates the law on facial challenges. Chief Justice Roberts in his majority opinion in *U.S. v. Stevens*, 559 U.S. 460, 472 (2010) explained that in non-First Amendment cases,[3] "To succeed in a typical facial attack [a litigant] would have to

---

[3] Considerable authority suggests that First Amendment doctrine is appropriate for deciding Second Amendment issues. This would thus indicate that the First Amendment's overbreath doctrine is applicable to the Second Amendment. The First and Second Amendments both safeguard natural, pre-existing human rights, whereas Amendments 4-8 are mainly controls on particular government processes, and Amendments 9-10 are interpretive rules. *See generally* Kopel, *The First Amendment Guide to the Second Amendment,* 81 Tenn. L. Rev. 417 (2014). Just as in the First Amendment context, overbroad regulations on Second Amendment activity serve to chill exercise of Second Amendment rights.

*Heller's* majority opinion is replete with references to the First Amendment in explaining the scope and meaning of the Second Amendment. Lower court opinions have likewise relied on First Amendment analogies in deciding Second Amendment cases. *See, e.g., Ezell v. City of Chicago,* 651 F.3d 684, 697, 699, 702-03, 706-08 (7th Cir. 2011); *United States v. Marzzarella,* 614 F.3d 85, 89 n.4 (3rd Cir. 2010). And while subject to considerable criticism, various circuits have relied on the watered down intermediate scrutiny analysis of a First Amendment case, *Turner Broadcasting Systems v. FCC,* 520 U.S. 180 (1997), in rendering Second Amendment decisions. *See, e.g., Heller v. District of Columbia,* 670 F.3d 1244 (2011) (upholding the District of Columbia Council's prohibition of most semi-automatic rifles, and of firearms magazines holding more than 10 rounds of ammunition). *But see* the dissenting opinion in that case of now Justice Kavanaugh, 670 F.3d at 1280:

establish 'that no set of circumstances exists under which [the statute] would be valid,' *United States* v. *Salerno*, 481 U. S. 739, 745 (1987), **or** that the statute lacks any 'plainly legitimate sweep,' *Washington* v. *Glucksberg*, 521 U. S. 702, 740, n. 7 (1997) (Stevens, J., concurring in judgments) (internal quotation marks omitted)" (emphasis supplied).[4] Here the statute plainly lacks any legitimate sweep. It is not directed to firearms without serial numbers or to undetectable firearms. Its plain sweep is directed to prohibit any firearms from being made in the District, period. And that is something the District cannot do consistent with the Second Amendment no matter how much it believes that guns contribute to social harm. *See* Doc. 8 at 1 (claiming, "Guns beget gun violence.")

### b. The Second Amendment protects Mr. Heller's right to make a Glock type firearm.

Firearms are a constitutionally protected item. *District of Columbia v. Heller*, 554 U.S. 570. Mr. Heller seeks to make a **serialized and registered** firearm that is in all relevant characteristics identical to the nine mm Glock handguns DC issues to its police force, and which DC has registered for countless civilians for home protection and to carry on the street pursuant to DC issued concealed carry pistol licenses. The barrel, slide, trigger, and other

---

It is ironic, moreover, that Justice Breyer's dissent explicitly advocated an approach based on *Turner Broadcasting*; that the *Heller* majority flatly rejected that *Turner Broadcasting* based approach; and that the majority opinion here nonetheless turns around and relies expressly and repeatedly on *Turner Broadcasting*.

[4] Justice Stevens there said in relation to the *Salerno* standard, "I do not believe the Court has ever actually applied such a strict standard, even in *Salerno* itself, and the Court does not appear to apply *Salerno* here. At note seven he went on to say. "In other cases and in other contexts, we have imposed a significantly lesser burden on the challenger. The most lenient standard that we have applied requires the challenger to establish that the invalid applications of a statute 'must not only be real, but substantial as well, judged in relation to the statute's plainly legitimate sweep.' *Broadrick* v. *Oklahoma,* 413 U.S. 601, 615 (1973)."  521 U.S. at 740 & n.7.

associated metal parts are all identical to the parts which compose a factory manufactured Glock handgun. The sole difference is that he will be finishing the incomplete polymer receiver on which all Glock handguns are based and installing the metallic parts himself.

Mr. Heller intends to use this firearm for self-protection, target practice, and all other lawful firearm uses. According to DC, notwithstanding DC Code § 7-2504.01, he could do that, except that the gun will be made with a polymer receiver he will need to finish to turn the collection of parts into a completed firearm. Doc. 8 at 15. As DC acknowledges, the polymer receiver makes the finished Glock style handgun a Ghost Gun under its statute. Doc. 8 at 14. Indeed, the unfinished receiver itself constitutes a Ghost Gun under DC law. *See* DC Code § 7-2501.01(9B). In fact, DC's designation of an unfinished receiver as a Ghost Gun assures that no one may make a gun in the District, polymer frame or metal frame, since the very act of making a receiver requires that at some point in the manufacturing process the piece of metal or other material that would become the receiver would meet DC's definition of an unfinished receiver, as vague as that term is. Thus, the Ghost Gun law itself amounts to a ban on manufacture of firearms in the District because it is a ban on making receivers. Among other things, thereto, DC's claim that Mr. Heller is not prohibited from manufacturing a gun in the District is simply false.

Other than how Mr. Heller's intended firearm is made, once made it will be, contrary to DC's suggestion (Doc. 8 at 19 n. 17), the type of gun commonly and typically possessed by law abiding citizens for lawful purposes. DC has made no showing that such a firearm if registered and serialized as Mr. Heller averred he would do, is such a dangerous and unusual firearm as to be denied Second Amendment protection. *See District of Columbia v. Heller,* 554 U.S. at 627. This should be contrasted with some type of unusual, exotic firearm like the

Cody Wilson Liberator 3-D printed gun. That firearm does raise legitimate concern since the gun can function (albeit poorly) with less than 3.7 ounces of metal in violation of federal law and thus might pass undetected through a metal detector. That is the type of dangerous and unusual arm that may be constitutionally banned.

DC's suggestion that Mr. Heller's making a firearm himself does not implicate the Second Amendment because he already has guns and he can just as easily buy a firearm commercially (Doc. 8 at 20) is unavailing. As we showed in our preliminary injunction application, there is a long history and tradition of individuals making their own firearms. And there is no history or tradition of prohibiting the making of such firearms. That should be the end of the discussion. *See Wrenn v. District of Columbia,* 864 F.3d 650, 657-60, 663-65 (D.C. Cir. 2017) (analyzing DC's restrictive carry regime using the text, history, and tradition standard).

The District purports to denigrate Mr. Heller's efforts because he would be making his firearm from a kit rather than perhaps hammering out the parts on a blacksmith's anvil, which in any event DC law prohibits. *See* Doc. 8 at 20. Mr. Heller is no more constrained by the methods firearms were made at the founding than a modern-day author is constrained to publish his work by a hand-cranked printing press. A modern-day author may write on a computer and publish his work via the web while still maintaining full First Amendment protection. *See, e.g., Reno v. American Civil Liberties Union,* 521 U.S. 844, 849 (1997); *Kyllo v. United States*, 533 U.S. 27, 35-36, (2001) (Fourth Amendment). Mr. Heller may likewise use modern technology to manufacture a firearm. The Second Amendment is not bound to the technology of the founding period any more than is the First Amendment. *See Caetano v. Massachusetts,* 577 U.S. __, 136 S.Ct. 1027, 1028 (2016).

8

DC points to plaintiffs having other firearms available to them as a basis for asserting the burden on their Second Amendment rights is not substantial. Doc. 8 at 28. That argument is inconsistent with the D.C. Circuit's decision in *Heller v. District of Columbia,* 801 F.3d 264, 280 (2015) invalidating DC's limitation on citizens registering more than one gun a month. It is also inconsistent with the Supreme Court's rejection of DC's claim that it could ban handguns because D.C. residents could still have rifles and shotguns. *See Heller,* 554 U.S. at 629. *See also Parker v. District of Columbia,* 478 F.3d 370, 400 (D.C. Cir. 2007) ("Once it is determined – as we have done – that handguns are "Arms" referred to in the Second Amendment, it is not open to the District to ban them."

### c.   DC's manufacturing bans fails any degree of heightened scrutiny.

*Heller* rejected interest balancing in evaluating DC's handgun ban. *See* 554 U.S. at 634-35. An interest balancing approach is likewise inappropriate in evaluating DC's firearm manufacturing bans, either DC Code § 7-2504.01 or the provisions of the Ghost Gun legislation, both of which make it impossible to legally construct a firearm in the District. Even if an interest balancing test is used, however, DC's manufacturing bans fail the requirement of both intermediate and strict scrutiny that the regulation be narrowly tailored.

DC at least concedes that under intermediate scrutiny it must show that "'the means chosen are not substantially broader than necessary to achieve [an important governmental] interest.'" Doc. 8 at 22 (quoting *Ward v. Rock Against Racism,* 491 U.S. 781, 782-83 (1989). With respect to DC Code § 7-2504.01's blanket ban on manufacturing a firearm, DC has not here and cannot possibly meet it burden to show narrow tailoring because that statute is simply a broad ban against manufacture of any firearm whatsoever. Nor can DC meet its burden with respect to the challenged portions of its Ghost Gun provisions.

DC justifies both of its manufacturing bans, asserting they curb the flow of "unregistered and untraceable guns in the District." Doc. 8 at 24. DC claims banning firearm manufacturing is a "reasonable" means to limit the availability of firearms lacking serial numbers. Of course, DC never explains why it can't just prohibit the manufacture and possession of firearms without serial numbers. Indeed, the Ghost Gun legislation never even mentions serial numbers. And while DC claims the legislation is designed to address unregistered firearms, the Ghost Gun legislation actually **prohibits** registration (and thus the ability to trace) firearms it defines as Ghost Guns! *See* DC Code § 7-2502.02(a).

Something is seriously out of whack with either DC's proffered justification for this legislation or the legislation itself, if not both. Although perhaps some deference might be due to the city government's judgement as DC claims, *see* Doc. 8 at 24, it's hard to defer to a non-sequitur. In *Heller v. District of Columbia,* 801 F.3d at 275-80, the D.C. Circuit declined to simply defer to the city's justifications for its various registration requirements. Rather the Court analyzed the proffered justifications and the evidence to support them in light of the city's claimed governmental interests with the result that several of the city's regulations were held invalid under the Second Amendment. *Id.*

The conclusion DC's manufacturing ban and the challenged Ghost Gun provisions are overbroad in the extreme and sweep well into prohibiting Second Amendment protected conduct without justification is manifest. DC fails to address why a regime such as California (and as we discuss infra Connecticut) has adopted, which requires the maker of a self-made firearm to apply in advance for a state issued serial number and affix that serial number to the self-made firearm, does not solve the problems DC claims to which its Ghost Gun legislation is directed. Regimes such as California's and Connecticut's assure the firearm is

traceable and that the maker is not a prohibited person. DC does not explain why a regulatory regime similar to what ATF is proposing with respect to so-called Ghost Guns does not meet its concerns. *See Notice of Proposed Rule Making*, *Definition of Frame or Receiver and Identification of Firearms,* 2021 R-05, 86 FR 27720 (May 21, 2021). ATF's proposal would classify unfinished receiver kits like Mr. Heller sought to register with DC as firearms and require the unfinished receiver contained in such a kit to bear a serial number. All firearms made from such kits would thus bear serial numbers and be fully traceable.

Nor does DC address why less drastic measures would not satisfactorily achieve its legitimate interests. *See McCullen v. Coakley*, 573 U.S. 464, 495 (2014) ("To meet the requirement of narrow tailoring, the government must demonstrate that alternative measures that burden substantially less speech would fail to achieve the government's interests, not simply that the chosen route is easier"). We suggested several. *See* Doc. 6 at 38-39; Doc. 6-4 at 6. DC's response was silence.[5] DC's silence with respect to less restrictive alternatives is telling given it acknowledges its legislation cannot be substantially broader than necessary to achieve its legitimate interests.[6] *See* Doc. 8 at 22. Plaintiffs are thus likely to succeed on the merits of their claims the manufacturing bans are unconstitutional.

**d.  DC's ban on legally manufactured polymer receiver guns is unconstitutional.**

DC admits our claim it has outlawed otherwise legally registered polymer receiver firearms, such as the Glock series, is accurate. Doc. 8 at 25. DC justifies its banning of the

---

[5]  DC fails to point to anything in the legislative record with respect to its Ghost Gun provisions where the City Council considered any lesser restrictive measures. *See generally* Doc. 8. Our review of the legislative record failed to indicate any consideration of lesser restrictive measures.

[6] We note that limiting firearms in the hands of law-abiding citizens is not a legitimate governmental interest. *See District of Columbia v. Heller,* 554 U.S. 570.

most popular handgun possessed in America,[7] and similar polymer frame firearms, because DC says they risk passing through metal detectors undetected. DC fails to provide one single example of this ever occurring, however. DC wholly ignores that a bare firearm receiver cannot cause any harm. Without additional components, a bare receiver cannot fire a round. The additional parts necessary to fire a round are the magazine, which holds metal cartridges, the metal barrel, and the metal slide mechanism.[8] These major firearm parts cannot pass through a standard metal detector without being detected. For this reason, federal law does not ban polymer receivers. Nor does any other state in the union. Eight states have passed so-called Ghost Gun laws: California, Connecticut, Hawaii, Nevada, New York, New Jersey, Rhode Island and Washington State. Although several of these laws address undetectable firearms, none purport to ban bare polymer receivers. Attached herewith as Exhibit 2 are copies of the relevant statutes of these jurisdiction which we discuss below.[9]

---

[7] Forbes reports, "Glock has a nearly 65% market share of the handguns in the U.S., according to Rommel Dionisio, managing director at brokerage firm Aegis Capital." *See* https://www.forbes.com/sites/denizc...-who-got-rich-off-glock-pistols/#7731cbc04e50. He was apparently speaking of sales to law enforcement agencies and not the general public. Nonetheless, a million or so Glocks are sold in the U.S. annually based on numbers of Glock firearms produced locally and imported from Austria. *See* https://www.atf.gov/firearms/docs/report/2019-firearms-commerce-report/download at 9 (927,524 handguns imported from Austria in 2018).

[8] Attached as Exhibit 1 are photographs of a Glock 26 handgun, registered in the District of Columbia, broken down into its major component parts: the polymer frame, the metal slide mechanism, the metal barrel, the part metal/part plastic recoil spring assembly, and a loaded magazine concerning 10 metallic cartridges. Without these other metal parts, the polymer receiver is harmless, which is why 18 U.S.C. § 922(p), requires no metal to be contained in the receiver of a firearm.

[9] New York's law was just recently signed into law and Plaintiff's have not found a codified edition.  Accordingly, the text of the enacted law, S13A, is presented in Exhibit 2. Similarly, Nevada's statute is not yet codified, so the text of that statute has also been provided in Exhibit 2.

California Penal Code § 17280 defines undetectable firearms essentially identically to the federal statute, *see* 18 U.S.C. §922(p). It therefore does not ban polymer receiver firearms. A multitude of polymer receiver firearms are listed on California's list of so-called not unsafe firearms approved for sale in that state. ***See*** *https://www.oag.ca.gov/firearms/certified-handguns/search*.

Connecticut does not have a separate statute addressing undetectable firearms though it does require self-made firearms to contain a serial number. *See* Conn. Gen. Stat. 29-36a (a). The serial number may be obtained from the State Department of Emergency Services and Public Protection similar to California's regime. *See Id.* & Conn. Gen. Stat. 29-36b.

Although Hawaii requires all firearms manufactured in the state to contain a serial number, it does not have a separate provision concerning undetectable firearms. *See* Hawaii Rev. Stat. 134-10.2.

Nevada is similar. While Nevada requires firearms manufactured in the state to have a serial number, including what it defines as "unfinished receivers," it does not have a separate undetectable firearm provision. *See* Nevada Bill AB-286 (effective Jan. 1, 2022).

New Jersey does define the term undetectable firearm and that definition essentially tracks the federal definition in 18 U.S.C. § 922(p); so, New Jersey does not prohibit polymer receiver firearms. *See* N.J.S. 2C:39-1(ii).

NY Con. Laws § 265.55 addresses undetectable firearms and essentially tracks the federal definition contained in 18 U.S.C. § 922(p). It accordingly does not restrict polymer frame firearms. New York's recently passed "Ghost Gun" law, S 13A, prohibits possession of unfinished receivers except as to persons licensed as gunsmiths but does not otherwise address undetectable firearms.

Rhode Island Stat. § 11-47-2(8) designates a Ghost Gun as a firearm, including a frame or receiver, lacking a serial number. The statute also addresses an undetectable firearm and the statutory definition tracks federal law, 18 U.S.C.§ 922(p). Additionally the statute designates firearms made **entirely** of plastic or fiberglass or through a 3D printing process as undetectable firearms, *see Id.* § 11-47-2(18), which is redundant of the federal statute since the federal statute requires a certain amount of metal in the major components of a firearm other than the receiver. *See* 18 U.S.C. §922(p).

Lastly, the State of Washington prohibits the manufacture for sale of an untraceable firearm or the provision of such firearm to a prohibited person, *see* RCW § 9.41.190 (1)(d); RCW §9.41.325. It does not prohibit the private manufacture of such a firearm by a person who is not prohibited from possessing firearms. An untraceable firearm is defined as a firearm without a serial number manufactured after July 1, 2019. RCW 9.41.010(35). Washington State also prohibits the manufacture or possession of an undetectable firearm. RCW §9.41.190 (1)(a). The definition of an undetectable firearm comports with the federal definition contained in 18 U.S.C. § 922(p). *See* RCW  §9.21.010(33).

Not one of these eight states which have adopted legislation to control Ghost Guns has sought to outlaw commercially produced polymer receiver firearms such as the Glock series of pistols or polymer frame receiver firearms made by other manufacturer. Each of these jurisdictions to the extent they address the issue have defined undetectable firearms consistent with the federal definition set forth in 18 U.S.C. § 922(p). We know of no state that has gone as far as the District to purport to outlaw the millions of polymer frame firearms possessed for self-defense by law-abiding citizens throughout the United States, nor the thousands of such firearms that are currently legally registered in the District and which

Plaintiffs Hanson and Elby possess for self-defense. The District has certainly not pointed to one other jurisdiction having adopted such a draconian measure.

Nor has DC pointed to any example of harm presented by a bare polymer receiver passing undetected through a metal detector. Anywhere. To be sure DC points to unregistered unserialized guns found at crime scenes. And we don't dispute that untraceable firearms are a legitimate concern DC may Constitutionally address through appropriately tailored legislation that does not intrude on Second Amendment rights. Outlawing the entire class of serialized, registered polymer frame firearms containing metal barrels and metal slide assemblies that are readily detected by X-Ray machine and metal detectors simply does not address the harms as to which DC's Ghost Gun legislation is directed.

Tellingly, DC failed to respond to the expert report we provided of former ATF firearms examiner Richard Vasquez. Doc. 6-4. Indeed, DC's opposition provides no affidavit or expert testimony whatsoever to support its factual claims. DC simply without further explanation or support of any kind asserts its ban on polymer frame firearms is "sufficiently tailored." Doc. 8 at 26. A lot more than its bare assertion is required to justify such a sweeping prohibition and restriction on the Second Amendment rights of its citizens. In sum, DC's defining commercially produced polymer frame firearms as Ghost Guns is simply irrational and it thereby flunks any degree of Constitutional scrutiny, including rational basis.

**e. DC cannot arbitrarily restrict the firearms its citizens choose for self-protection.**

*Heller* states the Second Amendment applies *prima facie* to all bearable arms. *See* 554 U.S. at 629. The D.C. Circuit in *Parker v. District of Columbia,* 478 F.3d at 400 said, "[o]nce it is determined – as we have done – that handguns are "Arms" referred to in the Second

Amendment, it is not open to the District to ban them." Although *Heller* found no fault with that explanation, *Heller* does instruct that the carrying of dangerous and unusual arms can be limited. 554 U.S. at 627. So, the controlling principal is that arms cannot be banned unless they are both dangerous and unusual.

DC quotes *Wrenn*, 864 F.3d at 662, that "firearm restrictions must leave "alternate channels for exercising core Second Amendment rights, citing *Heller v. District of Columbia,* 670 F.3d at 1262. (Doc. 8 at 26). That *Heller* decision actually used the words "ample channels" and *Wrenn* uses the word "ample" repeatedly. *See, e.g.,* 864 F.3d at 662-63. To the extent DC is asserting this wording in *Wrenn* and *Heller II* are inconsistent with *Heller* and *Parker*, this court must follow *Heller* and *Parker.* Presumably, DC is suggesting the challenged provisions leave "ample channels" for the exercise of Second Amendment rights. Well, let's think about that. DC prohibits manufacture of any firearm. Hence, there is no ample channel to make a gun in the city. DC admits firearms cannot be made commercially here and the only logical reading of DC Code § 7-2504.01(a), as we discussed above, forecloses the non-commercial firearm manufacture. So, no ample alternatives there.

Next, the unfinished receiver prohibition also renders is impossible to make a gun, which by definition requires a finished receiver, laying aside the issue for now exactly when a block of some substance becomes an unfinished receiver on the way to becoming a finished receiver. So, no ample channels exist there either. Were the legislation to say that at the point the unfinished receiver becomes an unfinished receiver, it must contain a government issued or recorded serial number, that would offer at least an alternative channel for the exercise of Second Amendment rights to manufacture a firearm. Of course, no evidence exists that DC ever even considered that alternative.

DC would have this court examine the burden on Mr. Heller self-defense rights in his being forbidden to make a firearm. Putting aside DC's false promise that Mr. Heller can make a firearm with a metal receiver – which he obviously may not since it would run afoul of the unfinished receiver prohibition – DC posits that the burden on Mr. Heller is slight since he already owns firearms and presumably can simply buy more. *See* Doc. 8 at 21-22. Yet, if DC may ban the manufacture of firearms Constitutionally, then so may every other state and/or the federal government. At that point the Second Amendment right to own a firearm would cease and the burden would become overwhelming. There either is or is not a Second Amendment right to make a firearm. DC says there is not. If DC is correct, then there is no right to keep or bear that which can be prohibited from being made.

Moving on to the issue of polymer frame firearms, DC asserts the burden of DC Code § 7-2501.01(9B)(i)'s definition of Ghost Gun (the polymer receiver ban) in Second Amendment rights is slight because Mr. Hanson and Mr. Elby can keep and carry other entirely metal firearms. *See* Doc 8 at 25. Not so fast. We presented expert testimony of the particular utility of polymer frame handguns for self-defense. *See* Doc. 6-4 at 2-3.  And we presented expert testimony that polymer frame firearms are not a public safety risk. *Id.* at 3-5. DC presented no contrary evidence other than the speculative assertions of counsel.[10]

DC has presented no evidence polymer frame firearms are unusually dangerous or not useful for self-defense. DC does not contest that polymer frame firearms such as Glocks are commonly owned by law abiding persons for self-defense and other lawful purposes. Indeed,

---

[10]  One would have thought that if commercially made polymer frame pistols truly are a public menace, Defendant MPD Chief Robert Contee would have tendered a sworn statement to support DC's characterization of such firearms. Of course, that would also raise the question why the Chief carries such a "dangerous and unusual firearm" himself and requires his officers to do so as well, both on duty and off duty. The lack of any such support for DC's position here is telling.

as shown by the attached Declaration of DC Firearms Instructor Mark G. Briley, Exhibit 3 hereto, polymer frame handguns are particularly suited for self-defense. Mr. Briley states that some 90 percent of his students in his Utah, Virginia, Maryland and DC concealed carry classes use polymer frame handguns. *See also* Exhibit 4 (Declaration of Marina Galli). Even DC concedes that firearms "most useful for self-defense" must remain accessible. Doc. 8 at 28, quoting *Wrenn,* 864 F.3d at 663 (citing *Heller,* 554 U.S. at 627). Yet DC bans them.

Even assuming intermediate scrutiny is the appropriate test for judging a ban on the most popular self-defense arms in the country – and we take issue with that assumption – the burden is on DC to show an actual, not imagined, public safety interest that is reasonably addressed by its ban on polymer receiver firearms. *See Heller v. District of Columbia,* 801 F.3d at 275-80. As the Second Circuit put it, "[O]n intermediate scrutiny review, the state cannot 'get away with shoddy data or reasoning.' To survive intermediate scrutiny, the defendants must show 'reasonable inferences based on substantial evidence' that the statutes are substantially related to the governmental interest." *New York State Rifle and Pistol Association v. Cuomo,* 804 F.3d 242, 266 (2d. Cir. 2015) (invalidating New York's seven round magazine limit) (footnotes and citations omitted). DC has shown nothing of the kind. Significantly, the legislative record is barren as to any discussion of public danger posed by commercially produced polymer frame firearms. *See* Public Hearing on B23-0018 (October 3, 2019), available at, https://lims.dccouncil.us/downloads/LIMS/41601/Hearing_Record/B23-0018-HearingRecord2.pdf. And DC has cited no other evidence in support of the ban.

It appears obvious to us DC allowed one of the various anti-gun lobbying groups to write its Ghost Gun legislation, without anyone in the DC government actually taking the

time or effort to think through what DC Code § 7-2501.01(9B)(A)(i) actually meant,[11] and now the Attorney General's office, to avoid political embarrassment, is stuck trying to defend this nonsensical, outlier provision. Because DC has failed to offer a sufficient justification for DC Code § 7-2501.01(9B)(A)(i)'s definition of a Ghost Gun, Plaintiffs are likely to prevail in their claim that this provision is unconstitutional.

### f.  Contrary to DC's suggestion, we are not claiming a right to build a gun without a serial number.

DC disputes our claim that text, history, and tradition should control the question of the unconstitutionality of its manufacturing bans by a largely irrelevant discussion of the need for serial numbers on firearms and the concomitant ability to trace such firearms. Doc. 8 at 29-34.[12] However, Mr. Heller had his firearm kit specifically sent to a District federal firearms licensee so that it could be registered, and he averred his intention to mark the firearm with a serial number. DC is thus arguing against a straw man. We don't contend there is a constitutional right to possess a firearm that lacks a serial number, homemade or commercially made. Our contention is that based on the text, history, and tradition of the Second Amendment there is a right to manufacture a firearm. That right like all rights is not unlimited. As we said in our preliminary injunction application, DC can impose all sorts of regulations on self-made firearms, serial numbers, advance application requirements, inspections, licenses, etc. Doc. 6 at 37-39.

---

[11]  This is evident by the fact that despite that DC law prohibits "Ghost Guns" from being registered, MPD has been registering polymer frame handguns such as Glocks since the enactment of the Ghost Gun legislation. *See* Declaration of Marina Galli, Exhibit 4, hereto.

[12]  Of course none of that discussion, serves to justify either DC's outright ban on the manufacture of any firearm in the District or its outlawing of commercially produced polymer frame firearms.

So contrary to DC's assertion, the construction of self-made firearms need not occur outside the government's traditional control methods. *See* Doc. 8 at 33. California's and Connecticut's regulatory schemes are prime examples of narrowly tailored regulations that ensure legitimate governmental interests are protected in the context of self-made firearms. DC's legislation lacks any such attempt at narrow tailoring and that is why Plaintiffs are likely to prevail on the merits in this case.

### g. DC's unfinished receiver provision (DC Code § 7-2501.01(17B)(A) is still vague.

DC disputes that its unfinished receiver provision is unconstitutionally vague. Doc. 8 at 35-36.  In its discussion, DC fails to address either of the Sixth Circuit cases we cited for the vagueness of DC Code § 7-2501.01(17B)(A). *See Springfield Armory v. City of Columbus,* 29 F.3d 250, 252 (6th Cir. 1994) (focusing on the lack of criteria to determine the meaning of "slight modification"); *Peoples Rights Organization v. City of Columbus*, 152 F.2d 522, 538 (6th Cir. 1998) (finding the term "readily assembled" to be vague because it did "not provide sufficient information to enable a person of average intelligence to determine whether a particular combination of parts is within the ordinance's coverage." DC does admits its statute lacks a specific scienter requirement and suggests the court should read such a requirement into to the statute. Doc. 8 at 36-37.

DC cites a number of cases relating to machine guns and the term "readily restored" in the context of a gun capable of being converted or restored to fire in full automatic mode. *See* Doc. 8 at 35-36 ns.27-28. Suffice it to say there is a substantial body of law with respect to that particular question. As the court in *M-K Specialties Model M-14 Machinegun,* 424 F.Supp.2d 862, 869 (N.D.W.Va. 2006) explained:

"The intent of the 'ready restoration' clause is, at least, to statutorily include a weapon that is inoperable as a fully automatic weapon on the occasion of the alleged unlawful possession but is capable of renewed automatic operation by the purposeful deployment of a practicable effort." *U.S. v. Aguilar-Espinosa*, 57 F.Supp.2d [1359,] 1362-63 [(M.D.Fla 1999)]. The restoration process may require:

> (1) the ability of a reasonably skilled and knowledgeable individual, but not necessarily an expert or artistic worker; and

> (2) tools that are readily available to, and commonly understood by, such individuals.

*Id.* In *Aguilar-Espinosa*, the court noted that readily available tools included Allen wrenches, files, jeweler's screw drivers, but excluded the resources available to a master machinist with a modern well-equipped lathe. *Id.*

It further stated that "[t]he applicable test is the 'readiness' of the restoration rather than its ultimate feasibility." *Id.* With respect to "readiness" of restoration, the Eighth Circuit has held that a firearm was "readily restorable" even though the process of restoration would require an eight-hour working day in a properly equipped machine shop. *U.S. v. Smith*, 477 F.2d 399, 400 (8th Cir.1973).

With respect to the legislation at issue here there is no well-developed body of law interpreting the term "readily made." Moreover, that term is limited by the further ambiguous term "without the expenditure of substantial time and effort," a limitation not present in the body of judicial interpretation of "readily restored" in the machine-gun cases on which DC relies that look at the capability of restoration of a firearm to fire automatically. *United States v. Aguilar-Espinosa*, 57 F.Supp.2d at 1362-63. For these reasons, the machine gun cases DC cites are inapposite and *Springfield Armory v. City of Columbus,* 29 F.3d 250, and *Peoples Rights Organization v. City of Columbus*, 152 F.2d 522 should be persuasive for the conclusion that that DC Code § 7-2501.01(17B)(A) is unconstitutional vague.

### III.    Plaintiffs have shown irreparable injury.

The District denies that Plaintiffs suffer an irreparable injury from the provisions challenged in this action. However, that effort is unavailing. DC contests the teaching of *Elrod v. Burns,* 427 U.S. 347, 373 (1976) that the loss of constitutional rights for even minimal periods constitutes irreparable injury. Doc. 8 at 39, citing *Chaplaincy of Full Gospel Churches,* 454 F.3d 290, 300 n.7 (D.C. Cir. 2006) (noting that *Elrod* was a plurality opinion). The D.C. Circuit has recently been much more definitive on the matter, however. In *Mills v. District of Columbia,* 571 F.3d 1304, 1312 (D.C. Cir. 2009) the D.C. Circuit said:

> We further conclude that appellants have sufficiently demonstrated irreparable injury, particularly in light of their strong likelihood of success on the merits. See *CityFed Fin. Corp.*, 58 F.3d [738,] 747 [1995]. . . . It has long been established that the loss of constitutional freedoms, "for even minimal periods of time, unquestionably constitutes irreparable injury." *Elrod v. Burns*, 427 U.S. 347, 373, 96 S.Ct. 2673, 49 L.Ed.2d 547 (1976) (plurality opinion) (citing *New York Times Co. v. United States*, 403 U.S. 713, 91 S.Ct. 2140, 29 L.Ed.2d 822 (1971)). Granted, the District is not currently imposing an NSZ checkpoint, but it has done so more than once, and the police chief has expressed her intent to continue to use the program until a judge stops her.

*See also BST Holdings, L.L.C. v. OHSA,* Case No. 21-60845, slip op. at 19 (Fifth Cir. Nov. 12, 2021). Moreover, this is a particular type of case where the legislation at issue serves to chill Constitutional conduct. *See Chaplaincy of Full Gospel Churches v. England*, 454 F.3d at 301.

In any event, there is no question but that Mr. Heller's Second Amendment rights have been violated as DC has not disputed that MPD directed Mr. Heller's firearm kit to be returned to the vendor. So, he has suffered a concrete injury by the denial of the firearm kit. Mr. Godwin and Mr. Hanson have also suffered concrete injuries to their Second Amendment rights. DC criminalizes their possession of their registered, commercially

produced polymer frame pistols. Not only do they fear DC will attempt to revoke their registrations and confiscate their firearms, but they are also subject to arrest if they continue to exercise their Second Amendment freedoms by possessing the banned polymer frame registered pistols. It is hard to fathom a more immediate, concrete, serious Constitutional injury. Thus, Plaintiffs suffer irreparable injury from the provisions at issue in this case.

**IV.    The balance of equities and the public interest favor grant of the injunction.**

DC argues the balance of equities and the public interest favors denial of the requested injunction. Doc. 8 at 41-42. However, we pointed out in our preliminary injunction application that the D.C. Circuit has acknowledged the "obvious" fact that "enforcement of an unconstitutional law is always contrary to the public interest." *Gordon v. Holder*, 721 F.3d 638, 653 (D.C. Cir. 2013), as have other circuits. *E.g., K.A. ex rel. Ayers v. Pocono Mountain Sch. Dist.*, 710 F.3d 99, 114 (3d Cir. 2013) ("[T]he enforcement of an unconstitutional law vindicates no public interest."). Doc. 6 at 42.

DC does not dispute this statement of the law. Rather it falls back on its need to address the problem of Ghost Guns. Doc. 8 at 41. Nothing, however, stops DC from quickly amending the offending provisions of its Constitutionally infirm legislation to properly tailor those provisions to pass Constitutional muster. Plaintiffs would not object to a brief stay (e.g., 30-45 days) of the court's injunction to allow DC to do so if it should so choose, provided, however, that there be no stay of enjoining the enforcement of the Ghost Gun provisions as they relate to commercially manufactured polymer receiver firearms that comport with federal law and otherwise comport with DC law. *See Palmer v. District of Columbia*, Case No. 1:09-cv-01482 FJS, Doc. 66 (Sept. 19, 2014) (copy attached as Exhibit

5. Thus, the District's legitimate interests could be protected while Plaintiffs received the relief requested.[13] For these reasons, grant of the requested injunction is in the public interest.

## V.   Conclusion.

Plaintiffs have met the requirements for grant of a preliminary injunction.  They have shown the likelihood of success on the merits, that they suffer irreparable injury, that the balance of harms favors an injunction and that an injunction is in the public interest. Plaintiff's request the court to enter the requested preliminary injunction.

---

[13] Plaintiffs have been made aware that the City Council on November 16, 2021 passed an emergency measure to address the issues Plaintiffs raise. Plaintiffs are still studying that emergency measure which is not yet effective.

We note that Defendants' voluntary cessation of their unconstitutional action would not in any event moot this case. *See Knox v. Serv. Emps. Int'l Union, Local 1000,* 567 U.S. 298, 307 (2012). Unless the party asserting mootness can prove that it is "absolutely clear that the allegedly wrongful behavior could not reasonably be expected to recur," *Parents Involved in Cmty. Schs. v. Seattle Sch. Dist. No. 1*, 551 U.S. 701, 719 (2007), its voluntary cessation of the challenged practices does not suffice to deprive a court of Article III jurisdiction. *See also Chafin v. Chafin,* 568 U.S. 165 (2013); *Adarand Constructors, Inc. v. Slater,* 528 U.S. 216, 222 (per curiam). Among other things, Mr. Heller is seeking damages against the District for its unconstitutional action. If and when the city suggests that any of the claims at issue here are moot, we will fully address the matter.

Respectfully submitted,

**DICK ANTHONY HELLER**

**ANDREW HANSON**

**ELBY GODWIN**

/s/ George L. Lyon, Jr.
Matthew J. Bergstrom (D.C. Bar No. 989706)*
George L. Lyon, Jr. (D.C. Bar No. 388678)
Arsenal Attorneys
4000 Legato Rd, Suite 1100
Fairfax, VA. 22033

1929 Biltmore Street NW
Washington, DC 20009
202-669-0442, fax 202-483-9267
Attorney for Plaintiffs
gll@arsenalattorneys.com

*Admission to D.C. District Court Pending
November 18, 2021

## CERTIFICATE OF SERVICE

I, George L. Lyon, Jr., a member of the bar of this court, certify that I have served this 18th day of November, 2021, a copy of the foregoing Reply to Opposition to Application for Preliminary Injunction on all counsel of record via the court's electronic filing system.

/s/George L. Lyon, Jr., DC Bar 388678